## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SERGEANT WILBUR F. JUSTICE,    )
        )
    Plaintiff,        )
        )
    v.        )
        )    C. A. No. 06-497-SLR
STANLEY W. TAYLOR, JR., in his    )
official capacity as the Commissioner    )
of Correction; ALAN MACHTINGER    )
individually and in his official capacity    )
as the Director of Human Resources    )
of the Department of Correction;    )
and DEPARTMENT OF CORRECTION)
of the STATE OF DELAWARE,    )
        )
    Defendants.        )

## APPENDIX TO DEFENDANTS' OPENING BRIEF

## IN SUPPORT OF SUMMARY JUDGMENT

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Marc P. Niedzielski (ID 2616)
Stephani J. Ballard (ID 3481)
Deputy Attorneys General
820 North French Street
6th Floor
Wilmington, DE 19801
(302) 577-8324

DATED:  February 26, 2008

# TABLE OF CONTENTS

AFFIDAVIT OF ALAN MACHTINGER.................................................................A000001

DEPOSITION OF WILBUR JUSTICE.................................................................A000002

DEPOSITION OF ALAN MACHTINGER ...........................................................A000030

PRESS RELEASE ISSUED BY THE NEUBERGER FIRM ON
    AUGUST 11, 2006.................................................................................A000051

PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' REQUESTS
    FOR ADMISSIONS TO PLAINTIFF PURSUANT TO F.R.C.P. 36...........A000052

PLAINTIFF'S AMENDED ANSWERS AND OBJECTIONS TO DEFENDANTS'
    FIRST SET OF INTERROGATORIES ......................................................A000061

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SERGEANT WILBUR F. JUSTICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C. A. No. 06-497 *** |
| STANLEY W. TAYLOR, JR., in his | ) |
| | ) |
| Defendants. | ) |

### AFFADIVIT OF ALAN MACHTINGER[1]

State of Delaware //
Kent County// ss

I, Alan Machtinger, having been duly sworn do state the following to be true and correct:

Exhibit 1 to my deposition is my employee time card for the year 2004. The time card correctly records that I was on vacation leave for the weeks of July 19 and August 2, 2004. However, in reviewing my credit card records, the timecard does not reflect that I was also on vacation July 29-30, 2004 and August 9-10, 2004. I do not have any records regarding my work status for July 26-28, 2004, but believe I might have been at work.

_____
Alan Machtinger

SWORN AND SUBSCIRBED before me this 12TH day of October, 2007

JEANETTE J. CHRISTIAN
Notary Public, State of Delaware
My Commission Expires May 23, 2009

_____
Notorial Officer

---

[1] In accordance with agreement of counsel at the deposition of Alan Machtinger conducted by the plaintiff on September 13, 2007, defendants submit this declaration as a supplement to that deposition.



**WILCOX & FETZER LTD.**

## In the Matter Of:

## Justice

## v.

## Taylor, et al.

### C.A. # 06-497

---

### Transcript of:

### Wilbur F. Justice

### October 17, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Justice v. Taylor, et al.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF DELAWARE

SERGEANT WILBUR F. JUSTICE,          )
                                     )
            Plaintiff,               )
                                     )  Civil Action No.
v.                                   )  06-497
                                     )
STANLEY W. TAYLOR, JR., in his       )
official capacity as the Commis-     )
sioner of Correction; ALAN           )
MACHTINGER, individually and in      )
his official capacity as the         )
Director of Human Resources of       )
The Department of Correction; and    )
DEPARTMENT OF CORRECTION OF THE      )
STATE OF DELAWARE,                   )
                                     )
            Defendants.              )

            Deposition of WILBUR F. JUSTICE taken
pursuant to notice at the law offices of the
Department of Justice, 820 North French Street, Carvel
State Building, 6th Floor, Wilmington, Delaware,
beginning at 10:04 a.m. on Wednesday, October 17,
2007, before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street, Suite 302
          Wilmington, Delaware  19801-3707
          For the Plaintiff

        MARC P. NIEDZIELSKI, ESQUIRE
        DEPARTMENT OF JUSTICE
          820 North French Street
          Wilmington, Delaware  19801
          For the Defendants

              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Justice v. Taylor, et al.
Wilbur F. Justice

---

**Page 2**

1    WILBUR F. JUSTICE, the deponent herein,
2   having first been duly sworn on oath, was examined and
3   testified as follows:
4   BY MR. NIEDZIELSKI:
5      Q.  Good morning, Mr. Justice, we have met
6   before —
7      A.  Right.
8      Q.  — correct?  My name is Marc Niedzielski and I
9   represent the defendants in this case and I'm going to
10  be asking you a series of questions.  Is there any
11  reason, physical reason or medical reason, why you
12  would not be able to understand questions I pose to
13  you?
14     A.  No.
15     Q.  And is there any medical reason or physical
16  reason why you wouldn't be able to truthfully respond
17  to those questions?
18     A.  No.
19     Q.  Let's start with the basics.  When were you
20  born?
21     A.  October 24th, 1947.
22     Q.  And that makes you how old?
23     A.  I'll be 60 next Wednesday.
24     Q.  Happy birthday.

---

**Page 3**

1      A.  Thank you.
2      Q.  Where were you born?
3      A.  In Lewes, Delaware.
4      Q.  And —
5      A.  At Lewes Hospital, Lewes Delaware Hospital.
6      Q.  Beebe Hospital?
7      A.  Yes.
8      Q.  And do you have any brothers or sisters?
9      A.  Yes, I do.
10     Q.  What do you have?
11     A.  Right now I have ten -- it was nine more
12  brothers and it's five sisters.
13     Q.  Are they all still living?
14     A.  Yes, they are.
15     Q.  Are they all living in the local area around in
16  Sussex County?
17     A.  Well, some I think -- well, it is three that
18  stayed and four in Millsboro, Delaware.  We have
19  Maryland, New Jersey, Wilmington, Delaware and one in
20  Florida.
21     Q.  Are your parents either of your parents still
22  living?
23     A.  Both of them are deceased.
24     Q.  Do you know approximately when they passed?

---

**Page 4**

1      A.  My mother passed October of '89.  My father
2   passed in April of '98.
3      Q.  And where did you attend school?
4      A.  I went to Millsboro, 204 Millsboro, Delaware,
5   graduated from there and went to William C. Jason,
6   Georgetown, Delaware.
7      Q.  Was that a high school?
8      A.  Yeah, high school.
9      Q.  It was called —
10     A.  William C. Jason.
11     Q.  Is it still there?
12     A.  Now it's Del Tech, a community college in
13  Georgetown.
14     Q.  Did you graduate from high school?
15     A.  Graduated in 1965.
16     Q.  What did you do after you graduated from high
17  school?
18     A.  After I graduated from high school I worked at
19  chicken factory until October of '66.
20     Q.  And what happened in October of 1966?
21     A.  I was drafted into the Army.
22     Q.  Did you get your notice?
23     A.  Yes.
24     Q.  Your 1A?

---

**Page 5**

1      A.  Yes.
2      Q.  Report for physical induction?
3      A.  Exactly.
4      Q.  And you were drafted into the U.S. Army?
5      A.  Yes.
6      Q.  And where did you go for basic training?
7      A.  I went to South Carolina, basic training.
8      Q.  Do you remember the name of the facility?
9      A.  Fort Jackson.
10     Q.  Wasn't that the home of the straight leg
11  infantry?
12     A.  Yes, it was.
13     Q.  And did you do basic training there?
14     A.  I did, yes, I did basic training at Fort
15  Jackson.
16     Q.  Did you do any additional training after basic?
17     A.  No.  I left Fort Jackson and went to Chicago,
18  Illinois and did AIT there.
19     Q.  Advanced infantry training?
20     A.  Yes.  It was more or less into administrative,
21  but still doing AIT, which is usually other training
22  related to basic training.  This was like on-the-job
23  training.
24     Q.  This was advanced individual training?

---

2 (Pages 2 to 5)

Justice v. Taylor, et al.
Wilbur F. Justice

6

1   A.  Yes.
2   Q.  What was your MOS?
3   A.  71 -- at that time it was 74B20.
4   Q.  Was that a clerk?
5   A.  Yes, key punch operator clerk.
6   Q.  How long were you in Chicago getting that
7   training?
8   A.  I was in Chicago -- well, after the training I
9   stayed on at the same job for 14 months.
10  Q.  Why did you stay there at -- why did you stay
11  there?
12  A.  Chicago?
13  Q.  Yes.
14  A.  We was working downtown Chicago so one of the
15  units was stationed downtown that stayed in one of the
16  buildings.  They made it more or less like a post
17  right downtown Chicago.  So, I worked downtown Chicago
18  at one of the administrative buildings for the
19  military.
20  Q.  Do you remember what unit you were supporting
21  at that time?
22  A.  Fifth Army.  Then, they eventually moved to Ft.
23  Sheridan, which is in Chicago.
24  Q.  But you were there for 14 months?

7

1   A.  In Chicago.
2   Q.  And then where did you go after that?
3   A.  After that there I went to he Vietnam.
4   Q.  Where were you stationed in Vietnam?
5   A.  I was at Long Bend.
6   Q.  What is the name of the big prison there?
7   A.  They had a prison -- they had a prison there,
8   but I'm thinking it was at Bien Hoa.
9   Q.  Which core area was Long Bend, was it second
10  core, third core?
11  A.  I'm not for sure about which core it was, I'm
12  not for sure which core it was.
13  Q.  Was it in a coastal area?
14  A.  Pretty much, it was close by Saigon.
15  Q.  They used to call it LBJ?  Did they use to call
16  it LBJ?
17  A.  Yes.
18  Q.  And it was pretty close to Saigon?
19  A.  Yes.
20  Q.  What you was your duty assignment there?
21  A.  I still went out there and did the same job as
22  in Chicago, key punch operator.
23  Q.  Were they in support of a logistics unit or
24  something like that?

8

1   A.  Yes.
2   Q.  Did you use to have to -- remember those
3   federal service numbers when you order a part, do you
4   remember typing this real long number?
5   A.  Most of what we was typing in was we had these
6   cards and we were typing in people that had gotten
7   wounded, people that had got killed, sending them back
8   to the states where they could turn around and
9   identify who the person was, set up where they could
10  go to the family and say this is what happened.  Not
11  giving full details, but let me know that this person
12  died, what date and everything.
13  Q.  Your job was to key punch in the name of the
14  soldier?
15  A.  Yes.
16  Q.  Whether he is wounded or killed?
17  A.  Right.
18  Q.  And that was amongst a stack of cards?
19  A.  Of cards.  Then, they would put it into -- it
20  would run through the computer.  They had the
21  computers that went around at that time and they would
22  put it on a tape and then they would send it back to
23  the states.
24  Q.  They would transmit it back to the states --

9

1   A.  Yes.
2   Q.  -- or send the tape back?  Do you recall?
3   A.  Send the tape back.
4   Q.  How long were you at LBJ?
5   A.  I was there my last six months and 24 days.
6   Q.  You were there six months and 24 days?
7   A.  Yes, six months approximately, 24 to 26 days.
8   Q.  That was called a short tour, right?
9   A.  Yes.
10  Q.  Because a normal tour was 13 months, correct?
11  A.  Yes.
12  Q.  And what rank were you at that time?
13  A.  E4 specialist.
14  Q.  Do they still have the specialists?
15  A.  Yes, they do.
16  Q.  And it -- at one time is it correct it would go
17  all the way up to spec 9?
18  A.  At one time.
19  Q.  It doesn't go that far now?
20  A.  As far as it goes is spec 4.
21  Q.  That's it.
22  A.  That's it.
23  Q.  And then after that you go into the sergeant
24  non-com ranks?

3  (Pages 6 to 9)

Justice v. Taylor, et al.
Wilbur F. Justice

**10**

1    A.  Yes, sir.
2    Q.  When you got done your tour where were you
3    returned to?
4    A.  I came back -- well, after processing and
5    everything out of California, came back to Millsboro,
6    Delaware.
7    Q.  And what did you do there?
8    A.  Well, took a break for three months.
9    Q.  Did you collect unemployment benefits?
10    A.  No. I saved a little money so I didn't really
11    collect any unemployment at that time.
12    Q.  You saved some money?
13    A.  Came back and just sort of -- you know, glad to
14    be back home and then I started working at the DuPont
15    nylon plant in Seaford.
16    Q.  Now, when you got back out of the Army, do you
17    remember what year and what month it was?
18    A.  I got back it was in last of October of '68.
19    Q.  And then you took a couple months off. Do you
20    remember when you started at Seaford?
21    A.  Not for sure. I'm thinking it's around
22    January.
23    Q.  About 1969?
24    A.  '69.

**11**

1    Q.  Do you remember what your job was at the DuPont
2    nylon plant?
3    A.  First started off making boxes.
4    Q.  Just regular cardboard boxes?
5    A.  Yes, regular cardboard boxes.
6    Q.  What was the reason for that?
7    A.  Well, some of the tubes -- once the nylon rolls
8    up on the tubes they would take the tubes and put them
9    in boxes and seal the boxes and then take them to the
10    warehouse.
11    Q.  And that would be sent to a customer at that
12    point?
13    A.  They were sent to different companies.
14    Q.  How long did the making boxes continue?
15    A.  Well, about roughly I was there around six
16    months. Everybody starts out making boxes.
17    Q.  After you make boxes for six months what do
18    they get you to do after that?
19    A.  If you catch on fast enough making the boxes
20    the way that they're supposed to be made they have job
21    bids that you can bid on.
22    Q.  What was your next job after making boxes?
23    A.  After that I bid on a job as forklift driver.
24    Q.  Forklift?

**12**

1    A.  Yes.
2    Q.  Did you get the job?
3    A.  Yes.
4    Q.  How long did you work with the forklift?
5    A.  I was only maybe a couple months because of my
6    seniority.
7    Q.  I don't understand.
8    A.  You can bid on a job because some jobs people
9    don't bid on, but once they find out that a person
10    with less seniority then they can bump that guy.
11    Q.  You got bumped?
12    A.  I got bumped.
13    Q.  Where did you go from the forklift?
14    A.  To machine operator.
15    Q.  What kind of machine operator?
16    A.  This was like baling the nylon that comes down.
17    You have a cutter that cuts it, it runs through the
18    machine and then it comes down like into an oven and
19    once -- we have boxes there and once it comes out you
20    have to make sure it doesn't jam up. Once it comes
21    out you have to wrap the boxes and then they shoot it
22    onto another machine and they ship it right out.
23    Q.  How long did you continue as machine operator?
24    A.  Did that about I guess maybe a couple months.

**13**

1    Q.  And then what did you do after that?
2    A.  After that I felt DuPont wasn't the right job
3    that I wanted to do because it was shift work and
4    being that I just came from Vietnam I just wanted an
5    eight to four job, you know, with weekends off. So, I
6    left DuPont and started working for National Cash
7    Register.
8    Q.  NCR?
9    A.  Yes, which made cash registers.
10         MR. NIEDZIELSKI:  Did you want to put
11    something on the record?
12         MR. NEUBERGER:  We made a couple technical
13    amendments to the Answers to Interrogatories today to
14    change a Friday to a Monday and vice versa. You
15    haven't had a chance to look at all that to verify
16    because we inadvertently forgot to highlight all the
17    changes. Some other discovery came in today and we
18    have agreed to leave the deposition open after its
19    conclusion should you feel the legitimate need to
20    reconvene later on.
21         MR. NIEDZIELSKI:  Thank you.
22    BY MR. NIEDZIELSKI:
23    Q.  You went to work for NCR, what were you doing
24    for NCR?

4  (Pages 10 to 13)

Justice v. Taylor, et al.
Wilbur F. Justice

14

1    A. Machine operator.
2    Q. What kind of machine were you operating?
3    A. It was like making parts. Ourt parts had to be
4    diagrammed so the machine was diagrammed to stamp into
5    a piece of metal for the parts for the typewriters.
6    So, mostly as an operator you would take a machine,
7    press down and it would make that design and then you
8    would take the part and put it in a pan.
9    Q. Where was this location?
10   A. In Millsboro, Delaware.
11   Q. How long did you work for NCR?
12   A. I worked there about a year.
13   Q. Where did you go from there?
14   A. A lot of the jobs are in my Interrogatory
15   report, but I left there and I went to General Motors
16   and worked there for three years.
17   Q. Which plant did you work at?
18   A. Up here in Newport.
19   Q. Did you also live up here?
20   A. No. I rode back and forth.
21   Q. I take it were you not the only person that did
22   that?
23   A. Yeah.
24   Q. Would you carpool with others?

15

1    A. Yes, I would.
2    Q. Now, that is shift work, is it not?
3    A. That was like one shift. It was three to 11,
4    but it was weekends off.
5    Q. And what did you do? Assembly work?
6    A. I was on the assembly line.
7    Q. You did that for three years?
8    A. Three years.
9    Q. Then, what happened?
10   A. Then, had a house built in Millsboro. So,
11   every summer -- well, I left there and found a job
12   back in Millsboro. I started doing construction in
13   Ocean City.
14   Q. And were you in one of the trades?
15   A. It started as laborer and ended up as cement
16   finisher.
17   Q. How long approximately did you do that?
18   A. I worked there from '73 to '75.
19   Q. And then what happened in '75, did you get
20   another job?
21   A. Started working for Masten Lumber Company.
22   Q. M-A-S-T-E-N?
23   A. T-E-N.
24   Q. And what was your job with Masten?

16

1    A. Truck driver.
2    Q. How long did you hold that job?
3    A. I worked from '75 to '82, 1982.
4    Q. And then what did you do in 1982?
5    A. Started with the Department of Corrections.
6    Q. How did that come about? How is it you decided
7    to start with the Department of Corrections?
8    A. Well, at that time I had worked some jobs that
9    I wasn't -- they were good jobs, but at the same time
10   I was thinking as I was getting older that I need
11   something permanent, something that I could retire
12   from, something with better benefits. I had a family
13   and so I was thinking on those terms. At that time
14   the Department of Corrections was hiring and I felt
15   that that was something that I would like to do.
16   Q. So, I take it you submitted an application,
17   right?
18   A. Yes.
19   Q. They did a background check on you, right?
20   A. Yes.
21   Q. And then you started recruit training or they
22   call it basic officer training?
23   A. Yes.
24   Q. How long was that training?

17

1    A. That was like six weeks training.
2    Q. And at the conclusion of that where were you
3    assigned?
4    A. My first night I was assigned to WEBBS Center
5    in -- over in Newark -- over in Newport.
6    Q. Is it in Prices Corner?
7    A. Prices Corner, yes.
8    Q. Right behind the State Police barracks?
9    A. Yes.
10   Q. What was WEBB being used for at that time?
11   A. Well, at that time it was like pretrial, but
12   they had people there with long sentences, life and
13   everything, at that time.
14   Q. I mean, was it considered a good assignment at
15   the time?
16   A. Well, I was assigned -- technically I was
17   assigned to DCC, because of coming out of the
18   Academy WEBBS was short of personnel and so they sent
19   me to WEBBS at that time.
20   Q. How long did you stay at WEBB?
21   A. I stayed at WEBBS about a year and a half.
22   Q. And then where did you go from WEBB?
23   A. I left from WEBBS and went to -- which is it,
24   Howard R. Young now?

5 (Pages 14 to 17)

Justice v. Taylor, et al.
Wilbur F. Justice

18

1    Q.  You went to Gander Hill?
2    A.  Yes.
3    Q.  They still call it Gander Hill, right?
4    A.  Yes, they do.
5    Q.  Approximately what year would that have been
6    that you went to Gander Hill?
7    A.  I went to Gander Hill approximately in --
8    somewhere in '83.
9    Q.  And do you recall where you were assigned at
10   Gander Hill?
11   A.  When I went to Gander Hill, I was assigned on
12   twelve to eight shift working in the infirmary.
13   Q.  Infirmary?
14   A.  Yes.
15   Q.  Did you keep that assignment while you were at
16   Gander Hill?
17   A.  No.
18   Q.  What happened?
19   A.  Gander Hill had opened in '83 and so with me
20   going over with a year and a half or so it was like a
21   lot of seniority.  So, I was able to go to day work as
22   soon as -- they needed people, the more people that
23   came they started opening different areas.  So, I was
24   able to move to day work.

19

1    Q.  You moved to day work from twelve to eight?
2    A.  Right.
3    Q.  Is day work the desired shift?
4    A.  Well, to some people it's the desired.  Some
5    people like twelve to eight and some people like four
6    to twelve.
7    Q.  But you like eight to four?
8    A.  I would rather have eight to four.
9    Q.  And because you had seniority at that point,
10   year and a half, you were able to bid on that and get
11   it, right?
12   A.  That's right.
13   Q.  How long did you work day shift?
14   A.  I worked day shift from the latter part of '83
15   up until '88.
16   Q.  And did you work day shift the entire time?
17   A.  Yes.
18   Q.  What was your assignment within the
19   institution?
20   A.  At the time working day shift from -- coming
21   over there in latter part of '83, working in different
22   housing areas.
23   Q.  And what happened in '88?
24   A.  '88 they came out with the corporals and

20

1    sergeants in August of '88.
2    Q.  And what happened in August of '88?
3    A.  During the course of that time I was also
4    assigned to outside hospital duties while I was on day
5    work and they came out with the corporals and
6    sergeants and they gave them to people that they
7    thought was role models, did good jobs and everything.
8    I was over at the hospital so I wasn't aware of what
9    was going on or nobody -- the supervisor came over to
10   check the book to make sure we was performing
11   security, but nobody had mentioned about the corporals
12   and sergeants.
13       Once I heard about that, you know, I came
14   back and I said I would rather work in the institution
15   because I felt I deserved to be promoted to a sergeant
16   position.  So, in October of '88 they promoted me to
17   sergeant.
18   Q.  When you say you were working in the hospital,
19   which hospital?
20   A.  Different hospitals, St. Francis, wherever they
21   would send an inmate that the hospital had the best
22   treatment.
23   Q.  When you would go and report to work, you would
24   actually go straight to the hospital?

21

1    A.  Yes, I wouldn't report to the institution.  I
2    would go straight to the hospital.
3    Q.  You would report to the institution first?
4    A.  No, I would go straight to the hospital.
5    Q.  And you were armed?
6    A.  Yes.
7    Q.  So, when would you know that an inmate was in
8    the hospital and which hospital you had to go to?
9    A.  Well, normally, 90 percent of the time the
10   inmate -- we would have two or three inmates over
11   there.  I was assigned strictly day work so if an
12   inmate came in the hospital even though they would
13   have overtime during it, one of the overtime would
14   have to leave and go back to the institution if he
15   wanted to work because I was assigned outside
16   hospital, I would take whoever's place was over there.
17       They had one person assigned to four to
18   twelve and one person assigned twelve to eight, but it
19   needed two people to work the hospital.  So, I would
20   work with an overtime person on day work.
21   Q.  There was always two CO's?
22   A.  Exactly.
23   Q.  In October of '88 you were promoted to
24   correctional sergeant, correct?

6 (Pages 18 to 21)

Justice v. Taylor, et al.
Wilbur F. Justice

22

1    A.  Correct.
2    Q.  Where were you assigned then?
3    A.  In '88 I was assigned started working in
4    booking and receiving.
5    Q.  How long did you stay there?
6    A.  But in '88 after the hospital duty I was
7    assigned on four to twelve, four to twelve shift.
8    Q.  Four to twelve at booking and receiving?
9    A.  No.  Four to twelve I was working as a lead
10   worker checking the areas and making sure that the
11   other officers were performing their duties.
12   Q.  You would kind of rove the institution?
13   A.  Exactly.
14   Q.  When did you go to booking and receiving?
15   A.  I went to booking and receiving around 19 --
16   approximately around 1990.
17   Q.  And how long did you stay at booking and
18   receiving?
19   A.  I stayed at booking and receiving until I left,
20   transferred, to MCI in 2001.
21   Q.  So, you were in booking and receiving for 11
22   years?
23   A.  Yes.
24   Q.  Were you doing day shift?

23

1    A.  Yes.
2    Q.  Did you know a guy by the name of Kevin Senato?
3    A.  Yes.
4    Q.  And he would do --
5    A.  Four to twelve.
6    Q.  How did the transfer to MCI happen?
7    A.  Well, I had put in a transfer to MCI and had
8    interviewed down there at least one time before even
9    as a CO and it was kind of hard to get down there.
10   Some of the people that had less time came into the
11   department and next thing you knew they was down to
12   MCI, they was retired Air Force men.  So, at the time
13   MCI had a lot of retirees working there.  So, I had
14   put in again to -- they had three sergeant positions
15   when I put in for it in 2001 and took the interview
16   and got the job.
17   Q.  And is working at MCI -- it's also known as
18   Morris Correctional?
19   A.  Exactly.
20   Q.  It has a fancy name.
21   A.  Morris Correctional Community Center.
22   Q.  Is that a desired location for a CO to work?
23   A.  Well, it's good for a CO up to a sergeant if he
24   has been working in a level five facility because then

24

1    he knows the difference from coming out of the Academy
2    working at a level four institution versus coming out
3    of the Academy and working at a level five
4    institution.  It's beneficial for a person to have
5    worked level five institution than just leave out of
6    the Academy and come to level four institution.
7    Q.  But is the assignment a desirable assignment?
8    Is it something a person has put in for to work at
9    like Morris Correctional?  Do you understand what I'm
10   asking you?
11   A.  No, you can rephrase it.
12   Q.  Sure.  In other words, is it something that all
13   correctional officers or a lot of them would like to
14   work at Morris Correctional institute?
15   A.  No.  Some people would rather stay where there
16   is a lot going on.  They're not really concerned about
17   the population.  Some people feel that after a certain
18   amount of time that they want more or less a lay-back
19   atmosphere.
20   Q.  Would Morris Correctional be a lay-back
21   atmosphere?
22   A.  Yes, it is.
23   Q.  Who was the warden when you went there in 2001?
24   A.  Warden Bianco.

25

1    Q.  Is he still the warden as far as you know?
2    A.  As far as I know.
3    Q.  Did you interact with Warden Bianco?
4    A.  Yes, I did.
5    Q.  How did you find Warden Bianco?
6    A.  Well, I found him to be a nice warden.
7    Q.  Was he respectful and that sort of thing?
8    A.  He was respectful.
9    Q.  Did he seem to be interested in having his
10   Morris Correctional Institution run smoothly?
11   A.  Well, talking with Warden Bianco he wanted to
12   make sure that whatever happened there stayed there.
13   He tried to resolve issues if it got to him.  A lot of
14   issues didn't get to him.  Then, sometimes he was
15   caught in the middle, but overall he had the final
16   say.  So, it pretty much went to whatever he decided.
17   He had the final say.
18   Q.  Did you work a particular shift when you were
19   at Morris?
20   A.  When I was at Morris I was VHR, but mostly --
21   Q.  What is VHR?
22   A.  Vacation holiday relief.  But mostly I went on
23   different shifts for a short time because that's part
24   of the job, but mostly I stayed on day work.

7  (Pages 22 to 25)

Justice v. Taylor, et al.
Wilbur F. Justice

26

1    Q.  How many sergeants would be on the shift day
2    work at MCI?
3    A.  At least two sergeants.
4    Q.  And what other officers would be working that
5    shift?
6    A.  You would have a corporal and then you would
7    have two other officers.
8    Q.  CO's?
9    A.  Two other CO's.
10   Q.  Who was the shift commander?
11   A.  That would be one of the sergeants if the
12   lieutenant wasn't there or if he was on vacation or
13   his day off.
14   Q.  There were some lieutenants that would work
15   there as well?
16   A.  Yeah, the lieutenant on each shift even though
17   three to 11 hours for a while without a lieutenant, but
18   it was supposed to be a lieutenant on each shift.
19   Q.  Who is the deputy warden under Bianco?
20   A.  Well, deputy warden -- we don't have a deputy
21   warden at MCI.  We have a deputy warden at central
22   VOP.
23   Q.  That's on the grounds of the Delaware
24   Correctional Center, correct?

27

1    A.  Yes.
2    Q.  And that's Hutchinson?
3    A.  Yes.
4    Q.  Is there a captain that is assigned to Morris?
5    A.  Well, they had a captain, he went by staff
6    lieutenant, but from hearing he was a captain, but he
7    always answered to the staff lieutenant.
8    Q.  Was he a captain?
9    A.  Well, on paper it was staff lieutenant.  When
10   he left they made -- they promoted another guy to
11   captain, but then this guy was supposed to have been
12   floating between institutions.
13   Q.  Just so we understand I'm going to -- what is
14   the first rank amongst correctional officers?
15   A.  Correctional officer.
16   Q.  And above that?
17   A.  Corporal.
18   Q.  And above corporal?
19   A.  Sergeant.
20   Q.  Above sergeant?
21   A.  Lieutenant.
22   Q.  What is above a lieutenant?
23   A.  Staff lieutenant.
24   Q.  Above a staff lieutenant?

28

1    A.  Captain.
2    Q.  Above a captain?
3    A.  Deputy warden.
4    Q.  Above deputy warden?
5    A.  Warden.  Well, some institutions have security
6    chief, which would be before the deputy warden.
7    Q.  Would that be a major normally?
8    A.  That would be a major at a larger institution.
9    Q.  Now, did you work continuously at Morris
10   Correctional from 2001 until you retired?
11   A.  Yes, I did.
12   Q.  When did you retire?
13   A.  2007, February.
14   Q.  Now, how many years did you have with the
15   department at that point?
16   A.  Almost 26 with the department and I had -- yes,
17   almost 26 years with the department, started in '82.
18   Q.  Had you been planning on retiring?
19   A.  Well, no, I hadn't planned on retiring.  I
20   hadn't planned on retiring when I retired.
21   Q.  Why did you retire?
22   A.  Well, I was working there and I put in that
23   kind of time.  When I put in for the job as community
24   work program coordinator, I seen myself working there,

29

1    you know, for a good period of time because I looked
2    at the job and the part-time job that I had was serve
3    -- which served a good purpose for me and after not
4    getting the job it was kind of hard every day going to
5    work with the job you tried to get.  What are you
6    going to do about the job, you know?
7        So, I felt that I wasn't really happy with
8    the process of how things went.  I had enjoyed what I
9    was doing.  I felt that the promotion would be a great
10   incentive, you know, for me working there.  I felt
11   that I was more qualified then.  I feel the same way
12   right now if I had to go back to do the job.
13       So, with that in mind and being that I
14   never had any disciplinary or anything in my record I
15   felt that I was in a position to retire that I thought
16   the best thing for me to still being bombarded with
17   questions every day I felt that it was best for me to
18   go ahead and retire.
19   Q.  Did other people apply for the position?
20   A.  It was another lieutenant at that institution
21   that said something to me about he applied.  Whether
22   he did or not I didn't follow through on it.  I didn't
23   really get into discussing whether he did and what
24   happened or whatever.

8  (Pages 26 to 29)

Justice v. Taylor, et al.
Wilbur F. Justice

---

30

1    Q. Do you know how many people applied for the
2 position?
3    A. I don't know for sure. I mean, I'm not for
4 sure how many applied for the position.
5    Q. Is it your understanding that there were a
6 number of people that applied, though?
7    A. Yes.
8    Q. And only one person was selected?
9    A. Yes.
10    Q. And that was Mr. Hank Fuller?
11    A. Yes.
12    Q. Did you have an opportunity to work with Hank
13 Fuller?
14    A. Yes, I worked with Mr. Fuller at Gander Hill
15 before he left. Not what you would say right side-by-
16 -side, but he was a counselor up there. I was in
17 charge of booking and receiving. Every inmate that
18 came into the institution his paperwork and stuff went
19 to the records department and the records department
20 compiled everything about this inmate, which Mr.
21 Fuller would eventually deal with him at some time or
22 another as far as his case.
23    Q. Did you have any background in correctional
24 counseling?

---

31

1    A. Yes. I worked for at that time Kimberly
2 Quality Care. I worked for Vision Quest and that was
3 working with juveniles that had committed a crime and
4 were in these different programs and so they needed a
5 caseworker to go find and find out if they were
6 attending school, find out if they were at home at
7 night, you know, making curfew calls.
8        At the same time some of them that were
9 looking for employment if they were at that time over
10 16 -- I mean, we dealt with kids as young as eight-
11 years old up until 17. At that time we would take
12 them out and have them fill out applications and
13 everything to get a job even though they was in
14 school.
15    Q. Was this within the Department of Corrections?
16    A. No. This was like a state-funded job.
17    Q. Was this a part-time job you had?
18    A. It was a part-time job.
19    Q. When did you have these part-time jobs? First
20 let's start with Kimberly Quality Care.
21    A. I started the Kimberly Quality Care somewhere
22 in '88.
23    Q. What was your position with them?
24    A. It was like -- it was three different titles.

---

32

1    You could be a parent advocate. You could be case
2 management -- a caseworker and then you could be a
3 child advocate.
4    Q. Which one were you?
5    A. Well, at any different time I had to play
6 different roles because we dealt with females and
7 males; and, if you are going into a home with a single
8 mother and we always had someone working with you, you
9 would have to -- you might have to change over and be
10 that other party. It all depends on that situation
11 that they didn't get along or felt that the mother --
12 if I had a female with me that they felt that, okay,
13 here is another woman coming in and telling me what to
14 do, then I would have to be the child advocate; or, if
15 the parent felt that I don't have anything to do with
16 him, he is in the program, but the parent would have
17 signed him up, then I would have to switch and be the
18 parent advocate.
19        Also while I'm doing that you still would
20 have to do your progress notes, get them together and
21 then you do your case management about what you think.
22 If he had to show up to court for his probation
23 officer how would they be able to feel that he is
24 doing good or whether he is violating his probation by

---

33

1    not going to school. They also would bring them in
2 for drug screening at the same time.
3    Q. How long did you work for this Kimberly Quality
4 Care?
5    A. About a year and a half.
6    Q. And then that was from 1988 to '89?
7    A. Yes.
8    Q. And you talked about working for Vision Quest
9 then?
10    A. Vision Quest.
11    Q. When was that?
12    A. I worked for Vision Quest somewhere in '96 to
13 2002.
14    Q. Was that also part-time?
15    A. Part-time.
16    Q. And what was your title with Vision Quest?
17    A. Pretty much played the same role.
18    Q. Which was?
19    A. Parent advocate, child advocate and then
20 casework.
21    Q. Were you ever designated within the Department
22 of Corrections as a correctional counselor?
23    A. No.
24    Q. What do you understand to be the requirements

---

9 (Pages 30 to 33)

Justice v. Taylor, et al.
Wilbur F. Justice

34

1  to be a correctional counselor?
2  A. Well, correctional counselor I feel that every
3  officer that works as a correctional officer is also a
4  correctional counselor because every officer counsels
5  inmates about their responsibilities, about doing the
6  right thing in order to get out of prison.
7  Correctional counselors, which I have sat
8  on multiple disciplinary boards with, does the same
9  thing, bring them in and try to tell them which
10  direction to go. As a correctional officer they do
11  the same counseling.
12  Q. Is there actually a position within the
13  Department of Corrections?
14  A. As correctional counselor, yes, there is.
15  Q. What are the requirements to be employed as a
16  correctional counselor?
17  A. As a correctional counselor I'm sure you have
18  to take a correctional counselor test.
19  Q. Do you have to have college?
20  A. No, you don't have to have any college.
21  Q. Throughout your career with the Department of
22  Corrections have you applied for other positions while
23  you were in the department?
24  A. Yes, I applied for lieutenant position.

35

1  Q. When was that?
2  A. '99 probably, maybe in 2000, maybe in 2000. I
3  tried for several times, at least a couple times,
4  maybe three times.
5  Q. And that was when you were at Gander Hill?
6  A. Yes.
7  Q. Did you apply for any other positions within
8  the Department of Corrections?
9  A. Well, I'm sure I applied for probation parole I
10  guess when I was at Gander Hill.
11  Q. What position were you applying for?
12  A. At probation parole.
13  Q. You were applying for a position as a probation
14  officer?
15  A. Yes.
16  Q. Any other positions that you applied for?
17  A. No, that was it in probation besides the
18  community work program —
19  Q. Did you apply for that position on a prior
20  occasion?
21  A. Which position?
22  A. Community work program coordinator.
23  A. Did I apply for it on a prior occasion?
24  Q. Yes.

36

1  A. Rephrase.
2  Q. This is about when you applied for it in 2004,
3  correct?
4  A. Yes.
5  Q. Did you apply for the same position on a prior
6  occasion?
7  A. No. I applied for a community work program
8  coordinator in 2001 when I first got down to Morris
9  Correctional Community Center.
10  Q. Was it a position that was going to be at the
11  Morris Correctional Institution?
12  A. Yes, it was.
13  Q. Did you go through the interview process?
14  A. When I turned my application in I got a letter
15  back stating I did not meet the minimum qualifica-
16  tions.
17  Q. Did it say why?
18  A. No. They just sent me a letter saying you
19  don't meet the minimum qualifications.
20  Q. Who got that position in 2001?
21  A. Matthew Gibbs.
22  Q. And Matthew Gibbs you have known him a very,
23  very long time, correct?
24  A. Yes, sir, yes, for a good while.

37

1  Q. Was he working at Sussex Work Release Center?
2  A. Yes, he was.
3  Q. So, you don't know why, but they just said you
4  were not qualified for the position?
5  A. Yes. They don't — if it's — when you turn an
6  application in for any job if you don't meet the
7  qualifications, minimum qualifications, they just send
8  you a letter stating that you don't meet the minimum
9  qualifications.
10  Q. Was the position the same that you applied for
11  in 2004?
12  A. Yes, same position.
13  Q. Why did you think the result would be different
14  in 2004?
15  A. Because when I filled the application out in
16  2001 all the things that they were asking for that I
17  felt that because I worked there and I knew what the
18  job calls for that just by me putting that I worked
19  there and the time that I had in corrections would
20  meet the qualifications; but, then when I found out
21  that everything that they wanted to show what you did
22  to relate to what they were asking for, which I had
23  it, but I didn't put it on the application.
24  Q. What were they looking for that you didn't put

10 (Pages 34 to 37)

Justice v. Taylor, et al.
Wilbur F. Justice

---

**38**

1  on?
2     A.  Have you did case management, casework,
3  counseling?  Those were some of the highlights that
4  they were looking for.  I based my application the
5  first time on the work that I was doing there and the
6  work that they knew I was doing that this was -- go to
7  personnel and they would say, okay, he put in because
8  after I got it back and said you didn't meet the
9  minimum qualifications and I looked at it and I said,
10  Oh, okay, I didn't put in everything that I did, how
11  long I did it, who I did it with and I didn't do that.
12  So, that was the reason -- that was different -- that
13  was the difference why I put it in the next time.
14     Q.  Do you happen to have a copy of your 2001
15  application for the position?
16     A.  No, I don't.
17     Q.  What happened to it?
18     A.  The copy of the application?
19     Q.  Yes.
20     A.  I didn't keep it.
21     Q.  You didn't keep it?
22     A.  No.
23     Q.  Why not?
24     A.  Because I did not meet the minimum qualifica-

---

**39**

1  tions so I didn't keep the application.
2     Q.  But, I mean, in the 2004 application you kept a
3  copy of that?
4     A.  Yes.
5     Q.  But you didn't keep a copy of your 2001
6  application?
7     A.  Right.
8     Q.  What is the community work program coordina-
9  tor's job supposed to be?
10     A.  Well, one of the jobs is to do counseling, help
11  find them jobs, making sure that they pay the courts
12  and the fines, making sure that they're ready.  Even
13  though they are working there they have to report back
14  to the center, but making sure that they're ready to
15  go out into society and be a positive individual.
16  Also, going to their jobs, making sure that they're
17  there doing what they're supposed to do.
18     Q.  Are you supposed to also talk to employers
19  about positions for them?
20     A.  You call different employ -- different
21  employers also will contact the community work program
22  coordinator and let them know that they need
23  additional people to work here and there.  A lot of
24  employers will call and say after the individual leave

---

**40**

1  the job or whatever and it's very important that the
2  community work program coordinator go by and check and
3  make sure that they're there where he is supposed to
4  be.
5        Then, if they're doing what they're
6  supposed to do as far as the case file, then they put
7  in there that he has completed all his fines, court
8  costs, he has not been a problem, he pays his room and
9  board, he is at work, the employer feels that he is a
10  good worker, they refer that to the counselor that is
11  over them and then they can start working on their
12  release date.
13        If you look at my application, which is in
14  there, in the Interrogatory report, it will state
15  everything that requires of the community work program
16  coordinator.
17        MR. NIEDZIELSKI:  Would you mark this as
18  Justice-1.
19        (Justice Deposition Exhibit No. 1 was
20  marked for identification.)
21  BY MR. NIEDZIELSKI:
22     Q.  Do you see that document that has been marked
23  as Justice-1?
24     A.  Yes.

---

**41**

1     Q.  Could you please describe that to us?
2     A.  This application?
3     Q.  Yes.
4     A.  This is my application that I put in for
5  myself.
6     Q.  Is this your copy of the application you put
7  in?
8     A.  Is this my copy?
9     Q.  Um-hum.
10     A.  Yes, it is.
11     Q.  In other words, when you turned in yours on
12  July 15, 2004, you got a copy of it, correct?
13     A.  Yes, after I turned it in to them I asked them
14  could I get a copy with the stamp on it.
15     Q.  Who was it you spoke to when you turned it in?
16     A.  The secretary at the desk.  I'm not for sure
17  who that was -- as a matter of fact, I think it was
18  Mr. Bivens' wife, I think she passed away, I'm not
19  sure, but it was the secretary/receptionist.  When you
20  turn your application in and you tell them you want a
21  copy, they will make a copy and they will give it back
22  to you.
23     Q.  Were there other people dropping off
24  applications, if you know?

11 (Pages 38 to 41)

A000013

Justice v. Taylor, et al.
Wilbur F. Justice

42

1    A.   Well, people come and go.  I knew everybody
2    goes through the same process.  Any application I
3    turned in I went through the same process, giving it
4    to the receptionist and they make copies and give it
5    back to you.
6    Q.   And then they take the application?
7    A.   And they take it to the human resource officer.
8    Q.   Where is the secretary that you gave your
9    application to in relation to where the human resource
10   office is?
11   A.   She is here and like you go to the door and I
12   guess about ten feet she is right there, human
13   resources.
14   Q.   In other words, you go back, was this at the
15   McKee Admin Center?
16   A.   Yes.
17   Q.   You are not talking about the secretary or
18   receptionist out front, correct, when you first come
19   in?
20   A.   Are you talking about the front of the
21   building?
22   Q.   Yes.
23   A.   Yes.
24   Q.   Is that who you turned your --

43

1    A.   That's where you get your application and
2    that's where you turn them in at.
3    Q.   And that's a receptionist for the entire
4    building, correct?
5    A.   Yes.
6    Q.   And she went and made a copy for you and handed
7    yours back stamped human resources?
8    A.   Yes.
9    Q.   Do you know how she got it stamped human
10   resources?
11   A.   She went to the other side of the door.  She
12   had to go over to human resources to get the stamp.
13   Q.   Do you know how far she has to walk to do that?
14   A.   It's not -- I'll say if you was here and she
15   went on the other side of the door it's like where the
16   door we came in, about that far.
17   Q.   Well, does a person -- if you go through that
18   door right by where the receptionist is seated, are
19   you familiar with what is beyond that door?
20   A.   Yes.
21   Q.   Would you take a left and go all the way down
22   the hallway to human resources?
23   A.   No, you take a right.
24   Q.   You take a right?

44

1    A.   Yeah.  When you walk into the front of the
2    building, the receptionist sat here and the door is
3    right over here.
4    Q.   It's behind her to her left?
5    A.   No.  Receptionist sat here and the door that
6    you came in is right here.  So, when you walk in the
7    receptionist sat here.  So, she gets up and she goes
8    over here to this door because human resources are
9    right on the other side of her.
10   Q.   Now, just so we are clear what we are speaking
11   about you are talking about the receptionist who is
12   the front place you go to when you come from the
13   parking lot?
14   A.   No, you have another receptionist on the other
15   side of the parking lot that you come in and if you
16   are there to take -- take care of business, you have
17   to log in, state where you are going, who you are
18   there to see, but not that receptionist.
19   Q.   You are not talking about that one?
20   A.   No.
21   Q.   You are talking about a different one?
22   A.   The front of the building.
23   Q.   She came back and handed you this and it was
24   stamped, correct?

45

1    A.   Correct.
2    Q.   Then, what did you do after that?
3    A.   I took the stamped copy and I went back home.
4    Q.   Now, do you remember what time of day it was
5    that you turned this in?
6    A.   I'm not sure.
7    Q.   Do you remember what day of the week it was?
8    A.   I'm not sure about that.  You are talking about
9    three years ago.
10   Q.   What shift were you working during this period
11   of time.
12   A.   I was on seven to three shift and, if I'm not
13   mistaken, it was the 15th of July so whatever that
14   falls on in the calendar.  I'm sure you can look that
15   up.
16   Q.   Do you recall whether it was the -- were you
17   working that day when you turned in the application?
18   A.   This was more -- I'm thinking it was after I
19   got off of work because the closing date was 16.
20   Q.   You think you turned it in after your duties
21   and you got off at Morris Correctional?
22   A.   Yes.
23   Q.   And you were working seven to three?
24   A.   Yes.

12 (Pages 42 to 45)

A000014

Justice v. Taylor, et al.
Wilbur F. Justice

46

1    Q. So, you would have left Morris Correctional at
2    three?
3    A. It all depends on your relief. Sometimes
4    relief is not there.
5    Q. Morris Correctional is in Dover, correct?
6    A. Yes.
7    Q. And headquarters is also in Dover?
8    A. Yes.
9    Q. It's close by?
10   A. Right.
11   Q. You would have done that on your way home?
12   A. Yes.
13   Q. At this time where were you living?
14   A. In Dover.
15   Q. You were living in Dover?
16   A. Yes.
17   Q. What was your address in Dover?
18   A. Same address I have now, 203 North Caroline
19   Place.
20   Q. Is that a private residence?
21   A. Yes, development.
22   Q. How long had you been living at 203 North
23   Caroline?
24   A. I moved in 203 North Caroline Place in 1991.

47

1    Q. And this was your copy of the application that
2    you submitted, correct?
3    A. I submitted the original application. This is
4    a copy that they gave me back.
5    Q. You see there is other handwriting on this
6    application?
7    A. Other handwriting where?
8    Q. For instance, the very top of the front page?
9    A. Yes.
10   Q. Do you know what that says?
11   A. At the top it says Kent Raymond.
12   Q. What is Kent Raymond?
13   A. He is the supervisor over the community work
14   program coordinator.
15   Q. And there is numbers after it?
16   A. Yes.
17   Q. What are those numbers?
18   A. Those are numbers that are put on there and I'm
19   thinking that they're numbers that he puts on there, a
20   job posting, could be the job posting.
21   Q. When you filled in this application and you
22   turned it in, was that already there?
23   A. It wasn't there.
24   Q. You see that little box that says "Personnel

48

1    Use Only"?
2    A. Right.
3    Q. Was that filled out when you turned it in?
4    A. No.
5         MR. NIEDZIELSKI: This will be Justice-2.
6         (Justice Deposition Exhibit No. 2 was
7    marked for identification.)
8    BY MR. NIEDZIELSKI:
9    Q. I'm putting a document in front of you that has
10   been marked as Justice-2. Do you see that document,
11   sir?
12   A. Yes.
13   Q. Could you explain what this document is?
14   A. This is the job title of community work program
15   coordinator.
16   Q. What is this informing people of?
17   A. That they have an opening for community work
18   program coordinator.
19   Q. Is this the way you found out about the
20   opening?
21   A. Yes, they posted the position.
22   Q. Is this what was posted?
23   A. They had the other sheet behind it.
24   Q. What was the other sheet?

49

1    A. Qualifications.
2         MR. NIEDZIELSKI: Mark this, please.
3         (Justice Deposition Exhibit No. 3 was
4    marked for identification.)
5    BY MR. NIEDZIELSKI:
6    Q. The court reporter is placing a document in
7    front of you that is marked Justice-3. Can you
8    describe what this document is?
9    A. This is the summary statement of principal
10   accountabilities, nature and scope of the job.
11   Knowledge in the field on the back sheet.
12   Q. This is the minimum requirements, is this what
13   you were responding to when you were filling in your
14   application?
15   A. Yes.
16   Q. And is this the way that it appeared at the
17   time behind this exhibit, your Justice-2?
18   A. Yes.
19   Q. So, when you went to fill in your application
20   did you make a copy of that?
21   A. Make a copy of what?
22   Q. Both the announcement and the job qualifica-
23   tions.
24   A. No. I kept a copy of the job opening and then

13 (Pages 46 to 49)

**A000015**

Justice v. Taylor, et al.
Wilbur F. Justice

50

1    by responding to the qualification and the
2    requirements and all I was able to because I filled
3    out one before and because of the work that I had been
4    doing I addressed everything that I had been doing in
5    order to state and let me know that -- which I didn't
6    do the first time.
7        So, I was able to put down everything
8    which is in the Interrogatory report of all that I had
9    done in order to show that I was capable of being a
10   community work program coordinator.
11       Q.  I guess you said that behind this what has been
12   marked as Justice-2 there was a list of minimum
13   qualifications.  Was it the document that has been
14   marked as Justice-3 that was behind that or was it a
15   different document?
16       A.  This is Justice-3.
17       Q.  Right.  When you saw the posting for Justice-2,
18   was that behind?
19       A.  This was behind.
20       Q.  My point is that Justice-2 and 3 is exactly
21   what you were responding to when you filled in your
22   application?
23       A.  Yes.
24       Q.  Minimum qualifications here is knowledge of

51

1    human behavior, correct?
2        A.  Yes.
3        Q.  Knowledge of counseling theories and
4    techniques, including vocational counseling?
5        MR. NEUBERGER:  Where are you looking at?
6        MR. NIEDZIELSKI:  Page two, minimum
7    qualifications.
8    BY MR. NIEDZIELSKI:
9        Q.  How did you believe that you qualified for that
10   point two, knowledge of counseling theories and
11   techniques, including vocational counseling?
12       A.  If you look into my Interrogatory package it
13   would explain the knowledge of human behavior, which
14   is in my packet in case I missed something.  My
15   knowledge of human behavior is dealing with
16   individuals on a continuous basis and keeping account
17   of their behavior and in different situations, which
18   human behavior has a lot to do with counseling.
19       Q.  What about number two?
20       A.  My knowledge of counseling theories and
21   techniques.  Dealing with inmates on a daily basis you
22   counsel them on theories to make the situation where
23   they can be able to complete their time, responsible
24   for what they have done, using different

52

1    techniques of how if you apply yourself and sort of
2    set up different scenarios where these different
3    techniques could help them be a better person, be
4    responsible and also be respectful.
5        Q.  Can you, for instance, describe some various
6    counseling theories for me?
7        A.  Again, in my Interrogatory report I went
8    through explaining some of my counseling situations.
9    Many a time dealing with the juvenile kids my
10   counseling theories to them was whatever they had done
11   be responsible for it, but look to move forward by
12   staying drug-free, doing their homework, being in on
13   curfew time, respecting their parents.  Whether
14   they're single parents or if there was a married
15   couple, looking out for their younger siblings,
16   respecting the older siblings and always try to do the
17   right thing and obey the law.
18       Q.  What about knowledge of counseling techniques,
19   what is your area -- describe for me your knowledge of
20   counseling techniques.
21       A.  Well, a lot of counseling techniques is really
22   addressing whatever the problem is and it helps you to
23   find different techniques to work with the individual
24   on the problem that they have.  It's hard for me to

53

1    say what works for one person works for another.  So,
2    you would have to be addressed with a problem in order
3    for me to say which techniques I would use.
4        I mean, I've had different kids that had
5    issues, anger management, and kids that like to steal
6    from their parents.  I had kids that smoked their
7    parents' cigarettes.  So, you have to have -- which
8    techniques somebody uses depends on what the situation
9    is and that goes for saying where if it's an inmate,
10   you can't use the same technique on every -- every
11   inmate because if he has an alcoholic problem and one
12   has a drug problem.  So, you have to have different
13   counseling techniques to deal with these issues.
14       Q.  That's what I was asking.  If you could give us
15   an idea of your knowledge of the various techniques.
16       A.  Well, as I stated somebody, for instance, if it
17   was a drug problem, if the drug problem and I'm
18   counseling that inmate about his drug problem, I would
19   let him know that you are in jail not because you are
20   out robbing somebody, your problem is drugs, they have
21   drug programs that you need to sign up for, stay into
22   this drug program.
23       If you complete one and you still feel
24   that you are not sure of yourself, sign up for another

14 (Pages 50 to 53)

A000016

Justice v. Taylor, et al.
Wilbur F. Justice

**54**

1  drug program, you know, keep yourself clean; and, if
2  you have problems and you are thinking about using
3  drugs, come talk to somebody, you know.
4      Q.  Have you ever taken the correctional counselor
5  test?
6      A.  Correctional counseling test?  If I have, it
7  has been a while back.  It has not been any recent
8  time.  If I had taken it, it had to be in the '90s.
9  I'm not sure.
10      Q.  Do you a specific memory of ever taking the
11  correctional counselor's test?
12      A.  I would think that I have taken the
13  correctional counselor test.
14      Q.  Do you remember what the results were?
15      A.  No, I don't.
16      Q.  Did you pass?
17      A.  No, I know I didn't pass.
18      Q.  Third qualification is the ability to
19  communicate effectively both orally and in writing
20  including the ability to deal with unmotivated
21  individuals.  How did you demonstrate that?
22      A.  Well, communication is very -- one of the very
23  key issues.
24      A.  Unmotivated is a person that wants to blame

**55**

1  everybody but himself and you start by getting them to
2  participate in small things to get them unmotivated.
3  So, you start getting them involved in small things
4  whereas a person once they feel that they belong
5  because some people feel that I don't belong in
6  society and you have to motivate them to feel that
7  they do belong in society; but, they have to think
8  about who is holding you back, is it society or
9  yourself?
10      So, you have to start using small
11  techniques as far as getting them motivated and once
12  they see that, oh, I am just as good as the next
13  person, I can make something out of myself, they
14  appreciate that; but, if you don't encourage them,
15  then they will feel that, you know, I will just be
16  whoever and just do my time and when I get out it's no
17  big thing for me to come back into the institution.
18      Q.  You indicate on your application that you have
19  attended some courses at Del Tech, is that right?
20      A.  Yes.
21      Q.  Do you remember how many courses you took?
22      A.  Well, I only started out in the basic of
23  criminal justice.
24      Q.  Basic criminal justice course?

**56**

1      A.  Yes.
2      Q.  Did you complete that?
3      A.  No.
4      Q.  Do you remember when you took that?
5      A.  Somewhere in had to be in around '73, '74.
6          MR. NEUBERGER:  Could we take a break?
7          MR. NIEDZIELSKI:  Yes.
8          (Brief recess.)
9  BY MR. NIEDZIELSKI:
10      Q.  Mr. Justice, what are your hobbies?
11      A.  Baseball, bowling, pool, shooting pool.
12      Q.  Shooting pool?  Do you have your own pool
13  table?
14      A.  No.
15      Q.  Do you have your own bowling ball?
16      A.  Yes.
17      Q.  And baseball, are you talking about watching or
18  playing?
19      A.  Playing.
20      Q.  Softball or baseball?
21      A.  Well, I play both.
22      Q.  What position?
23      A.  Pitching and shortstop.
24      Q.  Slow or fast pitch?

**57**

1      A.  Slow and fast pitch.
2      Q.  And shortstop?
3      A.  Yes.
4      Q.  How long have you been in the National Guard?
5      A.  Well, with active duty in the National Guard
6  altogether 33 years.
7      Q.  Did you remain in the National Guard from the
8  time you left the service?
9      A.  No, I got out breaking service.  I didn't go
10  back in until '75.
11      Q.  You went back in the National Guard in '75?
12      A.  In 1975.
13      Q.  What rank did you go in as?
14      A.  Specialist.
15      Q.  Spec 4?
16      A.  Yes.
17      Q.  That's what they used to call them, spec 4's?
18      A.  Right.
19      Q.  In 1975 they went all the way up to spec 7's,
20  didn't they?
21      A.  Right.
22      Q.  Did you get promoted?
23      A.  No, I didn't get promoted until -- went in in
24  '75 and got back out in '77 and I went back in in '83.

15 (Pages 54 to 57)

Justice v. Taylor, et al.
Wilbur F. Justice

58

1    Q.  When you went back in in '83, what was your
2    rank?
3    A.  Still a specialist.
4    Q.  Pay grade E4?
5    A.  Right.
6    Q.  And when you went back in '83, did you remain
7    in the National Guard --
8    A.  Yes.
9    Q.  -- until the present time?
10   A.  Yes.
11   Q.  When did you get promoted to sergeant?
12   A.  In '85.
13   Q.  1985 you got promoted to E5?
14   A.  Yes.
15   Q.  Buck sergeant they call that?
16   A.  Yes.
17   Q.  Do they still call it buck sergeant?
18   A.  Somewhat.  Mostly now it's like sergeant
19   because of sergeant first class and staff sergeant,
20   but when you sign up you have to put what you are.
21   Q.  They use SG for sergeant?
22   A.  Yes, SGT.
23   Q.  Oh, you use SGT?
24   A.  SGT for sergeant, staff sergeant, SG.

59

1    Q.  But no T at the end?
2    A.  Not for staff sergeant.
3    Q.  When did you get promoted to staff sergeant
4    then?
5    A.  2002.
6    Q.  And that's an E6, right?
7    A.  Yes.
8    Q.  And that's designated by three chevrons up and
9    one rocker underneath?
10   A.  Yes.
11   Q.  And a sergeant would be three chevrons, no
12   rocker?
13   A.  Yes, no rocker.
14   Q.  What is your MOS now?
15   A.  42L35.
16   Q.  What is a 42 lima 35, is that what they say?
17   A.  Yes.
18   Q.  What is a 42 lima 35?
19   A.  It's administrative supervisor.
20   Q.  And what do your duties entail?
21   A.  Well, as administrative supervisor that's
22   because I've been into administrative, but at the same
23   time I have been doing training as NCO.
24   Q.  Is that MOS for training NCO, 42 lima 35?

60

1    A.  42 lima, no, that's the administrative MOS.
2    Q.  But in addition to that you are a training NCO?
3    A.  Yes, training NCO.
4    Q.  What kind of training do you do?
5    A.  Well, with the war and stuff going on I'm at
6    the range for the nine millimeters.  I'm like training
7    NCO for as far as the use of the weapon, the safety of
8    firearms.  So, that starts with the nine millimeters
9    and goes up to the M16.  With the war going on every
10   unit that has been activated has to be weapons
11   qualifications, weapon qualified, before they can
12   actually go over there.
13   Q.  You do the re-training and qualification for
14   the sidearm and basic rifle, correct?
15   A.  Yes.
16   Q.  Anything else?
17   A.  The gas mask.
18        MR. NEUBERGER:  You are saying you are a
19   firearms training officer?
20        THE WITNESS:  Yes.
21   BY MR. NIEDZIELSKI:
22   Q.  Which range do you use?
23   A.  The one on River Road.
24   Q.  Oh, in New Castle?

61

1    A.  Yes.
2    Q.  And I take it you use a Barretta model 92?
3    A.  They don't use them that much out there.  As a
4    matter of fact, they use the nine millimeters for the
5    sidearm and then they use the M-16.
6    Q.  Isn't the sidearm a Barretta nine millimeter?
7    A.  Yes.
8    Q.  It's a model 92?
9    A.  Yes, now, I'm not for sure about the model 92.
10   It should be because some people bring their own,
11   which officers, generals, on down.  So, they -- as far
12   as different times so they could be using.  Some of
13   them even have their 40's.
14   Q.  Oh really, their own personal 40?
15   A.  Right, but they train because of their rank
16   with another trainer or someone assigned to be the
17   training NCO for whatever situation they want to train
18   on their 40.
19   Q.  Does the National Guard offer training on the
20   40 caliber?
21   A.  I'm not for sure because we haven't trained
22   anybody on the 40.  I know the Department of
23   Corrections does.
24   Q.  But the 40 caliber that's not an Army-issued

16 (Pages 58 to 61)

Justice v. Taylor, et al.
Wilbur F. Justice

62

1  weapon, is it?
2      A.  No, because in the United States we only have
3  nine millimeters and the M-16.  We have some 14's, but
4  we don't train on them.
5      Q.  Can you get me one?
6      A.  No, that's a fine for something like that even
7  whether they use them or not.
8      Q.  So, you are administrative sergeant, what are
9  the duties of the administrative supervisor as
10  administrative sergeant?
11      A.  Well, the administrative supervisor is in
12  charge of all the administrative work that needs to be
13  done by section officers that is in your section, but
14  the paperwork even though they -- you know, once they
15  started with the computer way back when, even with the
16  computer now, if an officer that is in your section
17  has some paperwork evaluations that he wanted typed
18  up, then as administrative supervisor then you find
19  one of your clerk typists and you hand out, you
20  distribute the work to them.
21      Q.  You don't actually do it yourself, though?
22      A.  No.  You are just the person that makes sure
23  what needs to be done it gets done and you review it,
24  make sure that it's by military standard forms and you

63

1  give it to the person that asked for this to be done.
2      Q.  Are you presently working for the National
3  Guard full-time?
4      A.  Right now I'm doing some annual training
5  because I'm retiring next Wednesday.
6      Q.  You are retiring next Wednesday?
7      A.  Yes.
8          MR. NEUBERGER:  Sixty they make you leave.
9  BY MR. NIEDZIELSKI:
10      Q.  Unless you are a certain rank?
11      A.  No, didn't matter.
12      Q.  For enlisted?
13      A.  Enlisted, yes.
14      Q.  But officers it does matter, doesn't it?
15      A.  Officers have to be promoted in order to stay
16  in.  Enlisted can stay in the same rank, but at the
17  same time if you don't go to school and stuff, you are
18  not any benefit to them so they don't really want to
19  keep you in.
20      Q.  You have to make major in ten or you are out,
21  right?
22      A.  Yes.
23      Q.  Of course, there is an exception to that, isn't
24  there?

64

1      A.  It all depends on who it is.
2      Q.  If it's an officer that has prior enlisted
3  service?
4      A.  True, but all depends.  Some officers if there
5  is no need for that officer in what he is doing and
6  his time is in, then they just say you got your time
7  in, you know, we don't need that job.
8      Q.  What unit are you in?
9      A.  I'm with the 72nd troop command.
10      Q.  What is the 72nd troop command?
11      A.  That is the brigade of all the other units fall
12  under them.
13      Q.  Is it the headquarters --
14      A.  Yes.
15      Q.  -- of the brigade?
16      A.  Yes.
17      Q.  And the brigade is 187th signal brigade?
18      A.  No.  You have the joint force headquarters,
19  which is over by --
20      Q.  It's near Arundel?
21      A.  Yeah, that's one of the big units.  Most of our
22  unit is we find out all the units that is going to be
23  activated and we have to set up where we can train
24  them, weapons, gas mask and anything else they might

65

1  need.
2      Q.  Now, have you been full-time with the National
3  Guard at any point?
4      A.  No.  Well, you would put -- like I've been
5  working ADSW, which is active duty, which is I've been
6  doing that since July the 23rd up until the 30th of
7  September.  Then, now because of the year of National
8  Guard our military starts in October.  You are allowed
9  15 days of annual training.  So, because I'm retiring
10  then I'm doing my 15 days for 2008.
11      Q.  So, when you retire from the National Guard on
12  your birthday do you get a pension from the National
13  Guard?
14      A.  Yes.
15      Q.  How much?
16      A.  Right now I'm not for sure how much it is
17  because I'm doing training now, doing annual training,
18  then these are points towards my retirement.
19      Q.  That will be in addition to your pension you
20  are getting from the Department of Corrections,
21  correct?
22      A.  Correct.
23      Q.  Now, would you give me an outline and dates and
24  times when you were either a member of the union?

17  (Pages 62 to 65)

Justice v. Taylor, et al.
Wilbur F. Justice

---

66

1    A. Well, in my Interrogatory package is specific
2  dates and times, but I recall latter part of 2003,
3  2003 of August, up until February 1st of 2007.
4    Q. When you retired?
5    A. Yes.
6    Q. What was your position with the union?
7    A. I was vice-president in 2003, 2004. 2005 I
8  became president up until 2007, February 1st.
9    Q. You remained the president from 2005 to 2007?
10   A. Yes, two-year term.
11   Q. Do you run for office within the union?
12   A. Yes, you have to run for office.
13   Q. When you were the vice-president in 2003 and
14 2004, did you run for that position?
15   A. In 2003 I had to be accepted by the executive
16 board because they didn't have a vice-president at
17 Morris Correctional Community Center. So, I had been
18 in the union with Council 81, which is the same union,
19 they just changed names. Counsel 81 represented the
20 union, 1726 at that time.
21   Q. The present union's name is COAD, correct?
22   A. COAD.
23   Q. And formerly it had another name?
24   A. Yes.

---

67

1    Q. And it was de-certified by its membership,
2  correct?
3    A. Right.
4    Q. Do you remember when that occurred?
5    A. In '99. It was DCOA.
6    Q. DCOA, that's right. And that union got de-
7  certified by the members, correct?
8    A. Correct.
9    Q. And they formed a new union called COAD?
10   A. Yeah.
11   Q. And do they have a vice-president from each
12 facility?
13   A. Yes, they do.
14   Q. And to be in COAD you can't be above the rank
15 of sergeant, correct?
16   A. Correct.
17   Q. You have to be a correctional officer, corporal
18 or sergeant?
19   A. Right.
20   Q. Are there other unions that represent the
21 lieutenants?
22   A. Yes. That's AFSCME, 247.
23   Q. That's a different union?
24   A. Yes.

---

68

1    Q. Is there a different union that represents the
2  probation officers?
3    A. Yes.
4    Q. Do you know which one that is?
5    A. FOP represents them.
6    Q. What about correctional counselors, who do they
7  belong to?
8    A. They fall under 247.
9    Q. And what about the program work coordinators?
10   A. Program work coordinators they fall under 247.
11   Q. No matter where you work in the Department of
12 Corrections unless you are very high level management
13 you are probably going to belong to a union?
14   A. That's a state law.
15   Q. Do you recall from the year 2003, 2004 what was
16 your particular job, what were you doing for COAD?
17   A. Well, my job as COAD I was executive board
18 member, which we had to gather information of
19 complaints from your institution. If there were
20 grievances or labor management meeting that was an
21 issue at your institution, which management -- which
22 administrative would handle, you could give some
23 insight to another institution on what they're doing
24 at this institution because all institutions

---

69

1  supposedly work the same. Whether they do or not, but
2  they're supposed to work the same.
3        As an executive board member it wasn't
4  just that you take care of your institution. Because
5  of your position and because of the confidence that
6  other officers felt in you as a member and also as a
7  correctional officer, corporal or sergeant any member
8  had a right to choose whoever they want to represent
9  them.
10   Q. But the vice-presidents were they appointed by
11 the executive board?
12   A. Yes. Well, at that time the vice-president
13 wasn't there at MCI. Some of them get the job and
14 some of them get promoted so they leave. So, at the
15 same time because the election is over, then the
16 executive board can appoint once a person submits
17 their name to be the vice-president, even the
18 president. If the president gets promoted out of the
19 union, then they have to take the senior vice-
20 president will be acting and then he has to also
21 within -- it has to be over a year. If not, then an
22 election has to occur again.
23   Q. Do you have any members of the executive board
24 that have been promoted out of the union?

---

18  (Pages 66 to 69)

Justice v. Taylor, et al.
Wilbur F. Justice

70

1    A.  A lot of people got promoted out of the union.
2    Q.  In 2003 and 2004?
3    A.  2003, 2004?  I'm not so sure about 2003, 2004.
4    It's a possibility -- latter part of 2004 -- well, a
5    couple people that was with the union got promoted.
6    Q.  Who would they be?
7    A.  Alan Pedrick, Lisa Davis.
8    Q.  And they were in the executive board, do you
9    remember what their positions were?
10   A.  Alan Pedrick was vice-president at Gander Hill.
11   Lisa David was vice-president at DCC.
12   Q.  Do you know in Pedrick's case what he was
13   promoted to?
14   A.  Lieutenant.
15   Q.  And Davis?
16   A.  Lieutenant.
17   Q.  You indicate that the reason the executive
18   board has to have the ability to kind of fill in is
19   because on some occasions these people are promoted
20   out of the union, correct?
21   A.  Yes.  What I'm saying is that if a vice-
22   president from any institution are even -- you know,
23   if a vice-president or senior vice-president or
24   president had put in for promotion, it all depends on

71

1    the time left on the two-year that they were elected,
2    whether they bring in -- they do another election or
3    whether they -- whoever submits their name to fill
4    that person's term to finish out.
5    Q.  Do you know if any of the executive members of
6    the Department of Corrections in 2004 -- I'm talking
7    about upper management -- do you know if they had been
8    members of the union?
9    A.  Okay, could you rephrase that.
10        MR. NEUBERGER:  Yes, I didn't understand
11   myself.
12   BY MR. NIEDZIELSKI:
13   Q.  The executive members of the Department of
14   Corrections do you know whether any of those
15   individuals had in their prior life been members of
16   the union?
17   A.  I don't remember, I don't remember Pedrick or
18   Lisa Davis being a union member -- I mean, they always
19   was a union member, but as far as holding a position.
20   Q.  No, okay, maybe I didn't make myself clear.  In
21   2004 who was the bureau chief?
22   A.  You still have Stan -- I mean, Paul Howard.
23   Q.  Do you know if Paul Howard had a position with
24   the union when he was a correctional officer?

72

1    A.  Yes.
2    Q.  What was his position?
3    A.  He said he was president of the union one time
4    before.
5    Q.  He was part of the bargaining unit, was he not?
6    A.  If he was president he had to be president of
7    the bargaining union.
8    Q.  Do you know if Stan Taylor had been a member?
9    A.  I don't know about Stan.
10   Q.  Isn't it true that every lieutenant, captain,
11   major in the Department of Corrections had at one time
12   been a member of the correctional officers union?
13   A.  Not all.
14   Q.  Which ones had not been members of the
15   correctional officers union?
16   A.  Let's go with -- well, you take one guy at
17   Gander Hill, he might still be staff lieutenant,
18   Fahey, he has never been part of the union.
19   Q.  He has never been a correctional officer?
20   A.  Oh, he has been a correctional officer.  You
21   said part of the union.
22   Q.  But if you are a correctional officer, aren't
23   you part of the union?
24   A.  Yeah, right.  You are saying -- rephrase it.

73

1    Q.  You agree with me that nobody gets promoted to
2    lieutenant unless they have been either a sergeant or
3    correctional officer, correct?
4    A.  Yes, they have to be a correctional officer.
5    Q.  You agree with me everybody since you have been
6    with the Department of Corrections who is a
7    correctional officer up to sergeant has been a member
8    of the correctional officers union?
9    A.  Yes.
10   Q.  You agree with me that nobody who is presently
11   a lieutenant or above every one of those persons at
12   one time was a member of the correctional union,
13   correct?
14        MR. NEUBERGER:  You don't mean officer in
15   the union, you mean just a member?
16        MR. NIEDZIELSKI:  Just a member.
17   A.  Yes, they have to, that's state law.
18   Q.  Now, as a member of the executive board what
19   were some of your duties in 2003, 2004?
20   A.  Well, as I said earlier, gather information
21   that would benefit the members, talk with management.
22   If there was a problem at my institution, one
23   lieutenant could say -- for each shift just an example
24   that they had old forms of return to work and this

19  (Pages 70 to 73)

Justice v. Taylor, et al.
Wilbur F. Justice

74

1   lieutenant came from Georgetown and he is telling the
2   officer, I want this form filled out, return to work.
3   Well, at the same time administrative had came out
4   with new forms. So, he goes to personnel and he gets
5   the new form and he turns it in and then the
6   lieutenant says, No, I don't want that form, I want
7   the form from Georgetown.
8          Well, you know, coming to me is like,
9   well, you have to go with the new form that is out and
10  the same lieutenant is like if you don't turn in this
11  form, I'm going to discipline you, write you up and
12  all that. You take that same information and you go
13  to staff lieutenant, which is over the lieutenant, and
14  he tells you, okay, I'll handle it. He goes to the
15  lieutenant and straightens it out. That's some of the
16  information -- some of the things that you have to
17  resolve and then it turns out the lieutenant writes
18  the person up and then you have to turn around and you
19  have to agree.
20  Q.  Did you attend labor management meetings?
21  A.  Yes.
22  Q.  How many?
23  A.  As often as they're called. When they pass
24  state then they have to put your institution -- see,

75

1   they can have labor management at your institution and
2   then they can have labor management meeting for all
3   corrections, which means all vice-presidents has to
4   show to speak on behalf of their institution.
5   Q.  Did they have any in 2004, statewide labor
6   management meetings?
7   A.  2004? We were in the contract negotiation -- a
8   lot of things went on in 2004 and in the Interrogatory
9   report. At that time with all the stuff going on I
10  can't see where we would have time for a labor
11  management meeting because we was in contract
12  negotiations.
13  Q.  Who was at these contract negotiations
14  meetings?
15  A.  Well, the commissioner is there, Mr. Machtinger
16  was there, some of the wardens from different
17  institutions, Tom Carroll, Raphael Williams. Vince
18  never showed up as far as his institution down to
19  Georgetown.
20  Q.  Rick Kearney?
21  A.  Rick Kearney would show up. At Plummer Center,
22  I can't think of his name, he would show up.
23  Q.  Embrick?
24  A.  No.

76

1   Q.  Phillips?
2   A.  He would show up. I mentioned Tom Carroll.
3   Someone from maintenance department, DCC.
4   Q.  Were they in a separate union?
5   A.  Well, you are talking about deputy wardens and
6   warden stuff.
7   Q.  At these labor management meetings that you are
8   talking about were they contract discussions during
9   this period of time, 2004?
10  A.  No, that was just about institution. We had
11  contract negotiations going on, but you are asking
12  were there labor management meetings during that time
13  -- no, you were asking who would all come to them?
14  Q.  You talked about the labor management meetings
15  during 2004, right?
16  A.  Yes.
17  Q.  Did you attend those?
18  A.  Yes.
19  Q.  How many did they have?
20  A.  I can't recall because, like I stated before,
21  with the contract negotiation going on I can't recall
22  us having the labor management meeting in the misdt of
23  all that because we weren't getting anywhere with the
24  contract negotiation and then with all the other stuff

77

1   that went on during -- we had some meetings with the
2   commissioner, but it wasn't labor management meeting.
3   It was about how to fix the problem of longevity,
4   career ladder, the shortage of staff, you know, public
5   safety and how to retain people and what kind of raise
6   you would get.
7   Q.  Do you recall meeting -- doing contract
8   negotiation meetings, do you recall going to any
9   contract negotiation meetings?
10  A.  Yes.
11  Q.  In 2004?
12  A.  Yes.
13  Q.  How many of them did you attend?
14  A.  In 2004 every one they had in 2004.
15  Q.  Do you remember how many they had?
16  A.  I'm not sure, I'm not sure because we would
17  have one and we would always ask when the next one is?
18  We'll let you know. So, if things heated up it was
19  almost like they would bring us in to satisfy the
20  membership because the membership wanted to know how
21  come we don't have a contract. So, they would bring
22  us in to make us feel that we're accomplishing
23  something, which we were there all day doing
24  absolutely nothing because all of our articles that we

20 (Pages 74 to 77)

Justice v. Taylor, et al.
Wilbur F. Justice

## 78

1 submitted to them they would turn them down or
2 sometimes they wouldn't even answer us and just said,
3 We'll look them over, because we sat in one room and
4 they sat in another.
5 Q. At these meetings you indicated the union would
6 sit in one room, correct?
7 A. Right.
8 Q. And the management would sit in another room?
9 A. Correct.
10 Q. How would they get information to one another?
11 A. Because Mr. Machtinger would come down with
12 Gerry Cutler and they would pick up our articles.
13 Initially, they had tried to have face-to-face
14 contract negotiations, but it was too much arguing,
15 too much disagreement. They realized we weren't
16 accomplishing anything. So, they decided, you know,
17 the union go down in a room, put your articles
18 together, submit it back to management, we'll look
19 them over and we'll let you know what we're going to
20 do with them.
21 Q. Did the union have their own negotiators?
22 A. Yes, we did.
23 Q. Who were they?
24 A. Well, they started off with -- when I came

## 79

1 aboard it was with Public Service Profession
2 Association, which was called PSPA, and they had Tom
3 Ridgley was their contract negotiator.
4 Q. Tom Ridgley?
5 A. Yes, in 2004.
6 Q. And he worked for the union, correct?
7 A. He worked for the union.
8 Q. Give me a description of these meetings, these
9 contract negotiations, the union would be in one room
10 and management would be in another room, correct?
11 A. Yes.
12 Q. When were in your room with the rest of the
13 union members, what were you doing in that room?
14 A. Working on articles that the union -- we had a
15 task force report that they recommend that would be
16 best for everybody. So, we would take from the task
17 force and work on something that we felt was in the
18 best interest for the union and management and then --
19 and because management obviously didn't like the task
20 force report they brought them in to do discovery on
21 what needs to be fixed an all that; but, when the
22 report came back, they felt it benefit the members
23 versus management.
24 Q. Okay, but, I mean, physically so the members of

## 80

1 the union would discuss the task force report,
2 correct?
3 A. Correct, we had the task force report with us
4 and then we would take from the articles that the
5 union is saying they weren't going to approve.
6 Q. What articles are you talking about?
7 A. Well, we had the articles of -- for one we had
8 them where as far as the promotion process that was
9 one of the big ones because if a person to be promoted
10 if he had disciplinary, then take points away from
11 him; but, the way management has it set up if you have
12 disciplinary, you don't get an interview at all. So,
13 a person can have 40 years and if a position opened up
14 and he had a disciplinary within that year, he is not
15 allowed to put in for that job.
16 The thing is that we were saying, okay,
17 task force recommended there is a point system that
18 you take away, same way you give points for seniority.
19 Don't knock this guy out of the box because he had an
20 infraction where some lieutenant wrote him up and it
21 might not have been the right way to handle it, but at
22 the same time it stops him from interviewing.
23 Q. The articles you are talking about, are they
24 articles in the old contract that you are speaking of?

## 81

1 A. When you say "old contract," which contract are
2 you referring to?
3 Q. There was a contract I believe that had been
4 between management and the correctional officers union
5 which had been adopted some earlier time.
6 A. Right.
7 Q. And then rather than negotiate a new contract
8 there was was a number of provisions to extend the
9 terms of the contract, correct?
10 A. Correct.
11 Q. And when you talk about articles, are you
12 speaking about the articles of the contract?
13 A. Yes.
14 Q. So, for instance, one of the articles of the
15 contract involves promotion, correct?
16 A. Correct.
17 Q. And you wanted to change that so you would
18 propose rather than -- what you just discussed you
19 would propose that as a change to that article?
20 A. Correct, based on the task force
21 recommendation.
22 Q. And who would write these things up?
23 A. As far as union side or administrative?
24 Q. Union side.

21 (Pages 78 to 81)

Justice v. Taylor, et al.
Wilbur F. Justice

82

1    A. Well, we would take the person that -- which
2    was like the we would say would be the secretary that
3    would do the writing which we would submit, but what
4    happened is they were putting it on computers. We
5    would put it on words on paper and then put it on a
6    computer and print it out and then submit it to them.
7    Q. Who was doing that, the secretary?
8    A. She wasn't actually a secretary. We just like,
9    you know, you do the writing and then whoever would do
10   the writing because Tom Ridgley was the contract
11   negotiator, he would take what we all agreed on and he
12   would call Mr. Machtinger, call down to the office
13   they were in, okay, we have some articles to submit to
14   you.
15   Q. And so they would come down to your room and
16   they would pick up this printed off, whatever it was?
17   A. Whatever articles.
18   Q. And I guess they were suggested changes to the
19   articles of the contract?
20   A. You are saying us or them?
21   Q. It was your proposed changes to the present
22   articles of contract, correct?
23   A. Right.
24   Q. And they would take them back and say we will

83

1    get back to you or something like that?
2    A. Right.
3    Q. Do you recall how many of these meetings you
4    had?
5    A. We had several. I can't recall exactly numbers
6    of meetings because there were meetings that we showed
7    up and because certain members of their -- from
8    different institutions, wardens and stuff, didn't make
9    it the meeting was canceled, but you are free to stay
10   here and work on articles that you want to submit to
11   us. So, you can't call that really making any headway
12   as far as contract negotiations.
13   Q. The way you described it is that the way that
14   all these contract negotiation meetings were done in
15   2004?
16   A. 2004 on up until we quit negotiation because of
17   the change of election, went all the way up to there.
18   Q. You quit -- I don't understand.
19   A. We stopped contract negotiation somewhere in
20   2006.
21   Q. Why?
22   A. Because all the stuff that was going on again
23   in 2006. Management wasn't addressing any of our
24   contracts. We had a problem with the negotiator and

84

1    we even went to arbitration because we wasn't making
2    any headway and at that time we brought in Ms.
3    Christine Whitehead to help negotiate with the
4    negotiator, Tom Ridgley. So, we ended up going to
5    arbitration and so that stopped the contract
6    negotiation over the articles that we had.
7    Q. How many times in 2004 did you meet with Alan
8    Machtinger?
9    A. Well, every meeting Machtinger was there and
10   every contract negotiation I was there.
11   Q. Would you personally meet with Alan Machtinger,
12   though, by himself?
13   A. No, no one did.
14   Q. Would any individual in the union meet with
15   Alan Machtinger by himself?
16   A. No. The head negotiator might talk to
17   Machtinger, but it would always be one of the members
18   with them. I went with the head negotiator to give
19   articles to Machtinger and turned around and went back
20   to the room, but not in 2004 because it was more of
21   the president's position to go with the negotiator.
22   That way nothing could be said about a disagreement,
23   you know, whereas the negotiator could agree with
24   Machtinger with nobody from the executive board being

85

1    there.
2    Q. So, only the president of the union would
3    usually escort the negotiator, correct?
4    A. President or the senior vice-president.
5    Q. And the reason for that was you didn't want
6    anybody other than the negotiator and the president
7    meeting with their negotiator, correct?
8    A. No, that's not what I'm saying.
9        MR. NEUBERGER: That's not what he said.
10   BY MR. NIEDZIELSKI:
11   Q. You said you didn't want them to discuss --
12   A. We didn't want our head negotiator to go there
13   by himself to meet with Machtinger and Gerry Cutler
14   because he was their attorney.
15   Q. He was their what?
16   A. Their attorney for the contract.
17   Q. He was a negotiator?
18   A. Yes. So, we want our lead negotiator to go
19   down there because we had put in work with his input
20   and so what we came up with we would give it to him,
21   but it would be senior vice-president or president
22   that would go and make sure that only thing that
23   happened was the exchange of paper.
24   Q. That's the point. So, a member of the union

22 (Pages 82 to 85)

Justice v. Taylor, et al.
Wilbur F. Justice

**86**

1  would go with the negotiator and deliver the piece of
2  paper?
3     A.  Right, of the articles.
4     Q.  And that was it, and then they would return to
5  your room?
6     A.  Right.
7     Q.  And then Machtinger and/or Cutler would take
8  that piece of paper and go in their room?
9     A.  They would take it back to the other wardens or
10  sometimes it was vice versa, Machtinger and Gerry
11  Cutler would come to our room and ask have you all
12  finished the articles that you want to propose to us?
13  So, it wasn't they always went there. Sometimes they
14  would come down there.
15     Q.  Your understanding was Gerry Cutler was the
16  negotiator on behalf of management, correct?
17     A.  Right.
18     Q.  How did those meetings go? What was the nature
19  of the meeting? Were people being angry at you or
20  something like that?
21     A.  Angry at me?
22     Q.  Yes.
23     A.  What people are you talking about?
24     Q.  Anybody.

**87**

1     A.  Well, the membership felt we weren't getting
2  anywhere because they felt management was stalling.
3  They felt management didn't want a contract because it
4  was '99 last contract, it's 2007. So, management as
5  long as they don't have a contract they can do what
6  they want to do.
7        So, we was catching a lot of heat from the
8  membership because of the fact that we couldn't get a
9  contract because of the fact that we showed them the
10  proposals that we worked so hard on and Machtinger was
11  the one that would give us release time to do it and
12  we had problem getting release time to even work on
13  the proposals. So, we would have them ready for
14  management where it wouldn't take all day, where we
15  would get some feedback to take to our membership, but
16  that didn't work either because we felt --
17     Q.  I'm sorry, you weren't done?
18     A.  Because we felt that you all can work on it on
19  your own time and we are saying let us hurry up and
20  try and get a contract, give us time to do these
21  proposals. We would be in the union hall six and
22  seven o'clock in the morning so we could get them done
23  and take them over. We wouldn't always be over to
24  personnel. We would do our proposals right there at

**88**

1  the union hall and take them over to them and it was,
2  Oh, we'll look them over. We would sit there and they
3  wouldn't respond and we was like can we go to lunch?
4  Yeah, take a lunch break. Then, we come back and we
5  are still sitting there and we'll get back to you.
6  When is the next date? We'll let you know.
7     Q.  Where would you meet for these contract
8  negotiations?
9     A.  Most of the time it was at the employment
10  office.
11     Q.  243 McKee Road?
12     A.  Yes.
13     Q.  You said you were working on a new contract,
14  correct?
15     A.  Well, some -- it was a new contract because
16  once the other contract expires it's a new contract.
17  Even though it has some of the same proposals in there
18  that we didn't have no problem with, but the
19  government brought in the task force to help out on
20  recommendations to make both parties happy; but, at
21  the same time management felt that we don't want to go
22  by what the task force recommends, we're management,
23  we'll do it our way.
24     Q.  What is release time, you mentioned release

**89**

1  time?
2     A.  Release time so as an executive board and even
3  though we didn't have a contract we had an in-term
4  agreement --
5     Q.  In-term agreement?
6     A.  Yes. -- with the state and the union that any
7  time contract negotiations, labor management meeting,
8  handling grievances, elections, that you are supposed
9  to get release time.
10     Q.  What is that?
11     A.  That release time is that you are able to be
12  released from work to take your union -- take care of
13  your union business during the course of your eight-
14  hour shift.
15     Q.  Release time is when you are released from your
16  normal duties as an employee at the Department of
17  Corrections to do union matters?
18     A.  Right.
19     Q.  And you get paid for it?
20     A.  Right.
21     Q.  Release time is actually still part of your
22  job, though?
23     A.  Exactly.
24     Q.  So, you are doing your job as a Department of

23 (Pages 86 to 89)

Justice v. Taylor, et al.
Wilbur F. Justice

90

1  Corrections employee, but you are doing it for the
2  union?
3  A. Right.
4  Q. Then, you became the president when?
5  A. 2005.
6  Q. And you got elected to that position?
7  A. The president that was elected in February
8  resigned in 2005 after about three months.
9  Q. Why did he resign?
10 A. It was his own personal issue.
11 Q. You don't know why?
12 A. All I know is it was his own personal issue.
13 Q. You see this extremely large stack of papers?
14 A. Um-hum.
15 Q. I got this from your lawyers. When they gave
16 it to us it was on a disk, a CD.
17     MR. NIEDZIELSKI: And I guess, Tom, you
18 would be willing to stipulate that, in fact, these are
19 your documents and your production?
20     MR. NEUBERGER: Well, I'll stipulate that
21 anything that has a P number on the bottom, 01 through
22 480 some, appears to have come from us.
23 BY MR. NIEDZIELSKI:
24 Q. Why don't you start looking through these. Do

91

1  you see what they are essentially?
2  A. Yes, okay.
3  Q. There appears to be a number of articles from
4  newspapers that have been reproduced and been printed
5  out, is that correct?
6  A. Correct.
7  Q. You have seen those before, is that correct?
8  A. Yes.
9  Q. In fact, these were at the -- were you at the
10 deposition of Stan Taylor?
11 A. I was at the deposition with Stan Taylor, yes.
12 Q. Do you recall that Mr. Stephen Neuberger went
13 through those articles?
14 A. Well, it wasn't this thick.
15     MR. NEUBERGER: It wasn't in that form, I
16 mean?
17     THE WITNESS: Right.
18     MR. NEUBERGER: Did he make them as
19 exhibits to the deposition?
20     MR. NIEDZIELSKI: Yes.
21 BY MR. NIEDZIELSKI:
22 Q. Do you recall there was a large number of them?
23 A. Yes.
24 Q. Can you recall or tell me where in any of those

92

1  articles you are quoted?
2  A. In 2004?
3  Q. Yes.
4  A. In these articles from 2004 what they -- if you
5  are asking me did I personally say anything? Is that
6  what you are asking me?
7  Q. Yes.
8  A. I didn't personally say anything, but at the
9  same time that the executive board is made up for us
10 to represent the members and what we say in the
11 president on down because the president and senior
12 vice-president are the ones to speak to the media,
13 newspaper or radio, or whether it be called for
14 deposition, but whatever is being said has been
15 discussed between the executive board.
16 Q. Just so we are clear you were never quoted as
17 saying anything in 2004?
18 A. In 2004 I was never personally quoted as saying
19 anything.
20 Q. Did you make any statements, public statements,
21 in 2004?
22 A. In 2004 me personally speaking to the media I
23 didn't personally say anything.
24 Q. Since 2004 have you made any personal

93

1  statements to the press, the media, anything like
2  that?
3  A. You mean since I became president?
4  Q. Yes.
5  A. Yes.
6  Q. When was that?
7  A. 2005, 2006.
8  Q. Is there anybody that was on the executive
9  board in 2004 who was quoted in the newspaper and was
10 subsequently promoted to a job position they applied
11 for?
12 A. Okay, would you rephrase that.
13 Q. Anybody that was a member of the executive
14 board along with you in 2004 who was quoted in the
15 newspaper as saying something that was actually
16 promoted?
17 A. Okay, I think Dave Knight was a corporal
18 promoted to sergeant. I think that just happened
19 maybe in 2006.
20 Q. And you mentioned two other people, Pedrick and
21 Davis, who were promoted to lieutenant?
22 A. Right.
23 Q. Anybody else?
24 A. I don't recall anybody else.

24 (Pages 90 to 93)

Justice v. Taylor, et al.
Wilbur F. Justice

94

1    Q.  Have you ever had a personal one-to-one
2    conversation with Alan Machtinger?
3    A.  I have talked with Machtinger not — whereas we
4    have talked in discussion, but not where we were in a
5    room by ourselves.
6    Q.  How has he treated you on those occasions when
7    you have met or seen Mr. Machtinger?
8    A.  Well, my opinion of Mr. Machtinger is it's not
9    so much how he treats me.  It's like he feels that
10   what he says is the right way — I mean, I just feel
11   that he is into every promotion, grievance.  Even at
12   contract negotiation a lot of issues that Stan didn't
13   have a problem with he voiced his opinion.
14   Q.  I'm asking you about you personally, how did he
15   personally treat you?
16   A.  Well, I just felt that in a way he had to be
17   professional towards me and I had to be professional
18   towards him.  That's about the scope of it.  As far as
19   agreeing on anything it wasn't there.  There were
20   times that we met.  There were times that I had called
21   him or E-mailed him about something and he would
22   E-mail back, it's not happening, it ain't going to
23   happen.
24        So, we were very short — I was very short

95

1    with words and he didn't have any other choice because
2    in order for him to say anything to me I had to
3    approach him.
4    Q.  But he always treated you professionally?
5    A.  Yes.
6    Q.  And you always treated him professionally?
7    A.  Yes.
8    Q.  And he always treated you with courtesy?
9    A.  Well, I wouldn't say courtesy.  A person can be
10   professional, but still have their own way of letting
11   you know that, you know, I'm in charge of things and
12   it's my way or no way.
13   Q.  He never insulted you, did he?
14   A.  Well, with E-mails you can't say that it didn't
15   happen, ain't going to happen.  You could say we don't
16   do this.  When it come time for us to be off even for
17   contract negotiations he would always say, well, we're
18   not giving release time for this, release time for
19   that.  Do you take that as an insult?
20   Q.  Well, that's a disagreement, you agree,
21   correct?
22   A.  It's a disagreement, but it's other ways of
23   handling it because he is not the warden of any of
24   those institutions.

96

1    Q.  Is it his job to determine release time?
2    A.  It's the warden's job.
3    Q.  Does he give direction or release times?
4    A.  Who?
5    Q.  Alan Machtinger.
6    A.  It all depends.  I never had to — I had to go
7    to my warden.  I didn't have to go to Machtinger for
8    any release time.
9    Q.  When were those opportunities that you would
10   E-mail Machtinger about release time?
11   A.  Because of other executive board members
12   couldn't get off and other executive board members
13   would do the same thing, go to the warden, because
14   they knew that Machtinger if it was up to him, they
15   wouldn't get off.  So, they were able to go to their
16   warden and say, look, we have a meeting.  Most wardens
17   didn't have a problem.  Only way they would stop them
18   is if they were short of staff or had to call in
19   overtime.
20   Q.  So, if you went to the warden and the warden
21   said, We're short of staff, could he he deny you
22   release?
23   A.  The warden?
24   Q.  Yes.

97

1    A.  Yes, he could.
2    Q.  Has that happened?
3    A.  No, not with me.
4    Q.  Has it happened with other executive board
5    members?
6    A.  Some of them.  Some of them it happened.  You
7    know, some of them it all depends on the relationship
8    they have with their warden.
9    Q.  You have never personally been denied release
10   time?
11   A.  I can't say I've been denied by my warden.  I
12   mean, I think if you ask the warden we had a
13   discussion where he didn't have a problem or at least
14   he would tell me, but then he would tell the staff
15   lieutenant under him and they would be questioning me
16   why I'm going to do this, why I'm going to do that.  I
17   got a call from Stan Taylor one day, told me to come
18   over to his office.  I called my lieutenant.  I said,
19   Stan wants to see me.  They said, Well, he can't just
20   call over here and tell you to come to the office.
21   How long are you going to be?  I said, I don't know.
22        I walked in Stan's office, I said, You
23   need to get something straight.  He said, Who is
24   bothering you?  So, when I told Vince, he said, Well,

25  (Pages 94 to 97)

Justice v. Taylor, et al.
Wilbur F. Justice

98

1    I don't want no problem with Stan, you can go any time
2    you need to go, but that's when Vince is there. If he
3    is not there, like I told Vince I did union duties
4    after work because if I told the lieutenant that I
5    need to go sign out some checks because bills need to
6    be paid it was, We don't have enough staff or you are
7    pulling from the shift. We had plenty of staff.
8        So, I got to the point of all the rebuttal
9    behind it that I just said, Look, I'll do it when I
10   get off work. I didn't go to Stan. When Stan asked,
11   Who is bothering you, I just said, Well, you know,
12   I'll talk to Vince about and Vince as far as he was
13   concerned, but when he wasn't there and then because
14   Vince told me I worked more than any president that
15   was there; but, at the same time when he wasn't around
16   then I caught it from his staff lieutenant and
17   lieutenant.
18   Q.  And they would deny you permission for release
19   time?
20   A.  They would tell me, No, you can't go. One time
21   I was going because as the president and the state is
22   ready to enter into an agreement that he gets release
23   time to handle union business during normal working
24   hours. They was like, No, you can go after. If I go

99

1    to graduating class to brief them on -- sign them up
2    for the union they said in a memo, Well, when you get
3    done come back to work. They had more than enough
4    help.
5        I was like, When I get done? What about
6    all the work I got to do after I get them signed up?
7    I got to get the paperwork done and get it back to
8    personnel so these people can start paying with their
9    pay. If I don't, when do I get it done? They are
10   sort of like, well -- I had been doing it, but all of
11   a sudden everything changed. So, you asked me why
12   didn't I stay.
13   Q.  Have other union officers abused release time,
14   not you?
15   A.  I can't speak for other, you know, union
16   officers because my thing is like I told them I had
17   enough time that if I went at all I could take the
18   time. I don't need the union to abuse time. Stan, he
19   perfectly told me if you have problems, let me know,
20   but I didn't want to cause a bunch of problems with
21   Vince even though Vince okayed it, but at the same
22   time he had to tell the lieutenant, staff lieutenant,
23   that if he goes make sure he comes back and all this.
24   Q.  My question to you was not you, but have other

100

1    union officials abused release time?
2    A.  I can't speak on that because they weren't at
3    the institution with me, you know. So, like I was
4    saying, I was in the union when it was 1726. I didn't
5    abuse it and I didn't get into the union to get off.
6    I got into the union to do a job.
7    Q.  Did some people get in the union to get off?
8    A.  I can't answer that.
9    Q.  You never heard of that?
10   A.  I mean, you are going to hear -- if the truth
11   be told a lot of the union members, the ones that you
12   talk about got promoted, got in the union; but, at the
13   same time if I'm going onto management -- going to
14   want management to not fight as hard for my members
15   I'm going to get promoted.
16       So, you are asking, okay, why -- did some
17   of the people that was on the executive board during
18   2004, did they get promoted? Okay, then you check
19   with ten members from their institution and ask them
20   why did they get promoted because as a member they
21   didn't go in and fight for them against management.
22   So, I mean, if you want to know what that is all
23   about.
24   Q.  Why don't you give me examples. Who, for

101

1    instance?
2    A.  If you are talking about how Pedrick got
3    promoted, Lisa David got promoted, if you are on
4    management side when it comes to one of your fellow
5    officers, then eventually management got to take care
6    of them.
7    Q.  That's your testimony that the reason that
8    Pedrick --
9    A.  I'm not saying that's my testimony that's why
10   he got promoted. He had to pass a test.
11   Q.  And what about Davis?
12   A.  I'm not saying the same thing, but you are
13   saying what about the two people. I'm saying in the
14   situation where a lot of people that got promoted that
15   if you wanted to check with the members, you check
16   with the members and then get their testimony.
17   Q.  What I'm asking you is are you saying that is
18   the case with Pedrick and Davis?
19   A.  I'm not saying that's the case.
20   MR. NEUBERGER:  He is not saying it's
21   rigged in the sense they cheated on the test. He is
22   saying they would not fight for the workers while they
23   were on the executive committee. I think he has made
24   that clear.

26 (Pages 98 to 101)

Justice v. Taylor, et al.
Wilbur F. Justice

**102**

1    MR. NIEDZIELSKI: I don't think that's what
2  he said.
3    THE WITNESS: That's exactly what I said.
4  BY MR. NIEDZIELSKI:
5    Q. You are not saying that in the case of Pedrick
6  and Davis?
7    A. I'm not saying that in the case of Pedrick or
8  Davis.
9    Q. You are saying that they were not necessarily
10  aggressive on behalf of the union members when they
11  were in the union?
12    A. Because of some of the people that I had to
13  represent from that same institution felt that I don't
14  want them because they don't say nothing, they don't
15  fight to help me out. I don't know about Lisa Davis
16  because I didn't have to deal with anybody from DCC
17  because I was at MCI. I worked at Gander Hill for
18  twenty years, okay, so the members there knew that I
19  was for what is right and so they would call me and I
20  don't want him to go in here with me.
21    So, even though they had vice-president,
22  shop stewards there I would get with one of the stop
23  stewards and whatever incident it could be related to
24  something that I have Alan and I would tell them, Hey,

**104**

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

**103**

1  handle it this way or handle it this way.
2    Q. I understand.
3    MR. NIEDZIELSKI: Okay, we are going to
4  conclude the deposition at this point. Would you like
5  to ask some more questions?
6    MR. NEUBERGER: No. We don't have any
7  questions and I think there might have been one or two
8  misstatements so we won't waive reading and signing.
9  We'll have him read just in the case of a correction
10  and thank you for using your time productively.
11    (The deposition was concluded at 12:27
12  p.m.)
13    INDEX
14
15  DEPONENT: Wilbur F. Justice    PAGE
16    Examination by Mr. Niedzielski    2
17    EXHIBITS
18  JUSTICE DEPOSITION EXHIBITS    MARKED
19  1  Document Bates stamped D000564
     through D000567    40
20
     2  Document Bates stamped D000571    48
21
     3  Document Bates stamped D000579
22    through D000581    49
23  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 104
24
     CERTIFICATE OF REPORTER    PAGE 105
     CERTIFICATE OF REPORTER    PAGE 105

**105**

1  State of Delaware  )
                      )
2  New Castle County  )
3
4    CERTIFICATE OF REPORTER
5
6    I, Christina M. Vitale, Certified Shorthand
   Reporter and Notary Public, do hereby certify that
   there came before me on Wednesday, October 17, 2007,
7  the deponent herein, WILBUR F. JUSTICE, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10  under my direction.
11    I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12  examination of said witness.
13    I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17    Christina M. Vitale, CSR
      Certified     261-RPR
18    (Expir        1, 2008)
19
20  DATED:
21
22                         Christina M Vitale
23
24

27  (Pages 102 to 105)

**A000029**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Justice

v.

# Taylor, et al.

C.A. # 06-497

Transcript of:

Alan N. Machtinger

September 13, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A000030

Justice v. Taylor, et al.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SERGEANT WILBUR F. JUSTICE,          )
                                     )
              Plaintiff,             )
                                     ) Civil Action No.
v.                                   ) 06-497
                                     )
STANLEY W. TAYLOR, JR., in his       )
official capacity as the             )
Commissioner of Correction;          )
ALAN MACHTINGER, individually and    )
in his official capacity as the      )
Director of Human Resources of the   )
Department of Correction; and        )
DEPARTMENT OF CORRECTION OF THE      )
STATE OF DELAWARE.                   )
                                     )
              Defendant.             )

          Deposition of ALAN N. MACHTINGER, taken
pursuant to notice at the offices of The Neuberger
Firm, P.A., Two East Seventh Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m., on
Thursday, September 13, 2007, before Terry Barbano
Burke, RMR-CRR and Notary Public.

APPEARANCES:

          STEPHEN J. NEUBERGER, ESQUIRE
          The Neuberger Firm, P.A.
            Two East Seventh Street, Suite 302
            Wilmington, Delaware  19801
            For the Plaintiff

          STEPHANI J. BALLARD, ESQUIRE
          MARC NIEDZIELSKI, ESQUIRE
          Department of Justice
            Carvel State Office Building
            Wilmington, Delaware  19801
            For the Defendants

               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

Justice v. Taylor, et al.

**2**

1        ALAN N. MACHTINGER,
2        the deponent herein, having first been
3        duly sworn on oath, was examined and
4        testified as follows:
5    BY MR. NEUBERGER:
6        Q.    Mr. Machtinger, I am probably going to screw
7    up your name today and I want to apologize in advance.
8    There is no disrespect intended.
9        A.    You pronounced it correctly.
10        Q.    My name is Steve Neuberger and I'm one of the
11    attorneys for former and now retired Sergeant Wilbur
12    Justice.
13            Have you ever testified in court before?
14        A.    Yes, I have.
15        Q.    Have you ever had your deposition taken
16    before?
17        A.    Yes, I have.
18        Q.    I am going to review the process here just a
19    little bit just to make sure it is fresh in your memory
20    before I start asking any substantive questions; okay?
21        A.    That's fine.
22        Q.    I will ask you questions and the court
23    reporter here is going to type up your answers to those
24    questions. Although she is very good, we have to take

**3**

1    turns talking, because if we don't she can't get
2    everything down that is said.
3            So do you understand that?
4        A.    Yes, I do.
5        Q.    You also have to verbalize your answer, so if
6    you want to say yes, just say yes instead of nodding
7    your head. If you want to say no, say no instead of
8    shaking your head.
9        A.    I understand.
10        Q.    When we are done here today, you will have an
11    opportunity to review the transcript of the deposition
12    to see if there's any typographical errors, or things
13    of that nature, and then you will have an opportunity
14    to correct them; okay?
15        A.    I understand.
16        Q.    If I ask you a question and you don't
17    understand the question or you are confused by the
18    question, just ask me to rephrase it and I will be more
19    than happy to; all right?
20        A.    I understand.
21        Q.    Probably the most important thing is I do not
22    want you to guess. If you don't know the answer, just
23    say so, I will move on to another question; all right?
24        A.    Yes.

**4**

1        Q.    Are you taking any medications or is there
2    anything else today which would interfere with your
3    ability to remember accurately or testify truthfully?
4        A.    No.
5        Q.    Also, if you need any breaks, need to run to
6    the john, stretch out your back, just let me know, and
7    we would be happy to take a 10, 15 minute break for
8    you.
9        A.    That's fine.
10        Q.    You have taken an oath to tell the truth.
11            Do you understand the significance of
12    that oath?
13        A.    Yes, I do.
14        Q.    And do you understand that I'm going to be
15    asking you some questions today about a lawsuit filed
16    by Sergeant Wilbur Justice in the United States
17    District Court for the District of Delaware last
18    August, August of 2006?
19        A.    I'll take your word for the time frame.
20        Q.    Are you aware that the allegations made in
21    that lawsuit relate to events happening during the
22    summer of 2004?
23        A.    Yes, I do understand that.
24        Q.    For example, you've already given some sworn

**5**

1    testimony about some of those incidents in a MERB Board
2    hearing?
3        A.    That's correct.
4        Q.    That was last year, I guess, right?
5        A.    That's correct.
6        Q.    So are you familiar with some of the
7    underlying events, then?
8        A.    Yes.
9        Q.    When were you born?
10        A.    July 30th, 1947.
11        Q.    Where were you raised?
12        A.    New Mexico, Albuquerque, New Mexico.
13        Q.    Could you walk me through your educational
14    history?
15        A.    I have a bachelor's degree in political
16    science and economics from the University of New
17    Mexico. I have a master's degree in public policy from
18    George Washington University in Washington, DC. And I
19    have a master's degree in public administration from
20    the University of Maryland in College Park.
21        Q.    Could you walk me through your work history.
22    You can start in the beginning and move forward, or you
23    can start now and go back if that's easier for you.
24        A.    Well, I guess my first genuine job is I worked

2 (Pages 2 to 5)

Justice v. Taylor, et al.
Alan N. Machtinger

**6**

1    as a public assistance eligibility technician for the
2    State of Maryland in, I guess that was 1972.
3    Q.    Okay.
4    A.    Worked there for about a year, and then I was
5    a public assistance caseworker, which was kind of a
6    paraprofessional social worker.
7    Q.    Also in Maryland?
8    A.    Also in Maryland.
9         Worked at the time as a planner applying
10   for grants under the CETA program, public service
11   employment grants and training grants and things like
12   that.
13        To there I moved into a position as
14   chief of recruitment and selection for Prince Georges
15   County, Maryland. That was in 1979.
16        In 1981, I was hired as chief of
17   recruitment and selection for the State of Delaware,
18   which was then the state personnel office.
19        Served in that position until 1992, and
20   then during the cusp of administrations from Castle to
21   Carper, I served as deputy director of state personnel
22   for roughly a year. And then moved into the position
23   of human resource director for the department of
24   correction on January 1st, 1994. And I have been in

**7**

1    that position ever since.
2    Q.    So you have been a public employee since 1972;
3    right?
4    A.    Yes. Not for all the same government, but I
5    have been a government employee for that time period.
6    Q.    And you have been in your present position
7    since January 1st of 1994?
8    A.    That is correct.
9    Q.    Who does the director of human resources for
10   the department of corrections report to?
11   A.    The commissioner.
12   Q.    Who would have been the commissioner in
13   January of 1994?
14   A.    Robert Watson.
15   Q.    Who followed him as commissioner?
16   A.    Stanley Taylor.
17   Q.    Do you recall when Stanley Taylor assumed that
18   position?
19   A.    As I recall on an acting basis in November of
20   1995, and then appointed by the governor in January or
21   February of 1996.
22   Q.    Do you recall when he stepped down from that
23   position?
24   A.    He retired --

**8**

1    Q.    Roughly?
2    A.    Yeah, January or February of this year.
3    Q.    Who is the commissioner now?
4    A.    Carl Danberg.
5    Q.    Could you tell me a little bit about your
6    responsibilities as the director of HR?
7    A.    Okay. Well, I'm responsible for overseeing
8    all aspects of human resources and training. The
9    training director reports to me. That includes
10   hiring/firing, labor relations, pay and benefits,
11   recruitment/selection, EEO and affirmative action,
12   diversity.
13   Q.    Things like transfers, do those go through
14   your office as well?
15   A.    For the most part, no.
16   Q.    What types of transfers do?
17   A.    Transfers between institutions for the
18   correctional officer series would. Transfers within
19   institutions would not. Transfers that take place
20   under probation and parole would not.
21   Q.    Are you familiar with the process which
22   Sergeant Justice and Mr. Fuller and four other
23   candidates went through for the position of community
24   work program coordinator?

**9**

1    A.    Yes.
2    Q.    Would that be a type of personnel action that
3    went through your office?
4    A.    What do you mean by "go through"?
5    Q.    There's an application process for the
6    position, for a position such as that. Whose office
7    are the applications submitted to?
8    A.    That would be the human resources office,
9    recruitment and selection section.
10   Q.    And then from there the process goes wherever
11   the process goes, depending on the type of position at
12   issue?
13   A.    The answer is kind of an obvious, yes. The
14   process goes where the process goes.
15   Q.    Sometimes there's a testing process; right?
16   A.    Uh-huh.
17   Q.    Sometimes there's an interview process; right?
18   A.    Virtually always there's an interview process.
19   Q.    Virtually always, okay.
20        Now, you know that under our form of
21   government the highest law in the land is something
22   called the US Constitution?
23   A.    Yes, I know that.
24   Q.    Is the US Constitution something that is

3 (Pages 6 to 9)

**A000033**

Justice v. Taylor, et al.
Alan N. Machtinger

**10**

1 important in the human resources office for as long as
2 you have been the director?
3    A.   What do you mean by that?
4    Q.   Do you try to follow it? Do you try to abide
5 by it?
6    A.   That's a difficult question to answer. The
7 answer would be, of course, we try to abide by the
8 Constitution in everything we do, we all do that. I
9 don't know if you're asking me whether we have a copy
10 of the Constitution and we read it frequently, you
11 know, the answer is no.
12    Q.   But you do try to abide by the US Constitution
13 at all times?
14    A.   I guess in all aspects of our lives we do.
15    Q.   Are you aware that there's also something
16 called the Bill of Rights?
17    A.   Yes, I am.
18    Q.   And are you aware that from time to time there
19 have been amendments to the US Constitution, some of
20 which are known as the Bill of Rights?
21    A.   I'm aware of that, yes.
22    Q.   As the director of human resources, you know
23 that under the US Constitution you can't discriminate
24 against an officer in transfers or promotions because

**11**

1 of the color of that officer's skin?
2    A.   Yes, I'm aware of that.
3    Q.   And you know that you can't discriminate
4 against an officer because of their religion?
5    A.   Yes, I'm aware of that.
6    Q.   And you know that you can't discriminate
7 against an officer because of that officer's gender?
8    A.   Yes, I'm aware of that.
9    Q.   And that's because the 14th amendment to the
10 US Constitution, as well as various Federal laws and
11 State laws prohibit that; right?
12    A.   That is correct.
13    Q.   You know that you can't punish an officer
14 because of where he goes to church; right?
15    A.   That's correct.
16    Q.   You know you can't punish an officer because
17 he voted for George Bush or for John Kerry in the last
18 election; right?
19    A.   That's correct.
20    Q.   And in the same way you know that you can't
21 punish an officer because he voted for Governor Minner
22 or against Governor Minner in the last election; right?
23    A.   That's correct.
24    Q.   And that would be because the First Amendment

**12**

1 to the US Constitution, as well as certain provisions
2 under Delaware law would prohibit that; right?
3    A.   I'm not an attorney, but to the extent I'm
4 aware of that, the answer would be yes.
5    Q.   Under your tenure in the human resources
6 office, are First Amendment rights of department of
7 corrections employees something that your office tries
8 to respect?
9    A.   Yes.
10    Q.   Under the First Amendment, you know that you
11 can't punish an officer because he or she has filed a
12 lawsuit in State or Federal court; right?
13    A.   Correct.
14    Q.   And you know that you can't punish an officer
15 who's filed a charge with the Delaware Department of
16 Labor or the Federal Equal Employment Opportunity
17 Commission; right?
18    A.   Correct.
19    Q.   Do you know that you can't punish an officer
20 who petitions the general assembly for redress of
21 various grievances; right?
22    A.   That's correct.
23    Q.   And you know that you can't punish an officer
24 because he belongs to a union; right?

**13**

1    A.   That's correct.
2    Q.   Have you ever received training in the First
3 Amendment's application to the workplace?
4    A.   I can't say that I have been to a specific
5 course regarding the First Amendment per se. No doubt
6 that's been included in various training that I've
7 attended over the years.
8    Q.   Right. You have been a human resources
9 director since 1994?
10    A.   I have been in my current position since 1994,
11 that's correct.
12    Q.   Before that, you were with the state division
13 of personnel?
14    A.   State personnel office.
15    Q.   State personnel office.
16        In those positions, you have to be at
17 least somewhat familiar with laws governing workplace
18 relations with employees; right?
19    A.   That's correct.
20    Q.   How long have you known Stan Taylor?
21    A.   I think the first time I met Stan Taylor would
22 have been roughly 199 — I'm sorry, 1983.
23    Q.   Did you work together back then?
24    A.   At that time, I was chief of recruitment and

4 (Pages 10 to 13)

Justice v. Taylor, et al.
Alan N. Machtinger

14

1 selection for state personnel. We were developing the
2 examination series for officer, lieutenant, staff
3 lieutenant, captain. Stan Taylor was director of the
4 training academy at that point, so we worked together
5 in terms of developing the examinations.
6    Q.   Now, when Stan Taylor eventually became
7 commissioner of the department of corrections, he was
8 your boss; right?
9    A.   That's correct.
10    Q.   Was there anybody between you and he in the
11 chain of command?
12    A.   No.
13    Q.   So that was a direct report on your part, I
14 guess as the phrase goes?
15    A.   Yes.
16    Q.   So he was the boss?
17    A.   Yes. He was the commissioner of the
18 department of correction.
19    Q.   So you have to follow his lead on things,
20 right, because he's the boss and he's the commissioner
21 of the department of corrections?
22    A.   He was the man in charge, he was the
23 commissioner.
24    Q.   So did you have to follow his lead on those

15

1 types of things?
2    A.   Certainly.
3    Q.   Do you know who was above Stan Taylor in the
4 chain of command?
5    A.   The governor.
6    Q.   So the governor would be Stan Taylor's boss?
7    A.   Uh-huh.
8         MS. BALLARD:  You have to say yes or no
9 for the court reporter.
10        THE WITNESS:  I'm sorry. Yes.
11 BY MR. NEUBERGER:
12    Q.   So if the governor gave an order, would you
13 have to follow it?
14    A.   I want to be careful in responding.
15    Q.   Sure.
16    A.   Because no one has to follow an order that
17 would be impossible, dangerous, illegal. So within
18 that context, when your boss tells you to do something,
19 you're obligated to do it. You phrased the question as
20 if that were an absolute.
21    Q.   For example, if the governor ordered you to go
22 jump off the Delaware Memorial Bridge, would you
23 consider yourself bound by that order?
24    A.   The answer is no, that would be an example of

16

1 something that would be --
2         MR. NIEDZIELSKI:  Impossible.
3         THE WITNESS:  Well, it would be possible.
4 BY MR. NEUBERGER:
5    Q.   You just wouldn't do it.
6    A.   Yes.
7    Q.   I don't blame you.
8         Now, focusing back on Stan Taylor, so
9 the two of you have worked together for a good number
10 of years; right?
11    A.   Yes.
12    Q.   Would you consider yourself friends?
13    A.   Yes.
14    Q.   Did you ever do things together outside of
15 work?
16    A.   On occasion.
17    Q.   Could you give me some examples, just whatever
18 pops into your mind or your memory?
19    A.   We played golf together on occasion. Had a
20 major birthday party in July. He attended the birthday
21 party. We went on, there was a group of eight that
22 went on a golfing/football weekend trip a couple weeks
23 ago, we both attended that. We know each other's
24 families.

17

1    Q.   Did you guys ever go on a Polar Bear Plunge
2 down at Rehoboth or Dewey, wherever it is at?
3    A.   Yes. And the Bike to the Bay.
4    Q.   You are one of those people that actually goes
5 and jumps in the water on January 1st, or whatever date
6 it is?
7    A.   I have done it three or four times, yes.
8    Q.   Is it invigorating?
9    A.   It's not as good as it's made out to be.
10    Q.   Have you talked to Stan Taylor about your
11 deposition today?.
12    A.   Only extremely briefly during this last trip,
13 and he said he had been notified that he was to be
14 deposed and he asked if I knew what it was about, and I
15 told him very briefly that it was this case. Otherwise
16 we didn't have a conversation about it.
17    Q.   Did he call you yesterday?
18    A.   Did he call me yesterday? No, he did not.
19    Q.   Did he call you this morning?
20    A.   No, he did not.
21    Q.   Have you talked to anyone today other than
22 your attorneys about your testimony today?
23    A.   No.
24    Q.   How about some time in the last week or two?

5 (Pages 14 to 17)

Justice v. Taylor, et al.
Alan N. Machtinger

**18**

1    A.   Yeah, I think I mentioned it to Commissioner
2  Danberg, Deputy Commissioner Carol.
3    Q.   Was it just you informing them that you'd have
4  to take some time off -- not take some time off, but
5  you'd be otherwise engaged in Wilmington -- is it
6  headquarters?
7    A.   Headquarters or administration building,
8  either one.
9    Q.   What's the chain of command below you in the
10  HR office?
11    A.   In the HR office, I will tell you that the
12  training director also reports to me, and then the
13  deputy HR director reports to me, and she has three
14  supervisors who report to her.
15    Q.   Who was the training director during the
16  summer of 2004, if you can remember?
17    A.   That was on the cusp of two different training
18  directors.  It was either Tony Powell or Kathy
19  Mickle-Askin.  During that time frame Tony Powell would
20  have died, so I don't remember when he died and when
21  she took over.
22    Q.   Who was the deputy HR director during that
23  time?
24    A.   D-U-R-K-E-E, Janet Durkee.

**19**

1    Q.   Who are the three supervisors who reported to
2  her?
3    A.   John Smart, Karen Nunn.  That's with two
4  N's -- three N's, actually.  And Karen Candeloro.
5    Q.   I would like to focus your attention a little
6  bit more and in a little more detail on the summer of
7  2004; okay?
8    A.   All right.
9    Q.   During that time frame, you and the department
10  of corrections were in negotiations with a union known
11  as COAD, the Correctional Officers Association of
12  Delaware; right?
13    A.   Yes.
14    Q.   And those negotiations had been going on for
15  some time, would that be fair to say?
16    A.   That would be correct.
17    Q.   Do you recall how often you have had
18  negotiating sessions with COAD in like the June, July
19  and August of 2004 time frame?
20    A.   No, I couldn't tell you how many sessions we
21  had.
22    Q.   Do you recall if it was once a week, once a
23  month, or anything like that?
24    A.   It would have been more like once a month or

**20**

1  once every other month.  It was sporadic more than they
2  were regularly scheduled.
3    Q.   Let's focus on non-formal negotiating sessions
4  where you're not sitting -- were there formal
5  negotiating sessions and then the more informal
6  meet-and-confers or talking-about-term sessions?
7    A.   No, I don't think that's the way I'd
8  characterize it.
9    Q.   So when you did have the formal sessions,
10  could you describe to me what that would entail?  Were
11  you in one room around a table, were you in different
12  rooms with like a mediator going back and forth, how
13  does it work?
14    A.   Well, during that time frame --
15    Q.   During that time frame.
16    A.   We were not in mediation during that time
17  frame.  We would have come together in separate rooms.
18  Either come together once or twice during the day to
19  exchange proposals or proposals might have been ferried
20  back and forth during the day.  There would have been
21  very little time spent with all of us in the same room
22  across the table.
23    Q.   But it would happen sometimes?
24    A.   It would happen sometimes.

**21**

1    Q.   Do you recall who would attend those sessions
2  on behalf of COAD?
3    A.   Well, there would have been -- at that time it
4  would have been Mr. Ridgley would have been their chief
5  negotiator.  It would have been the president of the
6  union, who I believe at that time was Paul Smith.  And
7  it would have been, in general it would have been the
8  negotiating team, who for the most part were
9  institutional vice presidents.  And there might have
10  been maybe eight of those, and they changed frequently.
11  So the identity of their team, I couldn't tell you what
12  it was at any moment in time.
13    Q.   Do you recall if Wilbur Justice was one of
14  those vice presidents?
15    A.   I might not have, but I am aware of it as part
16  of the preparation for this deposition that he was a
17  vice president during that time frame.
18    Q.   So today we're in September of 2007; right?
19    A.   Yes, we are.
20    Q.   And events we're talking about were June,
21  July, and August of 2004; right?
22    A.   (Witness nods.)
23    Q.   That's more than three years ago?
24    A.   Uh-huh.

6 (Pages 18 to 21)

Justice v. Taylor, et al.
Alan N. Machtinger

22

1   Q.   So memories can fade; right?
2   A.   Uh-huh.
3   Q.   Yes?
4   A.   Yes, memories can fade.
5   Q.   How would you characterize those negotiating
6   sessions, the formal sessions?
7   A.   The ones across the table?
8   Q.   The ones across the table, but also the back
9   and forth with someone going back and forth between the
10  rooms.
11  A.   Well, our chief negotiator was Jerry Cutler.
12  Their chief negotiator was Thomas Ridgley. Most of the
13  dialogue would take place between the two of them and
14  we would give them proposals, they would give us
15  proposals, we would discuss those proposals. I'm not
16  sure I know what you're looking for.
17  Q.   Well, you attended all the sessions; right?
18  A.   I attended all the sessions.
19  Q.   And that obviously being in your capacity as
20  director of human resources; right?
21  A.   That's correct.
22  Q.   Did you feel you were making progress in the
23  sessions?
24  A.   Yes.

23

1   Q.   Now, when you guys were in the same room, were
2   relations cordial?
3   A.   Yes, I would characterize them as cordial.
4   Q.   Were they professional?
5   A.   I would say so.
6   Q.   You guys weren't screaming back and forth
7   across the table, were you?
8   A.   No.
9   Q.   During that same time frame, the summer of
10  2004, do you recall if the department of corrections
11  was in the news media very much?
12  A.   Yes, I do.
13  Q.   Were there stories written about the
14  department of corrections in the Delaware State News?
15  A.   I don't know.
16  Q.   How about in the Wilmington News Journal?
17  A.   Yes, there were.
18  Q.   What city do you live in? I forgot to ask you
19  that before.
20  A.   Dover.
21  Q.   Do you recall if any of these stories
22  addressed working conditions in DOC prisons?
23  A.   I don't recall, and you'd have to be more
24  specific, but I'd have to, you know, see whatever

24

1   articles to refresh my memory or anything. Working
2   conditions is such a --
3   Q.   I will ask you a more specific question and
4   then we can get to the more general ones.
5          Do you recall an unfortunate incident
6   involving a hostage taking and rape of a senior
7   counselor that summer?
8   A.   Of course I do.
9   Q.   That would have been Ms. Arnold?
10  A.   That's correct.
11  Q.   Would it be fair to say that that incident
12  received a great deal of publicity?
13  A.   That's what I assumed you were alluding to
14  previously.
15  Q.   Now, do you recall reading stories about a job
16  action taken by certain correctional officers and their
17  union?
18  A.   During the summer of 2004?
19  Q.   Yes.
20  A.   I don't recall if there was one during the
21  summer of 2004.
22  Q.   Do you recall reading stories about
23  legislators expressing concerns about the conditions in
24  DOC prisons?

25

1   A.   In what time are you talking about?
2   Q.   Summer of 2004 again.
3   A.   I'd have to see them to remember whether
4   there's allusions to legislators.
5   Q.   I am going to put a couple of documents in
6   front of you and some documents which were marked
7   yesterday during Mr. Taylor's deposition, and ask you,
8   if you want to read all of them, you are certainly
9   welcome to. I'm not going to ask you specific
10  questions about the documents. I'm just going to see
11  if these may refresh your recollection at all about --
12         MR. NIEDZIELSKI: To save some time, he
13  indicates he doesn't read the Delaware State News and
14  so if we could just -- I guess you can still ask him if
15  he recalls seeing them, but I think he has already
16  answered your question he doesn't read the Delaware
17  State News, and so we could probably save a lot of time
18  by getting rid of any articles that come from Delaware
19  State News.
20  BY MR. NEUBERGER:
21  Q.   Before we get into these, do you recall
22  reading comments made by union officials during the
23  summer of 2004 in the Delaware media?
24  A.   No, I don't recall one way or the other.

7 (Pages 22 to 25)

Justice v. Taylor, et al.
Alan N. Machtinger

26

1  Q.  In general, when there are stories about the
2  department of corrections in the local paper, do you
3  read them?
4  A.  In the News Journal, as I told you. I don't
5  read the Delaware State News.
6  Q.  In the News Journal, do you read those?
7  A.  Yes.
8  Q.  So if there were comments being made by union
9  officials in those articles, do you think you would
10  have read those comments?
11  A.  Certainly.
12  Q.  I am going to put in front you Taylor Exhibit
13  No. 2, Page A-31. Let's take a look at that.
14      Could this be one of the articles which
15  you might have seen in the Wilmington News Journal?
16  A.  I want to spend our time productively. Do you
17  want me to read the article? Is that what you want me
18  to do?
19  Q.  If you want to read the article, you are more
20  than welcome. For example, if you take a look at the
21  headline, it might jog your memory. I think you
22  already testified about this incident, for example.
23  A.  (Pause.)
24      I can't confirm that I read this

27

1  specific article, but obviously I remember the incident
2  and I remember that there were articles written during
3  that time frame.
4  Q.  If there was an article about that incident
5  during that time frame in the Wilmington News Journal,
6  do you think you would have read it?
7  A.  I would likely have read it, yes.
8  Q.  You can close that.
9      Now let's look at Taylor Exhibit No. 3.
10  Page A-85. Put that article in front of you.
11      If you could just review that and see if
12  this refreshes your recollection about the reading of
13  this article, and then I will ask you some questions.
14  A.  (Pause.)
15      In all likelihood I read this article.
16  I can't tell you when I would have read it, because I
17  was on leave for roughly two weeks right around this
18  time frame. When I'm gone we maintain the newspapers,
19  and I'll go back and revisit them at some point, but I
20  can't tell you when I would have read this article.
21  Q.  Let's take a look at the very bottom of Page
22  A-85.
23  A.  Okay.
24  Q.  That last paragraph which begins at the bottom

28

1  of Page 85 and goes over very briefly onto the top of
2  Page A-86.
3      Does that paragraph appear to indicate
4  that the correctional officers union has had staff
5  shortages that have contributed to several security
6  lapses in recent months, including one on July 12th
7  when a serial rapist took a counselor hostage at
8  knifepoint and raped her during a seven-hour standoff?
9  A.  Yes.
10  Q.  Do you recall the union making public
11  statements about that incident?
12      MS. BALLARD: Objection to the form. You
13  can answer.
14      THE WITNESS: Okay. I will wait until
15  the discussion takes place.
16      MS. BALLARD: Like yesterday's
17  deposition, I am just going to put a standing objection
18  on the record to questions characterizing the union
19  speaking as opposed to individuals speaking. That's
20  all.
21      THE WITNESS: Would you repeat the
22  question? Or rephrase the question.
23      MR. NEUBERGER: Could you repeat the
24  question?

29

1      (The pending question was then read back
2  by the reporter.)
3      THE WITNESS: I recall articles in the
4  newspapers, articles in the newspaper that quoted union
5  officials.
6  BY MR. NEUBERGER:
7  Q.  Talking about the rape incident?
8  A.  Talking about the rape incident.
9  Q.  Do you recall articles in the paper quoting
10  union officials talking about other incidents?
11  A.  I know there were other incidents that took
12  place roughly six months before that, and I can't tell
13  you specifically whether there were union officials
14  quoted in subsequent newspaper articles.
15  Q.  How about other events affecting the
16  department of corrections, such as staffing shortages?
17  A.  Well, they have noted that here, but typically
18  if they were going to make -- if the union's going to
19  make a comment, you know typically they're going to
20  allude to staffing shortages and compensation issues.
21  Q.  So do you have any specific recollection today
22  in September of 2007 of reading comments attributed to
23  union officials in the newspaper in the summer of 2004?
24  A.  No. Assuming I understand your question

8 (Pages 26 to 29)

Justice v. Taylor, et al.
Alan N. Machtinger

**30**

1  correctly.
2    Q.  I'm sorry, would you like me to repeat?
3    A.  I mean other than what I read just now, which
4  isn't the newspaper article, it is a piece of paper,
5  but if you ask me whether I have a specific
6  recollection of reading an article during the summer of
7  2004 regarding union officials making comments about
8  conditions in the department, the answer's no.
9    Q.  How about a general recollection as opposed to
10  the specific recollection I just asked you about.
11    A.  In general, there were unions, and unions will
12  make allusions to pay and compensation issues when the
13  opportunity presents itself.  I would do that if I were
14  them.
15    Q.  Do you recall if opportunities were presenting
16  themselves during the summer of 2004 during contract
17  negotiations?
18    A.  Well, contract negotiations were ongoing from
19  2002.  They weren't specific to 2004.
20    Q.  I am framing the time frame for the summer of
21  2004.
22    A.  If there were episodes that took place, like
23  the episode alluded to here, there would have been
24  newspaper articles about it.  And if union officials

**31**

1  had the opportunity, they would make comments that
2  relate to pay and compensation and staffing.
3    Q.  Do you think that would happen whenever there
4  was an opportunity even beyond just this particular
5  rape incident?
6    A.  I would expect so.  I don't have any specific
7  recollection.
8    Q.  For example, you've worked for the department
9  of corrections for the State of Delaware since '91/'92;
10  right?
11    A.  No.  Since 1994.
12    Q.  I'm sorry, since 1994.  Right?
13    A.  Correct.
14    Q.  There have probably been hundreds, if not
15  thousands, of newspaper articles written about the
16  department of corrections in that time frame?
17    A.  I'm not sure I'd agree that there's been
18  hundreds or thousands of articles.  There's been
19  numerous articles.
20    Q.  Numerous articles, okay.
21        And based on your working experience
22  with the department of corrections, based on your
23  experience as a director of human resources, do unions
24  representing correctional officers try to take

**32**

1  advantage of opportunities presented to them by the
2  media to raise issues that are important to them?
3    A.  Not only unions representing correctional
4  officers.  Unions representing probation officers or
5  correctional supervisors.
6    Q.  Right.  You're saying that's just something
7  that unions do, that's been your experience?
8    A.  I would if I were them, yes.
9    Q.  Because they want to improve their working
10  conditions, that would be their view?
11    A.  They want to provide services for their
12  membership.  Whether that be compensation issues or
13  contractual issues.  That's why they exist.
14    Q.  And on the other side of tables on those types
15  of issues would sit management; right?
16    A.  Yes.
17    Q.  And it's up to management and the union to
18  work out those types of issues; right?
19    A.  That's correct.
20    Q.  Let's change gears a little bit.  You
21  mentioned before that you had been on, I think you
22  said, about a two-week vacation during this time frame,
23  during the summer of 2004?
24    A.  I was on annual leave for two weeks, roughly

**33**

1  two weeks.
2    Q.  You said that you expected your staff would,
3  I'm not sure if you said make copies of articles or
4  pull articles for you to read and catch up on
5  eventually?
6    A.  No, I didn't say that.
7    Q.  What did you say?
8    A.  When my wife and I go on vacation, we have
9  somebody who takes in the mail, feeds the fish, kind of
10  watches over the house.
11    Q.  Sure.
12    A.  One of the things they'll do is collect the
13  newspapers.  So we come back from vacation, we have a
14  pile of newspapers.
15        Sometimes I'll thumb through them,
16  sometimes I won't.  I might look at them weeks later.
17  It's not an urgent item to look through them.  I'm not
18  looking through them for anything specific, but I just
19  kind of get a flavor of local news or anything else
20  while I'm gone.
21    Q.  So that's a personal thing as opposed to
22  something which is done by an employee in the human
23  resources office?
24    A.  That's absolutely correct.

9  (Pages 30 to 33)

Justice v. Taylor, et al.
Alan N. Machtinger

---

**34**

1  Q. We can close this exhibit, this Taylor
2  Exhibit 3.
3  Do you recall a time in the summer of
4  2004, specifically August, when the department of
5  corrections filed a lawsuit in Delaware Chancery Court
6  against COAD and its union officers?
7  A. If you're asking if I recall the date that it
8  occurred?
9  Q. Do you recall the event?
10  A. Yes, I do.
11  Q. Has that happened a lot during your tenure,
12  the department of corrections suing a union and its
13  union officials?
14  A. Not to my knowledge.
15  Q. Now, do you recall why the lawsuit was filed?
16  A. Yes.
17  Q. What is your understanding of why the lawsuit
18  was filed?
19  A. That there were officers in the court and
20  transportation unit who were refusing to work voluntary
21  overtime, is my understanding.
22  Q. Were you involved in the decision to file that
23  lawsuit?
24  A. No, I was not.

---

**35**

1  Q. That's something that's above your head,
2  that's something that's over your head, above your pay
3  grade, whatever the phrase may be?
4  A. I was not involved in it.
5  Q. You mentioned the court and transportation
6  system and the officers declining or refusing to work
7  voluntary overtime. That would have been in July or
8  August of 2004, roughly?
9  A. I couldn't tell you the date. Remember I told
10  you I could not remember the specific time period when
11  it occurred?
12  Q. Right. But that would have preceded the
13  lawsuit; right?
14  A. I don't know. You have to tell me when the
15  lawsuit was.
16  Q. I am going to put a document in front of you
17  which is marked as Taylor Exhibit No. 8.
18  Have you ever seen this document before?
19  A. I don't believe so.
20  Q. Do you see up at the very top right-hand
21  corner it says "E-filed August 5th, 2004, 3:33 p.m.?
22  A. Yes, I do.
23  Q. Now, do you see the caption on here it says,
24  "In the Court of Chancery in the State of Delaware, in

---

**36**

1  and for New Castle County"?
2  A. Yes, I do.
3  Q. Do you see where it says, "State of Delaware,
4  Department of Correction Plaintiff."
5  A. Yes.
6  Q. Then underneath that there's a version and it
7  says, "Correctional Officers Association of Delaware,"
8  and then it lists various officers in COAD as
9  defendants; right?
10  A. Uh-huh.
11  Q. Yes?
12  A. Yes. I'm sorry. I was reading at the same
13  time that you were talking. I apologize for that.
14  Q. No problem.
15  A. That's my fault.
16  Q. Does looking at the first page of this
17  document refresh your recollection at all about the
18  general time frame of the job action involving the
19  court and transportation?
20  A. Well, the date at the top says August 5th,
21  2004.
22  Q. But does that jog your own personal memory at
23  all?
24  A. I'm not sure what you mean by that. If you

---

**37**

1  had given me the same document that had a different
2  date, I wouldn't have contested.
3  Q. I am just asking if this refreshes your
4  recollection. I think you indicated you testified
5  before that you weren't sure about the dates; you just
6  couldn't remember?
7  A. Nor am I any more sure now than I was, other
8  than I take the document speaks for itself. It says
9  August 5th, 2004.
10  Q. I was just trying to refresh your recollection
11  and see if that jogged a memory for you.
12  A. Okay.
13  Q. We are done with that document.
14  That job action involving the court and
15  transportation officers and the refusal to work
16  voluntary overtime, do you recall if that caused any
17  problems in the department of corrections when it came
18  to staffing?
19  A. I'm not sure what you're alluding to. Can you
20  rephrase the question or give me a little more
21  background to answer the question?
22  Q. Sure. Do you recall if the department of
23  correction was able to properly staff the court and
24  transportation, is it office or department?

---

10 (Pages 34 to 37)

A000040

Justice v. Taylor, et al.
Alan N. Machtinger

**38**

1    A.   Unit.
2    Q.   Do you recall if the DOC was able to properly
3    staff the court and transportation unit during this job
4    action?
5    A.   Okay. I think that was the whole problem,
6    that court and transportation operates a lot on people
7    from institutions working overtime. So if they weren't
8    working the overtime, that it would have resulted in
9    staffing problems within court and transportation.
10   Q.   Do you recall reading any media articles in
11   that time frame about that problem?
12   A.   I can't give you any specific recollection.
13   Q.   How about a general recollection?
14   A.   Probably there were, but again, that's during
15   the time frame when I was on leave much of that time.
16   So I may have read articles a month later or not at
17   all. But if I was around and read the articles, I
18   would have read them.
19   Q.   Do you think you'd still have your calendars
20   from back then?
21   A:   I was unable to identify a calendar from back
22   then. I know I was gone for roughly two weeks, because
23   I can retrace everywhere we went, but my time card only
24   reflects a week, which was kept by the commissioner's

**39**

1    secretary, and I know that's less time than I took off.
2    MR. NEUBERGER: Stephani, do you recall
3    if a copy of that time card, I haven't gone through the
4    document production yet.
5    MS. BALLARD: We produced two pages of
6    time sheets, and they did include the time frame, I
7    remember they were the very last two pages of the
8    production. So you should have that if you have the
9    disk.
10   MR. NEUBERGER: Thank you.
11   THE WITNESS: I can tell you everywhere
12   we went how long we stayed there, which will add up to
13   the amount of time we were done.
14   BY MR. NEUBERGER:
15   Q.   Would you have pictures which might have the
16   dates stamped on them?
17   A.   No, but we probably could find Master Card
18   bills that included dinners in various locations.
19   MS. BALLARD: Is there a particular date
20   you're concerned with?
21   MR. NEUBERGER: I just want to know the
22   time frame.
23   MS. BALLARD: Do you want to get his time
24   sheet? Maybe that will help jog his recollection. It

**40**

1    is up to you.
2    MR. NEUBERGER: We will take a break.
3    When we take the break, I think we are only going to
4    need one break. I don't have a whole heck of a lot
5    more questions. When we take the break, I will go grab
6    the CD, and you said it's the last two pages?
7    MS. BALLARD: It should be the very last
8    two pages.
9    MR. NEUBERGER: Okay.
10   BY MR. NEUBERGER:
11   Q.   Do you recall if there were any picket lines
12   set up by union members in July or August of 2004 that
13   you saw with your own two eyes?
14   A.   No.
15   MS. BALLARD: No, you don't recall or no,
16   there were not picket lines?
17   THE WITNESS: One, I did not see any
18   picket line with my own two eyes, and I do not recall
19   if there were picket lines.
20   BY MR. NEUBERGER:
21   Q.   When you were in contract negotiations with
22   the union in the summer of 2004, did you believe that
23   the union officials were trying to use public attention
24   in the media as a lever to try to get a better deal

**41**

1    from the State of Delaware?
2    A.   No, and I'll explain.
3    Q.   Okay.
4    A.   Contract negotiations are limited to working
5    conditions, not compensation, and I think that the
6    union I think hoped that they would be able to achieve
7    additional compensation, but that would be outside of
8    the negotiations process.
9    Q.   Do you think that the union during that same
10   time frame was trying to use public pressure in the
11   media as a lever to improve working conditions?
12   A.   I don't want to put myself -- they'd have to
13   testify as to what they were trying to do.
14   Q.   I am just asking what you thought.
15   A.   I will tell you that typically unions do what
16   unions do, which is to try to achieve better conditions
17   for their membership. And when opportunities arise, I
18   expect them to take advantage of those opportunities.
19   Q.   So do you think that COAD took advantage of
20   those opportunities when those opportunities arose?
21   A.   I think the FOP does and AFSME does and the
22   United Auto Workers do, otherwise they wouldn't remain
23   bargaining agents for long.
24   Q.   How about COAD?

11 (Pages 38 to 41)

Justice v. Taylor, et al.
Alan N. Machtinger

42

1   A.   I think they probably were too, but you'd have
2   to ask them what their intentions were.
3   Q.   I am not asking you about their intentions.
4   I'm asking you what your perception was. Okay?
5   A.   Uh-huh.
6   Q.   All right.
7        COAD's use of the media during this time
8   frame, did it make your contract negotiations easier or
9   harder?
10  A.   I don't think it had any impact on them at
11  all.
12  Q.   So the news meeting, they're writing articles
13  about problems at the DOC on a regular basis; right?
14  A.   I don't know if it is a regular basis, but
15  there were articles that were written that talked about
16  DOC.
17  Q.   Right, talking about DOC. And the union went
18  public to the media trying to influence legislators,
19  the public, the media about a contract dispute or
20  issues about working conditions, a contract negotiation
21  or compensation, things of that nature?
22  A.   Staffing levels and compensation are the two
23  issues I would say.
24  Q.   Staffing levels and compensation?

43

1   A.   Yes.
2   Q.   COAD was regularly criticizing the department
3   of corrections in the media; right?
4   A.   I can't tell you whether they were regularly.
5   You'd have to show me articles that would confirm that.
6   Q.   So COAD was criticizing the department of
7   corrections in the media; right?
8   A.   I think that that occurred, yes.
9   Q.   And they criticized the department of
10  corrections specifically with regard to the rape
11  incident; right?
12  A.   Yes.
13  Q.   And they criticized the department of
14  corrections with regard to staffing levels and
15  compensation and working conditions; right?
16  A.   Staffing levels and compensation.
17  Q.   Okay, staffing levels and compensation.
18       And they criticized the department of
19  corrections about personnel policies; right?
20  A.   I don't know that that's true.
21  Q.   Did they criticize the department of
22  corrections about contract negotiation issues that you
23  read about in media?
24  A.   Not that I recall, but may well have. You'd

44

1   have to show me a specific article to jog my
2   recollection.
3   Q.   They may well have?
4   A.   They may have.
5   Q.   It would just depend whatever is in the
6   article?
7   A.   It would depend what was in the article.
8   Q.   COAD was saying the rape incident and other
9   various problems at the department of correction could
10  have been represented if the DOC had only listened to
11  what they had to say; right?
12  A.   Or pay them more money or increase staffing
13  levels.
14  Q.   So yes?
15  A.   Yes.
16  Q.   And COAD was criticizing the department of
17  corrections about the voluntary overtime and the
18  freezing issues and all kinds of staffing issues too;
19  right?
20  A.   I can't say that without looking at an article
21  to confirm that.
22  Q.   That very well could have been happening
23  during that time frame, you just have no present
24  recollection of it today?

45

1   A.   Whether it could have, I know there were a
2   number of newspaper articles. I can't tell you what
3   they said.
4   Q.   Do you recall if any of the articles generally
5   would have addressed those types of staffing issues,
6   such as freezing?
7   A.   May have. I can't tell you definitively.
8   Q.   And just so we're clear, when I say freezing,
9   are you aware of the personnel practice to which I'm
10  referring?
11  A.   I know what freezing is, yes.
12       MS. BALLARD: I don't know if you want to
13  get it stated on the record, because I am not sure.
14  BY MR. NEUBERGER:
15  Q.   Could you explain to me what freezing is?
16  A.   Freezing is a type of mandatory overtime where
17  you are working a shift and you are informed during
18  that shift that you'll have to stay for at least part
19  of another shift.
20  Q.   What happens if the employee just leaves?
21  A.   They are subject to disciplinary action.
22  Q.   I always wondered that.
23       I think we talked a little bit before
24  about the problems in the court and transportation

12 (Pages 42 to 45)

A000042

Justice v. Taylor, et al.
Alan N. Machtinger

**46**

1  unit. Do you recall that, me asking you some questions
2  about that?
3  A. Yes, I do.
4  Q. Do you recall learning if those problems
5  disrupted the State of Delaware court systems?
6  A. My recollection is too vague to be able to
7  respond affirmatively. They may have, but I can't say
8  for certain.
9  Q. Is it your understanding that one of the
10 duties of the department of corrections is to transport
11 prisoners to and from court so that they can have their
12 day or their days in court?
13 A. Yes.
14 Q. If the department of corrections does not have
15 the staffing or the manpower to transport those
16 prisoners, do you think that could cause a problem?
17 A. Yes, it could.
18     MR. NEUBERGER: Let's take that break now
19 and I'll go see if I can find those documents.
20     (Recess.)
21     MR. NEUBERGER: I'd like to mark this
22 document as Machtinger Exhibit 1.
23     (Machtinger-1 was marked for
24 identification.)

**47**

1     MR. NEUBERGER: The Bates number is
2  D 001767.
3  BY MR. NEUBERGER:
4  Q. Do you have this document in front of you?
5  A. Yes. I have a copy of the same document, I
6  believe.
7     Yes.
8  Q. What is this document, sir?
9  A. Time card.
10 Q. Would this be your time card for the year
11 2004?
12 A. Yes, it would.
13 Q. And that's your name at the top left?
14 A. That's correct.
15 Q. Where it says class title, it says human
16 resource administrator?
17 A. That's correct.
18 Q. We're looking at this, it looks like there's
19 12 months and 31 days for each month listed here, so
20 could you tell me what the H stands for in January 1st?
21 A. Holiday.
22 Q. How about January 3rd where there's a zero or
23 an O?
24 A. That's a weekend. In my case, weekends are

**48**

1  Saturdays and Sundays.
2  Q. That explains why these are spaced five days
3  apart.
4  A. Uh-huh.
5     MS. BALLARD: And the little SS above
6  them.
7  BY MR. NEUBERGER:
8  Q. Let's go down to July.
9  A. Okay.
10 Q. For July, what days does it say you were on
11 vacation?
12 A. Here's where we can run into the problem. It
13 says, the answer is it says, it says that I was on
14 vacation July 19th, 20th, 21st, 22nd, and 23rd.
15 Q. That's what it says?
16 A. That's what it says.
17 Q. Then in August, what vacation days are you
18 listed for?
19 A. 2nd, 3rd, 4th, 5th and 6th.
20 Q. Above the V it says 7.5?
21 A. That's correct.
22 Q. And what's that?
23 A. That's number of hours.
24 Q. The number of vacation hours that you were

**49**

1  taking?
2  A. That's correct.
3  Q. That's what this document indicates; right?
4  A. That's correct.
5  Q. Are you telling me that you may have taken
6  more vacation than this document indicates?
7  A. I don't think so, but the vacation time that I
8  took was consecutive, so there's the problem in the
9  weeks that they're assigned.
10 Q. Who fills out this sheet?
11 A. Judy Sherwood.
12 Q. Who is Judy Sherwood?
13 A. She is the secretary, executive secretary who
14 reports to the commissioner.
15     MR. NEUBERGER: There's a discrepancy in
16 this. Stephani, I think we still have enough time left
17 in the discovery period for me to get a document
18 request out.
19     MS. BALLARD: I think so. My suggestion
20 is maybe if you can jog your memory from the Cassie
21 Arnold incident. Do you remember going on vacation
22 right after that or later? That's my suggestion,
23 because everybody remembers that date, which was
24 July 13th, I believe.

13 (Pages 46 to 49)

Justice v. Taylor, et al.
Alan N. Machtinger

**50**

1    THE WITNESS: It clearly would have been
2  later than that, much later than that.
3    MS. BALLARD: That you went on vacation?
4    MR. NIEDZIELSKI: Can I suggest
5  something?
6    MR. NEUBERGER: Sure.
7    MR. NIEDZIELSKI: You can go home and
8  review your Master Card bills; correct?
9    MR. NEUBERGER: That was going to be my
10  suggestion.
11    THE WITNESS: Yes.
12    MR. NIEDZIELSKI: He is not going to give
13  you the Master Card bills.
14    MR. NEUBERGER: I don't want your Master
15  Card bills. I have a hard enough time keeping track of
16  my own.
17    MR. NIEDZIELSKI: What my suggestion is,
18  you would look at your Master Card bills, verify the
19  dates, and we would provide you a letter from Alan or
20  an affidavit, if you wish, indicating that based on his
21  review of those bills he can determine the dates he was
22  on vacation and where he was and all that sort of
23  stuff. How does that sound?
24    MR. NEUBERGER: That sounds good.

**51**

1    Can you send me an e-mail once you do
2  find out and we can finalize the record. It will
3  probably be an affidavit.
4    MR. NIEDZIELSKI: It will probably be a
5  declaration.
6    THE WITNESS: All I have to do is confirm
7  one date and I can construct it.
8    MR. NEUBERGER: That would be helpful.
9  BY MR. NEUBERGER:
10  Q.  We are done with that document.
11    Actually let's go back to the document.
12  One more question.
13    With the exception of the one problem
14  which you've noted about your memory that you took two
15  weeks of consecutive vacation, which does not appear to
16  be reflected on this, do you see any other similar
17  errors in this document?
18  A.  Nothing that is evident. I'm not sure what
19  you're alluding to.
20  Q.  I'm just trying to see if there are any more
21  problems in this document which leap to mind as you
22  look at it?
23  A.  Not that I can see.
24  Q.  You can put that document down.

**52**

1    Do you take pride in how you run the HR
2  department?
3  A.  Yes, I do.
4  Q.  Do you take pride in the work you do in the HR
5  department?
6  A.  Yes, I do.
7  Q.  Do you take pride in the work your employees
8  do in HR?
9  A.  Yes, I do.
10  Q.  Do you work hard?
11  A.  Yes, I do.
12  Q.  Do your employees work hard?
13  A.  Yes, they do.
14  Q.  Do you think that you and your employees
15  perform a high quality of work?
16  A.  Yes, I believe we do.
17  Q.  Do you and your department make it a habit of
18  losing applications that are filed in your office?
19  A.  No, I hope we don't.
20  Q.  Do you lose applications on a regular basis?
21  A.  Not to my knowledge.
22  Q.  Now, is it the policy of your office to send
23  letters acknowledging the receipt of applications for
24  various positions that are filed with your office?

**53**

1  A.  I don't believe we send letters acknowledging
2  receipt of applications.
3  Q.  Does your office ever send letters
4  acknowledging receipt of applications? I'll specify
5  the time frame summer of 2004.
6  A.  Not to my knowledge.
7  Q.  Does the human resources department of DOC
8  strive to treat all people equally?
9  A.  Yes, we do.
10  Q.  Does it matter if they are black or white?
11  A.  It doesn't matter if they are black or white.
12  Q.  Does it matter if they are male or female?
13  A.  It doesn't matter if they are male or female.
14  Q.  Does it matter if they are Protestant or
15  Catholic?
16  A.  It doesn't matter if they are Protestant or
17  Catholic.
18  Q.  Does it matter if they are Muslim or Jew?
19  A.  It doesn't matter if they're Muslim or Jew.
20  Q.  What about richer or poorer?
21    MR. NIEDZIELSKI: Wait a minute, I think
22  we are getting into the marriage vows, aren't we?
23    THE WITNESS: Not if they are rich or
24  poor or weak.

14  (Pages 50 to 53)

**A000044**

Justice v. Taylor, et al.
Alan N. Machtinger

54

1  BY MR. NEUBERGER:
2      Q.  How about weak or powerful?
3      A.  Not whether they are weak or powerful.
4      Q.  Does the HR department strive to treat all
5  people fairly?
6      A.  Yes, we do.
7      Q.  Is treating all people equally and fairly
8  something that is important to the HR department of the
9  department of corrections?
10     A.  Yes, it is.
11     Q.  Is that important to you?
12     A.  Yes, it is.
13     Q.  Is it of paramount importance that the law be
14  applied equally and fairly to all persons?
15     A.  Yes, it is.
16     Q.  Is that important to you?
17     A.  Yes, it is.
18     Q.  Is it of paramount importance that rules be
19  applied equally and fairly to all persons?
20     A.  Yes, it is.
21     Q.  Is that important to you?
22     A.  Yes, it is.
23     Q.  Was Wilbur Justice treated fairly and equally
24  when his application was mysteriously lost in the HR

55

1  department and no one else's was?
2      MS. BALLARD:  Objection to the form.
3      THE WITNESS:  I can't tell you what
4  occurred with Wilbur Justice' application.  There are
5  sometimes mistakes that are made when there are
6  thousands of events that take place.  When mistakes are
7  made, we try to correct them when we can and to address
8  every problem with integrity.
9  BY MR. NEUBERGER:
10     Q.  So was Wilbur Justice treated fairly and
11  equally when his application was mysteriously lost and
12  no one else's was?
13     MS. BALLARD:  Same objection.
14     THE WITNESS:  Yes.  The reason why is
15  because when a mistake is discovered, regardless of who
16  it is, whether it's the meek or the weak or the strong
17  or the rich or the poor, then we try to address those
18  mistakes fairly, equitably and with integrity.  It
19  doesn't matter who they are.
20  BY MR. NEUBERGER:
21     Q.  Was Wilbur Justice treated fairly and equally
22  when he was lied to by HR and told that he was listed
23  as an applicant for the position even though they had
24  lost his application?

56

1      MS. BALLARD:  Objection to the form.
2      THE WITNESS:  I can't tell you whether or
3  not Wilbur Justice was lied to.  You'd have to ask
4  somebody else that.
5  BY MR. NEUBERGER:
6      Q.  For example, you sat through the MERB hearing,
7  didn't you?
8      A.  Yes.
9      Q.  You were there for Mr. Klebart's testimony?
10     A.  Yes.
11     Q.  And you were there for everybody else's
12  testimony; right?
13     A.  Yes, I was.
14     Q.  You even gave sworn testimony that day?
15     A.  Yes, I did.
16     Q.  So you have heard testimony from DOC
17  employees, including the DOC employees in the HR
18  department, about what happened with Wilbur Justice's
19  application, isn't that right?
20     A.  I have heard testimony.
21     Q.  You have heard testimony.  Have you drawn any
22  conclusions from that testimony?
23     A.  I think what happened was so confusing, I
24  can't tell you what happened on that day.

57

1      Q.  If your own HR employees testified that Wilbur
2  Justice's application was lost, would you dispute that
3  testimony?
4      A.  I can't dispute it, but I don't know that
5  that's what occurred.
6      Q.  Was Wilbur Justice treated fairly and equally
7  when he was again lied to by HR and told that no
8  interviews were scheduled, even though they had already
9  been scheduled for just three days later?
10     MS. BALLARD:  Objection to the form.
11     You can answer.
12     THE WITNESS:  I think that based upon the
13  testimony as I recollect it, Mr. Klebart was just
14  simply mistaken.  But you'd have to ask Mr. Klebart
15  that, not myself.
16  BY MR. NEUBERGER:
17     Q.  I am asking you as the director of human
18  resources for the department of corrections, a person
19  who has held that position for more than ten years who
20  strives to treat all people fairly, equally, equitably
21  and whatever the other terms were that you used, was
22  Wilbur Justice treated that way when he was lied to by
23  the department and his application lost?
24     A.  I object to your characterization as lied to.

15  (Pages 54 to 57)

A000045

Justice v. Taylor, et al.
Alan N. Machtinger

58

1   Q. Okay.

2   A. Mr. Klebart, in all fairness to Mr. Klebart,

3 would not have been aware of interviews that would have

4 been scheduled.

5   Q. Would Mr. Klebart have been aware of the

6 preparation of the certification list?

7   A. I would expect so.

8   Q. You would expect so based on the position he

9 holds in the human resources department?

10   A. That's right. He's a human resources

11 technician who works in the recruitment and selection

12 unit.

13   Q. Was Wilbur Justice treated fairly, equally and

14 equitably when he was misinformed by human resources

15 and told that no certification list had been completed

16 even though it had been completed more than three weeks

17 earlier?

18     MS. BALLARD: Objection to the form.

19     THE WITNESS: If he was in fact told that

20 the certification list had not been completed when it

21 had, clearly he was misinformed if that occurred.

22 BY MR. NEUBERGER:

23   Q. Is that fair?

24   A. Well, fair or not, if he was misinformed, he

59

1 was misinformed.

2   Q. Is that fair?

3     MR. NIEDZIELSKI: Objection.

4     MR. NEUBERGER: You have your objection,

5 Marc.

6     THE WITNESS: I believe in telling

7 everybody the truth. If somebody wasn't told the

8 truth, they should have been told the truth.

9 BY MR. NEUBERGER:

10   Q. So is it fair that he was not told the truth?

11   A. I'm sure that no one intentionally lied to

12 him. I think that probably it was a point of

13 confusion, but Mr. Klebart would have to clarify that.

14 I couldn't.

15   Q. As the director of human resources, is it fair

16 that Wilbur Justice was not told the truth?

17     MS. BALLARD: Objection to the form.

18     THE WITNESS: I don't know whether or not

19 he was told the truth or not. I wasn't there. We

20 strive to tell everybody the truth. I would not lie to

21 an employee. I wouldn't lie to anybody else.

22 BY MR. NEUBERGER:

23   Q. When a person is not told the truth by your

24 office, is that fair?

60

1   A. I don't know about the word fair or not. We

2 try to tell everybody the truth. Sometimes people are

3 misinformed. If they were misinformed, so be it. I am

4 sure that Mr. Klebart nor anyone else intentionally

5 lied to Mr. Justice.

6   Q. Intentional lie or not, is it fair?

7     MS. BALLARD: I think he has tried to

8 answer your question.

9     MR. NIEDZIELSKI: Your question can't be

10 answered, to be honest with you.

11     MR. NEUBERGER: You have your objections.

12     THE WITNESS: I'm just struggling with

13 the word fair.

14 BY MR. NEUBERGER:

15   Q. You've testified that your office strives to

16 treat all people fairly and equally regardless of any

17 status. You have also stressed the importance of

18 treating people equitably. So I want to know is it

19 fair that Mr. Justice was given misinformation or flat

20 out lies by your office?

21     MS. BALLARD: Objection to the form.

22     THE WITNESS: Again, we strive to treat

23 everybody fairly, and we continue to do so. Apparently

24 they strive to treat him fairly too and caught him up

61

1 with the process.

2 BY MR. NEUBERGER:

3   Q. I'm sorry?

4   A. And they caught him up with the process. He

5 was in fact interviewed for the position.

6   Q. And he was informed of the interview on the

7 day of the interview?

8   A. That is correct.

9   Q. Whereas everyone else received six days'

10 notice prior to the interview, isn't that correct?

11   A. I don't know whether they received six days'

12 notice or not.

13   Q. Haven't you heard testimony to that effect?

14   A. I don't recall the exact number of days, but I

15 do know that the other people who were interviewed knew

16 about it before the day of the interview.

17   Q. Is it fair that they had more advance notice

18 than he did?

19   A. It's unfortunate maybe.

20   Q. Is it fair?

21   A. Again, I struggle with the word fair or not.

22   Q. You have a bachelor's degree, don't you?

23   A. Yes.

24   Q. And you have two master's degrees?

16 (Pages 58 to 61)

Justice v. Taylor, et al.
Alan N. Machtinger

62

1    A.    Yes.
2    Q.    Where did you go to high school?
3    A.    Where did I go to high school, Albuquerque,
4  New Mexico.
5    Q.    Albuquerque New Mexico High School?
6    A.    No.
7    Q.    What was the name of the high school?
8    A.    Sandia High School.
9    Q.    Sandia High School?
10   A.    That's correct.
11   Q.    Did you go to grade school and elementary
12 school before that?
13   A.    I went to elementary school and junior high
14 school they called them, yes.
15   Q.    Then you went to high school and then you went
16 to college and you got two master's degrees thereafter;
17 right?
18   A.    Yes, I did.
19   Q.    You started working for the State of Maryland
20 in 1972; right?
21   A.    Correct.
22   Q.    You began working for the State of Delaware in
23 1981; right?
24   A.    Correct.

63

1    Q.    You were the deputy director of state
2  personnel in '91/'92?
3    A.    Yes.
4    Q.    You had been working for the department of
5  corrections as the director of HR since January 1994.
6  January 1st?
7    A.    January 1st.
8    Q.    And you're telling me that you don't know the
9  definition of the meaning of the word fair?
10       MS. BALLARD:  Objection to the form.
11       THE WITNESS:  To me the word unfair is to
12 imply that somebody was treated unfairly, implies an
13 intent.  In this imperfect world, everybody doesn't get
14 exactly the same thing happened to them.  But unfair
15 implies that somebody was intentionally treated
16 differently.
17 BY MR. NEUBERGER:
18   Q.    Was Wilbur Justice treated equally when he was
19 informed about the interview the very morning of,
20 whereas everyone else was informed of the interview
21 several days prior?
22   A.    He was not treated identically to everybody
23 else.
24   Q.    Was it equal?

64

1    A.    I don't know about equal, but it wasn't
2  identical.
3    Q.    How about equal?  You just don't know?
4        MS. BALLARD:  Equal and identical are
5  probably --
6        MR. NEUBERGER:  If he wants to say that,
7  that's fine.
8        MS. BALLARD:  That's his testimony.
9        MR. NEUBERGER:  I'm sorry?
10       MS. BALLARD:  That's his testimony, he's
11 using the word identical.
12       THE WITNESS:  I used the word identical.
13 BY MR. NEUBERGER:
14   Q.    So you're saying you don't know if he was
15 treated equally?
16   A.    To the extent that equal and identical are
17 synonymous, I'm not sure -- I use the word identical,
18 he didn't have identical treatment.
19   Q.    Well, you have used the word fairly in your
20 testimony already several times; right?
21   A.    I've used the word fairly in response to your
22 questions.
23   Q.    Right, about the importance of fairness and
24 how the DOC strives to treat all people equally -- I'm

65

1  sorry, all people fairly; correct?
2    A.    That's correct.
3    Q.    You testified about that a few minutes ago;
4  right?
5    A.    Yes.
6    Q.    And you also testified that the department of
7  corrections strives to treat all people equally, be
8  they black or white; right?
9    A.    Right.
10   Q.    Do you recall that testimony?
11   A.    Yes.
12   Q.    And do you recall your testimony that the DOC
13 strived to treat all people equally regardless of
14 whether they are male or female?
15   A.    Yes, I do.
16   Q.    And regardless of whether they are Protestant
17 or Catholic?
18   A.    Yes.
19   Q.    Regardless of whether they are Muslim or
20 Jewish?
21   A.    Correct.
22   Q.    Regardless of whether they are rich or poor?
23   A.    That's correct.
24   Q.    Regardless of whether they are weak or

17 (Pages 62 to 65)

Justice v. Taylor, et al.
Alan N. Machtinger

66

1  powerful?
2  A. That's correct.
3  Q. Now you are telling me you don't know the
4  definition of the word equally?
5  MR. NIEDZIELSKI: Objection. Now this is
6  getting harassing, to be honest with you. Can you move
7  on, please?
8  BY MR. NEUBERGER:
9  Q. I would like an answer to the question. If
10  you don't know the definition of the word equally,
11  that's fine. If you're using equally and identical —
12  A. I'm suggesting that Mr. Justice was treated
13  fairly and equally when, one, they caught him up with
14  the process as quickly as they could; and two, they
15  gave him the opportunity to reschedule the interview.
16  Is it identical to everyone else, probably not. Is it
17  fair, it's as fair as it could have been under the
18  circumstances. That's my testimony.
19  Q. Where did you learn that they gave him that
20  opportunity to reschedule the interview?
21  A. At the MERB.
22  Q. So you do recall details from the MERB
23  hearing?
24  A. Uh-huh.

67

1  MR. NEUBERGER: I have no further
2  questions.
3  MS. BALLARD: I have some, Alan.
4  BY MS. BALLARD:
5  Q. Let me just pick up on the last line of
6  questioning about Wilbur Justice's application. When
7  is the very first time you learned about Wilbur
8  Justice's application being either misplaced or there
9  being some problems with the processing of that
10  application?
11  A. In preparation for the Step 3 grievance
12  hearing.
13  Q. And approximately when would that have been?
14  A. Maybe early 2005. Maybe a little later than
15  that.
16  Q. Did you at any point in the summer of 2004
17  have any knowledge of Wilbur Justice's application,
18  let's just use the term, being misplaced?
19  A. Absolutely not.
20  Q. Did you have any personal involvement in the
21  summer of 2004 in the handling of Wilbur Justice's
22  application?
23  A. Absolutely not.
24  Q. Did you give direction to anyone in human

68

1  resources in the summer of 2004 as to how to handle
2  Wilbur's application?
3  A. Absolutely not.
4  Q. Do you have any animosity towards Wilbur
5  Justice?
6  A. Not in the slightest.
7  Q. Did you in the summer of 2004?
8  A. Not in the slightest.
9  Q. Actually, how well did you know Wilbur Justice
10  at that time?
11  A. Then and now, very little. At that point he
12  was one of many vice presidents of the union. We had
13  had little or no personal interaction. He was a
14  representative from the smallest institution that we
15  have. I don't recall that we had at that point any
16  conversations or any interaction other than being
17  across the table from each other at negotiating
18  sessions when we were altogether in one group.
19  Q. Did you have any reason in the summer of 2004
20  to want to affect Wilbur Justice' application process
21  for the community work coordinator position?
22  A. No. Nor would I for anybody's position at any
23  time during my career.
24  Q. You mentioned that Larry Klebart may not have

69

1  known about when, either that the interviews were
2  scheduled or when they were scheduled. Why would he
3  have not known that?
4  A. Because interviews are scheduled at the
5  institutional level. We provide a list. They schedule
6  the interviews. They make the selections. They will
7  then send notification back after the selections are
8  made.
9  Q. So in this case, the interviews would have
10  been scheduled by someone at, I believe it was the
11  Morris facility?
12  A. That's correct.
13  Q. Do you know who at the Morris facility would
14  have scheduled the interviews?
15  A. No, I don't.
16  Q. Based upon what you have come to understand
17  about the process from the MERB proceeding and this
18  litigation, your testimony was that Wilbur Justice may
19  not have been treated identically as the other
20  candidates. In your opinion, was that a result of
21  someone's ill intent or just a mistake or something
22  else?
23  A. I have no doubt that any mistakes that were
24  made were not ill intent. They would have just been

18 (Pages 66 to 69)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

**A000048**

Justice v. Taylor, et al.
Alan N. Machtinger

70

1  inadvertent errors.
2      Q.  Do you have any reason to believe Wilbur
3  Justice was treated unidentically by anyone because he
4  was a union official?
5      A.  Absolutely not.
6          MS. BALLARD:  Could we have Taylor-9 from
7  yesterday.  It is the memo regarding CO overtime.
8  BY MS. BALLARD:
9      Q.  Alan, we have put Taylor-9 in front of you
10  from yesterday's deposition of Stanley Taylor.
11          Are you familiar with this document?
12      A.  Yes, I am.
13      Q.  Can you describe what this document is?
14      A.  It is notification to the bureau chiefs,
15  wardens and section administrators, with copies to
16  timekeepers, meaning DOC timekeepers, and the three
17  union presidents, that certain individuals, certain job
18  classes, who are not in COAD, would be able to work
19  COAD overtime to avoid freezing.
20      Q.  Did you play any part in drafting this
21  document?
22      A.  I authored it.
23      Q.  Now, according to this document, what types of
24  non-CO employees were allowed to work overtime?

71

1      A.  Staff lieutenants, captains, majors.  I
2  believe that lieutenants were already doing so.
3  Counselors and probation officers who were former CO's
4  were those who would be included.
5      Q.  Is a correctional counselor the same as a
6  community work program coordinator?
7      A.  No, it is not.
8      Q.  Is a probation officer the same as a community
9  work program coordinator?
10      A.  No, it is not.
11      Q.  At the time this memo was issued, were
12  community work program coordinators allowed to work CO
13  overtime?
14      A.  The answer's no.
15      Q.  At any time since this memo, have they been
16  allowed to?
17      A.  No, they have not.
18          MS. BALLARD:  That's all we have.
19          MR. NEUBERGER:  I have a couple questions
20  following up on that.
21  BY MR. NEUBERGER:
22      Q.  Mr. Machtinger, does the community work
23  program coordinator fall under the category of
24  probation and parole?

72

1      A.  No, it does not.
2      Q.  Where does it fall?
3      A.  It's a job class that's included in the class
4  titles that is a job classification at the institutions
5  who work with offenders in terms of trying to find them
6  jobs in the community.
7      Q.  Have any community work program coordinators,
8  that you're aware of, worked this CO overtime?
9      A.  Not that I'm aware of.
10          MR. NEUBERGER:  I have no further
11  questions.
12          MS. BALLARD:  I have one I forgot.
13          MR. NEUBERGER:  That's all right.
14  BY MS. BALLARD:
15      Q.  Alan, do you have any knowledge in the summer
16  of 2004, did any union officials -- and by that I mean
17  like the executive staff, the vice presidents --
18  receive promotions or transfers to any other positions
19  they applied for?
20      A.  Yes, I am aware that some have.
21      Q.  Some have?
22      A.  Yes, some did during that time period.
23          MS. BALLARD:  Thanks.  That was it.
24          MR. NEUBERGER:  That's going to open up a

73

1  whole other long area.  We will take a break then and I
2  will go get the answers.
3          MS. BALLARD:  If it will help, that's
4  what it was based on.
5  BY MR. NEUBERGER:
6      Q.  I think you just testified in an answer in
7  response to Miss Ballard's question that other union
8  officials -- I'm sorry, what was your testimony?
9      A.  Could you read it back?  If you want to know
10  what my testimony was.
11          MS. BALLARD:  His testimony was yes.
12          MR. NEUBERGER:  What was your question?
13  Without looking at the documents.
14          MS. BALLARD:  Whether other union
15  officials in the summer of 2004 received promotions or
16  transfers that they applied for.
17          THE WITNESS:  And I said yes.
18  BY MR. NEUBERGER:
19      Q.  Is that something you had personal knowledge
20  of or how did you learn that?
21      A.  I learned it when we were responding to the
22  interrogatories for this lawsuit, another individual
23  researched that information.
24      Q.  Who was that individual?

19  (Pages 70 to 73)

Justice v. Taylor, et al.
Alan N. Machtinger

**74**

1    A.   John Smart.
2      MR. NEUBERGER: What I'll probably do is
3 I'll go talk to my client and evaluate that. He's not
4 here today. He had his military duties and we will go
5 from there. We still have a little bit of time yet.
6      MS. BALLARD: We have time left, but it
7 is not supposed to be more than one day under the
8 rules.
9      MR. NEUBERGER: I'm sorry?
10      MS. BALLARD: The deposition is not
11 supposed to be, a deponent is not supposed to sit on
12 more than one day other than by agreement.
13      MR. NIEDZIELSKI: I don't think he is
14 talking about him. Are you talking about John Smart?
15      MR. NEUBERGER: I am talking about John
16 Smart.
17      MS. BALLARD: That's fine.
18      MR. NEUBERGER: I am done with the
19 deposition. I have no further questions.
20      Do you have any?
21      MS. BALLARD: No.
22      COURT REPORTER: Reading and signing?
23      MS. BALLARD: Yes.
24      (Witness excused.)

**75**

1      (The deposition concluded at 11:30 p.m.)
2       INDEX
3 DEPONENT: ALAN N. MACHTINGER     PAGE
4   Examination by Mr. Neuberger     2, 71
5   Examination by Ms. Ballard     67, 72
6
7       EXHIBITS
8 PLAINTIFF'S DEPOSITION EXHIBITS    MARKED
9 Machtinger-1   Employee Time Card    146
10
   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 76
11
   CERTIFICATE OF REPORTER     PAGE 77
12
13
14
...

**76**

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT

**77**

1 State of Delaware )
          )
2 New Castle County )
3
4      CERTIFICATE OF REPORTER
5
6    I, Terry Barbano Burke, RMR-CRR and Notary
Public, do hereby certify that there came before me on
Thursday, September 13, 2007, the deponent herein, Alan
7 N. Machtinger, who was duly sworn by me and thereafter
examined by counsel for the respective parties; that
8 the questions asked of said deponent and the answers
given were taken down by me in Stenotype notes and
9 thereafter transcribed by use of computer-aided
transcription and computer printer under my direction.
10
   I further certify that the foregoing is a true
11 and correct transcript of the testimony given at said
examination of said witness.
12
   I further certify that I am not counsel,
13 attorney, or relative of either party, or otherwise
interested in the event of this suit.
14
15
16            _Terry B. Burke_
17
18 Terry Barbano Burke, RMR-CRR
   Certification No. 233-RPR
   (Expires January 31, 2008)
19
20 DATED:
21
22
23
24

20 (Pages 74 to 77)

# THE NEUBERGER FIRM

### ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

**August 11, 2006**
**FOR IMMEDIATE RELEASE**

## FIRST PRISON UNION RETALIATION LAWSUIT FILED

Wilmington:   Today Sgt. Wilbur F. Justice, the president of the  Correctional Officers Association of Delaware (COAD), filed in federal court against the Department of Correction, Stan Taylor, and Alan Machtinger, the first of the many employee lawsuits which the Union promised last Sept. 16, 2005.

Sgt. Justice contends he was denied promotion two pay grades to the position of Community Work Program Coordinator in August of 2004 in retaliation for the highly visible and aggressive activities of both he and the Union.  At the time they were exposing to the media, the general public and the members of the General Assembly (1) chronic under staffing, (2) the need for salary increases to retain correctional officers, and (3) security lapses within the prison system where a counselor had been brutally raped on the job.  Moreover, Justice was on the contract negotiating team facing defendant Machtinger on the other side of the collective bargaining table.

Justice alleges Machtinger and his aides "lost" his application for promotion, which was simply an excuse to send a message to him and others that if they pushed too hard in exposing mismanagement within the prison system their chances of promotion were dead.  He also revealed today that on August 3rd, after a full one day trial, the Delaware Merit Employee Relations Board sided with Justice and found that the Department had committed a "gross abuse of discretion" in mishandling Justice's 2004 promotion application.  Then they Ordered the Department to vacate the promotion of another employee and re-interview Justice for that job.

This lawsuit seeks the lost promotion, lost wages and other damages, as well as punitive damages against Machtinger personally.  Justice also demands a mandatory injunction against Machtinger baring him from considering the Union activities of any COAD member or Union official in making future promotion decisions withing the Department of Corrections.

"All efforts to seek relief in 2006 from the General Assembly have failed for these brave men and women.  So as the Union promised in its press conference on September 16, 2005, we are now moving into the courtroom to seek relief for the 1,187 men and women in this Union," stated attorney Thomas S. Neuberger.  "As I said last year, Union leaders and members who spoke out on behalf of their dire needs have been harassed and retaliated against on the job, their working conditions have been changed adversely, and family members have been illegally retaliated against.  This is the first of the many federal court lawsuits to be filed to stop this violation of the freedoms of speech, association, assembly, petition, and to organize as a union.  This will cost the taxpayers millions of dollars, as already has happened with similar misconduct by the leadership of the Delaware State Police," said Neuberger.

"The Minner Administration cannot play by the rules, and so it retaliates against good men and women who blow the whistle to the public about governmental mismanagement.  This must stop!  Correctional officers are public servants who must be allowed to tell taxpayers when bad policy endangers public safety, and they must not suffer retaliation for speaking out," added co-counsel Stephen J. Neuberger.

"Moreover, COAD wishes to announce that years of contract negotiations have failed and the Union is now moving into contract mediation.  Finally, we soon will be announcing the COAD position on member cooperation with the current federal investigation of the prison system," Thomas Neuberger concluded.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT WILBUR F. JUSTICE,    :
    :
      Plaintiff,    :
    :
    v.    :
    :
STANLEY W. TAYLOR, JR., in his official    :    C.A.No.06-497-***
capacity as the Commissioner of Correction;    :
ALAN MACHTINGER, individually and in his    :
official capacity as the Director of Human    :
Resources of the Department of Correction; and    :
DEPARTMENT OF CORRECTION OF THE    :
STATE OF DELAWARE,    :
    :
      Defendants.

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' REQUESTS FOR ADMISSIONS TO PLAINTIFF PURSUANT TO F.R.C.P. 36

Plaintiff, by and through his attorneys, hereby objects to Defendants' Requests for

Admissions to Plaintiff Pursuant to F.R.C.P. 36 ("Discovery") in accordance with the numbered

paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses

contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement his

responses at a later time as discovery is completed.

## GENERAL OBJECTIONS

1.    Plaintiff objects generally to Discovery insofar as it requests information or

documents which are subject to the attorney-client privilege, or which constitute trial preparation

materials or attorney-client work product, or which are otherwise privileged or protected and not

subject to discovery.

2.    Plaintiff objects generally to Discovery to the extent that it seeks information not

relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects generally to Discovery insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.    Plaintiff objects generally to Discovery insofar as it requests personal or confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.    Plaintiff objects generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.    Plaintiff objects generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.    Plaintiff objects generally to Discovery insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.    Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Plaintiff objects to Defendants' instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

2.    Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Discovery which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

3.    Plaintiff objects to Defendants' definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

4.    Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

5.    Plaintiff objects to the extent that Defendants' definitions and instructions cause each interrogatory to ask multiple questions in violation of the Local Rules.

## OBJECTIONS TO SPECIFIC REQUESTS FOR ADMISSIONS
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1.    Plaintiff, Wilbur Justice, was not quoted in any newspaper articles pertaining to the Delaware Department of Correction (DOC) published at any time between June and August, 2004.

   **ANSWER:**   Admitted.

3

2.    Plaintiff, Wilbur Justice's, name does not appear in any newspaper articles pertaining to the DOC published at any time between June and August, 2004.

**ANSWER:**    Admitted.  By way of further answer, Plaintiff's picture appeared in The News Journal on August 7, 2004 in an article entitled "Guards, state reach deal on pay." (*See* P00439-441).

3.    On July 15, 2004, Plaintiff submitted his application for Community Work Program Coordinator to the DOC Human Resources Office.

**ANSWER:**    Admitted.

4.    On July 15, 2004, the DOC Human Resources Office retained one copy of Plaintiff's application, and one copy of the application was stamped "received" and returned to Plaintiff.

**ANSWER:**    Denied as stated.  By way of further answer, admitted that the DOC Human Resources Office retained the original of Plaintiff's application.  Also admitted that Plaintiff retained a copy of his original application which was stamped "received."

5.    Plaintiff had previously applied for the position of "Community Work Program Coordinator" in 1999 and was found not to meet minimum qualifications for the position.

**ANSWER:**    Denied as stated.  By way of further answer, admitted that Plaintiff applied for the positions of "Community Work Program Coordinator" in 1999 and was informed he did not meet minimum qualifications for the position.

4

**A000055**

6. Plaintiff had previously applied for the position of "Community Work Program Coordinator" in 2001 and was found not to meet minimum qualifications for the position.

**ANSWER:** Denied as stated.  By way of further answer, admitted that Plaintiff applied for the positions of "Community Work Program Coordinator" in 2001 and was informed he did not meet minimum qualifications for the position because he failed to address his prior experience in counseling.

7. Plaintiff filed an initial (Step 1) grievance with DOC when he was not selected to fill the Community Work Program Coordinator position in August 2004 (hereinafter, the "position").

**ANSWER:** Objection.  Vague and unclear.  Subject to and without waiving the foregoing objection:  Denied as stated.  By way of further answer, Plaintiff filed a Step 1 grievance with the DOC in September of 2004 after he was not selected to fill the Community Work Program Coordinator position.

8. Plaintiff, at his Step 1 grievance, claimed that he was more qualified for the position than the successful applicant, Hansel Fuller.

**ANSWER:** Admitted.

9. Plaintiff filed a Step 2 grievance with DOC following the denial of his grievance at Step 1.

**ANSWER:** Admitted.

5

10.    Plaintiff, at his Step 2 grievance, claimed that he was more qualified for the position than the successful applicant, Hansel Fuller.

**ANSWER:**    Admitted.

11.    Plaintiff filed a Step 3 grievance with DOC following the denial of his grievance at Step 2.

**ANSWER:**    Admitted.

12.    Plaintiff, at his Step 3 grievance, claimed that he was more qualified for the position than the successful applicant, Hansel Fuller.

**ANSWER:**    Admitted.

13.    Plaintiff filed a grievance with the Merit Employee Relations Board (MERB) following the denial of his grievance at Step 3.

**ANSWER:**    Admitted.

14.    Plaintiff, through counsel, at the MERB hearing, claimed that he was not selected for the position due to retaliation for his alleged union activity.

**ANSWER:**    Denied as stated.  By way of further answer, Plaintiff's counsel argued at the MERB hearing that the interviewing panel had committed a gross abuse of discretion. Plaintiff's counsel also argued that Plaintiff was more qualified than Hansel Fuller and that Plaintiff was retaliated against for his First Amendment protected union association and activity.

6

**A000057**

15.    The MERB decision, dated November 29, 2006, was reversed and remanded to MERB by the Superior Court by decision dated August 23, 2007.

**ANSWER:**    Objection. Request calls for legal conclusion. The Superior Court decision speaks for itself. Subject to and without waiving the foregoing objection: Admitted.


16.    The Superior Court decision dated August 23, 2007 found that the evidence before the MERB at the 2006 hearing did not support a finding of gross abuse of discretion in the promotion process for the Community Work Program Coordinator position.

**ANSWER:**    Objection. Calls for legal conclusion. The Superior Court decision speaks for itself. Subject to and without waiving the foregoing objection: Admitted.


17.    The scoring and ranking of applicants for the Community Work Program Coordinator position was done by the three-member interview panel.

**ANSWER:**    Denied. By way of further answer, admitted that the applicants for Community Work Program Coordinator were ranked.


18.    The selection and recommendation of Hansel Fuller as the successful applicant was done by the three-member interview panel.

**ANSWER:**    Admitted.

7

As to Objections:

THE NEUBERGER FIRM, P.A.

/s/ Stephen J. Neuberger

THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: October 17, 2007                    Attorneys for Plaintiff

Justice / Pleadings / Admissions / Justice - Response to Req. for Admissions

8

## DECLARATION OF SERGEANT WILBUR F. JUSTICE UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendant's Request for Admissions set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_____
**WILBUR F. JUSTICE**

_____
**Date**

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT WILBUR F. JUSTICE,                    :
                                               :
        Plaintiff,                             :
                                               :
    v.                                         :
                                               :
STANLEY W. TAYLOR, JR., in his official        :        C.A.No.06-497-***
capacity as the Commissioner of Correction;    :
ALAN MACHTINGER, individually and in his       :
official capacity as the Director of Human     :
Resources of the Department of Correction; and :
DEPARTMENT OF CORRECTION OF THE                :
STATE OF DELAWARE,                             :
                                               :
        Defendants.                            :

### PLAINTIFF'S AMENDED ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, by and through his attorneys, hereby objects to Defendants' First Set of

Interrogatories ("Interrogatories") in accordance with the numbered paragraphs as set forth

below. Plaintiff reserves the right to amend or supplement the responses contained herein as may

be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement his

responses at a later time as discovery is completed.

### GENERAL OBJECTIONS

1.      Plaintiff objects generally to Interrogatories insofar as it requests information or

documents which are subject to the attorney-client privilege, or which constitute trial preparation

materials or attorney-client work product, or which are otherwise privileged or protected and not

subject to discovery.

2.    Plaintiff objects generally to Interrogatories to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects generally to Interrogatories insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.    Plaintiff objects generally to Interrogatories insofar as it requests personal or confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.    Plaintiff objects generally to Interrogatories insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.    Plaintiff objects generally to Interrogatories insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.    Plaintiff objects generally to Interrogatories insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.    Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

2

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Plaintiff objects to Defendants' instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

2.     Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Interrogatories which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

3.     Plaintiff objects to Defendants' definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

4.     Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

5.     Plaintiff objects to the extent that Defendants' definitions and instructions cause each interrogatory to ask multiple questions in violation of the Local Rules.

## OBJECTIONS TO SPECIFIC INTERROGATORIES
### (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1.     For each allegation in your complaint, state with particularity and specificity the complete factual basis for that claim as against each defendant and identify all persons having knowledge as well as each and all documents or other items of evidence that relate to each claim. Please include the specific date(s) of the factual basis of those claims.

**Answer:** Objection. Depositions are just beginning and the record in this regard remains to be developed.

3

Subject to and without waiving the foregoing objection: See the Rule 26 disclosures and lists of witnesses included therein. See also the depositions that have already been taken in this case and documents. See also P00001 - 00490. Additionally:

**A. Plaintiff Sgt. Wilbur Justice.** As Prison Warden Bianco testified, "Sergeant Justice is an excellent employee." Sgt. Justice was a 22 year veteran within the DOC. He was a shift commander, a case worker, job placement officer, had worked the line with, was able to talk to and relate to inmates, who respected him. In the Warden's words, he has "respect from the inmate population." He maintains control of the prison inmates without having to issue a great deal of paperwork or writeups. As Bianco stated, "I hardly ever see a program violation with his name on it, and there's not a need to because he is able to communicate with the inmate population and let them know what is expected of them and they obey him." Sgt. Justice has worked with very difficult, unmotivated individuals in various settings and possesses an abundance of knowledge and experience in working with a wide variety of diverse individuals. He has utilized various counseling theories, practices, techniques, vocational employment training, to maintain and prepare written documents on Level 4 work release inmates, as well as level 5 work release inmates at Morris Correctional Work Release Center.

Sgt. Justice has received numerous awards and commendations for his outstanding work at DOC over the last 22 years. He has been praised by his superiors for his "hard work, dedication and going above and beyond the call of duty ensuring security and safety measures are met." His work is universally recognized as "outstanding" and "exceptional." He has no disciplinary history.

The United States Army also has lavished praise upon Sgt. Justice for his more than 20 years of service to the Army and National Guard stating that "[t]hrough your many

4

accomplishments, you have clearly shown that you are a Non Commissioned Officer with outstanding traits for all to emulate." He was the "Go-to-Man" because of "[h]is uncanny organizational skills blends well in any work group, yet never loses sight of responsibilities as a leader and supervisor." He "project[s] self-confidence, selfless service and enthusiasm; his contributions have directly contributed to the success of the unit. He builds loyalty in subordinates and is respected by his peers."

### B. Sgt. Justice's First Amendment Protected Union Activity and Association.

**1. Associating With the Union as an Active Member and Vice President.** In July 2004, Sgt. Justice was an institutional vice president of the Correctional Officers Association of Delaware ("COAD") - the correctional officer union. Sgt. Justice was an active participant who attended contract negotiation sessions and meetings. His status as a union official was very well known.

**2. Negotiating a New Contract With DOC.** When he applied for the position at issue, COAD was in contract negotiations with DOC and Sgt. Justice was part of the negotiating team. Director of Personnel Machtinger was involved in all of the contract negotiations and attended every session. These negotiation sessions began as face to face meetings between union and prison officials. However, after several ineffective meetings laden with heated verbal arguments between the two groups, union and prison officials, began meeting at the same time, but in separate rooms. This slowed the process down significantly and resulted in a significant amount of time wasted. Often, after working painstakingly for hours on revisions to the contract provisions, union officials often waited hours to hear management's responses to their proposals only to be told to go home or simply that their suggestions would not work. If any proposal suggested by union officials to address the main issues of the contract negotiations somehow

5

benefitted the staff, the answer from management was always no and that it could not be done. As a result, the contract negotiation sessions were often unproductive and frustrating.

     **3. Union Speech to the Media and the Public.** In Spring and Summer of 2004, in an effort to put pressure on DOC management and State elected officials to address reform in prison systems, union officials began speaking to the media and were very successful in disseminating their message of the need for reform in the Department of Correction. As a result, the media ran numerous stories and editorials addressing the very issues union officials were asking management to address. These issues included dire health and safety issues, the severe understaffing present throughout DOC, low wages for correctional officers, the lack of longevity pay or a career ladder, the inability of DOC to retain correctional officers after ten years of service, and lapses in security, among other things. The union's effort to utilize the media as a catalyst for their claims was extremely successful.

     COAD was also responsible for several large billboards which were posted across the State in an effort to increase public awareness. These billboards mainly focused on the understaffing problem within the prison system. Several slogans included:

Delaware
The First State
Unable To Staff Its Own Prisons

Delaware Corrections
Doing More With Less
More Inmate Less Staff

Delaware Corrections
Where Minimum Staffing...
Would be an Increase

Welcome to Sussex County
For Your Safety Obey the Law
We Cannot Staff Our Prisons

6

Delaware
It's Good to be the First
To Build Prisons Without Staff

In fact, one billboard ran directly underneath a billboard paid for Governor Minner which supported her re-election. After a few days, Minner's billboard was changed to simply state "Vote Democrat."

    **4. Union Speech and Petitions to Elected Officials.** Additionally, union officials spoke directly with elected officials such as in the Legislature. During the summer of 2004, union officials were in constant contact with Legislators, often in their offices one to two times a week. Further, COAD officials gave pointed speeches before the Joint Finance Committee addressing the various issues plaguing the prisons.

    **C. The Content of the Union Activity.** As discussed above, union officials were pushing for reform in several areas, mainly dealing with the severe understaffing of the facilities, wage increases for correctional offices to ensure retention and morale, and security lapses which were often a direct result of the understaffing problems. As the voice of the rank and file, Sergeants and below, COAD pushed hard for these issues at every given chance.

    **1. Severe Understaffing that Endangered Public Safety.** Prior to the formation of COAD, Governor Minner had ordered the removal of any vacant job positions within DOC. These cuts however did not eliminate DOC's need for the positions. So where you used to have three people doing the job, now there was only one. As a result of these cuts, the staffing numbers did not even come close to showing how severely understaffed the institutions were. By eliminating the positions Minner created the appearance that DOC was only short a few officers, while in reality it was severely understaffed. To add to this, staffing levels kept

7

falling as DOC was losing more officers faster than they could hire them. In cutting these positions, Minner only sought to distort the actual numbers so they did not appear so bad before the public, she never addressed the DOC's actual need for those positions to be filled. Staffing became so bad that at DCC there were two buildings which were closed because there was no staff to run them.

Correctional officers have one of the most dangerous jobs in the State of Delaware. They are tasked with the responsibility of keeping the public safe from some extremely violent inmates. Officers are only scheduled for eight hour shifts, but policy requires that minimum staffing levels be achieved. Therefore, at the beginning of a shift if there are not enough officers scheduled to work, other officers are asked to work voluntary overtime or in some cases are forced to work mandatory overtime, a process called "freezing." In May of 2004, the DOC was over an entire shift short which resulted in a mass amount of involuntary overtime or freezing of officers. As union officials disclosed to the media, understaffing was the number one problem facing the rank and file. When officers were frozen it meant they had to work mandatory sixteen hour shifts. Some officers would not even find out they were working a subsequent eight hour shift until minutes before their first shift ended.

The severe understaffing problem was caused by and also compounded by the large number of officers leaving DOC versus the number of new hires. As The News Journal reported, in 2003, DOC hired 152 officers, but lost 179. Likewise, in January of 2004 DOC lost 21 officers and by May of 2004 only 37 officers were hired while 79 had already left to find other jobs. The reasons for this massive fleeing from jobs with DOC was a direct result of practices such as freezing, the stress of working in hazardous conditions knowing there was a shortage of officers or officers who were tired from working 16 hour shifts, and low wages. In June of 2004,

8

COAD vice-president David Knight publically disclosed that staffing had reached crisis proportions with two officers leaving for every new recruit hired. This severe understaffing had a negative impact not only on issues such as security, but also the morale of correctional officers.

Security and understaffing went hand-in-hand. The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers. As Knight stated to The News Journal, it was normal for one officer to be responsible for 60 or more inmates in direct supervision environments and the ratio could even be 1 to 100 or more in some housing and facility areas.

The severe understaffing at DOC impacted many areas including the health and safety of the inmates, the health and safety of correctional officers, the classification of inmates, and morale of correctional officers. The health and safety of the inmates was in jeopardy because there were not enough officers to man the buildings to ensure safety. A good illustration of the falling staffing numbers at DOC can be exemplified within the "old" side of the Howard R. Young Correctional Institution. There Institution has two units containing inmates and each set of two is tied together and connected with a "bubble," or an office with protective glass on both units. From this "bubble" officers would monitor and watch the inmates. Prior to the understaffing problems, there were three officers who monitored the inmates. One would be out on the floors and the other two would monitor from the "bubble". The floor officer was removed and replaced by a roving officer between multiple units. Eventually, the numbers decreased and one officer was left to staff the bubble and monitor both rooms at the same time. So if an incident broke out, this lone officer would have to wait for help. He could not leave the bubble unmanned because the inmates in the other room would then be unmonitored. Another issue was confining the offenders for extended periods thus heating up

9

possible situations between the inmates.  Another example of the understaffing problem is seen in the use of "rovers" to monitor buildings.  A "rover" would make his rounds to check on the inmates who were locked into their cells.  When a shift was understaffed, the rover would have more buildings and rooms to check in on thus slowing down his ability to check on the inmates frequently.  As a result, the inmates were only getting checked on by a rover every so often. There was no consistent supervision.  Additionally, due to the understaffing inmates were often locked into buildings for long periods of time without being let out into the open air because there were not enough officers to ensure their safety outside the building.  Often times they were not let out of their buildings for more than an hour a day.  Their continued confinement led to increased violence among the inmates.

In turn, this increase in violence would effect an inmate's record often times preventing them from being classified and transferred to Level 4 lower security level prisons upon the approach of their release date.  Prisoners in DOC were often transferred to Level 4 facilities when their release date was approaching in an effort to reacquaint them with society.  These prisoners would be allowed to spend a certain amount of time at home with their family to allow them to adjust to a life of freedom.  Without this opportunity, prisoners often were not ready to be released after spending a significant amount of time behind bars.  For example, one inmate who was denied this opportunity to be transferred to a lower security level prison to reacquaint him with society immediately re-offended upon being released because he was petrified and did not know how to cope outside of captivity.  So when inmates caused problems while incarcerated, they could not be classified and would lose out on the opportunity to transfer to Level 4 facilities and reacquaint themselves with society.

Along the same lines, the hallways at DCC were only being monitored half of the time

DOC policy required them to be monitored. For example, one building at DCC consisted of five tiers with twelve hallways. Correctional officers were required to walk the hallways to check in on the inmates in their cells. Officers were also required to do "phone punches" to determine that an officer made it to the end of a hallway after checking in on the inmates. It took approximately five minutes for one officer to walk down a hallway and do a punch. Therefore, it took at least sixty minutes for all twelve hallways to be monitored. DOC policy required that two "phone punches" per hallway per hour. The only possible way for this policy to be met is for two officers to perform the monitoring of these hallways at the same time. With the severe understaffing problem, there were not enough officers for two groups to perform these punches, therefore, a single set of officers were tasked with checking in on the inmates and doing the punches for the entire building. This meant that inmates were only being checked in on once every hour instead of twice, which was the policy. To compound this, officers were also tasked with letting inmates out to chow, programs, etc. which required more staff to be pulled off of these required punches. As a result, punches were getting done less than once an hour and the inmates were getting monitored less and less.

Additionally, the health and safety of correctional officers was in jeopardy. As stated above, often two rooms filled with inmates was only monitored by one officer. Likewise, with staffing at or near all-time lows, officers were forced to parole the facility alone with the inmates rather than having a partner. There was less staff to respond to incidents and frequently there was little or no backup available to respond to incidents. DOC had an internal response team made up of correctional officers, but that team was short staffed as well. For example, it was possible that if two incidents occurred at the same time the rovers, as well as any spare officers, responded to each incident, no one was left to respond if a third incident were to break out.

11

**A000071**

Lastly, the morale of the correctional officers was directly impacted as they were often frozen and forced to work sixteen hour shifts. These officers spent significantly less down time at home to enjoy time with their families or for rest and relaxation. After awhile this resulted in many officers burning out. This led to officers seeking employment elsewhere, only escalating the already grievous staffing problem.

     **2. Wage Increases to Attract and Retain Skilled Correctional Officers.** As discussed above, DOC was experiencing a significant decline in the number of officers it was able to retain. Union officials began seeing a trend develop where after ten years of service, correctional officers were leaving DOC to seek employment elsewhere. For example, officers were leaving employment with DOC for jobs with companies such as Wal-mart where they received higher wages without having to work in extremely dangerous conditions. The underlying reason for the large drop-off in correctional officers was mostly due to the fact that there was no incentive to stay. Correctional officers hired by DOC would remain at their initial rate of pay and rank unless they tested and accepted a promotion. There was no career ladder or longevity pay. So for example, a recruit hired as a correctional officer would remain in that position unless he tested for Corporal and accepted a promotion. If you never tested or accepted a promotion, you would only receive the yearly 1-2% salary increase and by the time you could retired you would only be making 15-20% more than a new hire. New Jersey on the other hand had a career ladder where a correctional officer moved from a CO-I to a CO-II and so forth depending on years of service and automatically received a 5% raise in each of their first nine years on the job. By the time a New Jersey correctional officer retired he could receive as much as $70,000 per year without ever having to test or accept a promotion.

     Additionally, DOC allowed anyone who tested for promotion to the rank of

12

**A000072**

Corporal to accept a Sergeant's position if there was a vacancy. In other words, there was no requirement that a correctional officer have a certain amount of time with the department to move up in rank. Thus, as long as an officer took the Corporal/Sergeant test, s/he could accept a position as a Corporal or a Sergeant. There was no specific requirement for time on the job in order to move up. This practice is virtually unheard of in any other paramilitary organization. Basically, without any structure to their promotional process, a career ladder or longevity pay, there were no incentives for officers to stay on the job.

Another problem DOC experienced was officers enrolling in the Delaware academy, but then taking jobs in surrounding states such as New Jersey and Maryland where the pay was higher and there were career ladders allowing for upward mobility. While the starting salaries between these surrounding state institutions were comparable to Delaware, the difference was in incentives and the ability to move up in rank and pay simply by putting in time on the job. Union officials advocated for changes such as a career ladder and longevity pay which would result in better working conditions for correctional officers which would in turn help to keep officers on the job. As State Merit System employees, salaries and benefits were not included in the contract negotiations with prison officials. Union officials were left to use only the media as a catalyst for their claims in petitioning the Governor and legislature for higher wages.

   **3. Frequent Security Lapses.** Approximately nine months prior to the violent rape of a DOC counselor, union official David Knight addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape with DOC. As discussed above, the severe understaffing goes hand-in-hand with the security lapses. Despite the overwhelming amount of attention given to the issues of security at DOC, there were even more lapses that the public was not even aware about. Having one officer

13

multi-task and perform a job meant for several officers inevitably led to breakdowns in security. For example, to ideally man a Level 4 facility with 225 inmates, four officers were needed which included a stationary log officer who could not leave their post. In 2004, these Level 4 facilities were really operating with three officers, one of which was stationary. The numbers designated as the minimum staffing levels needed for operation were arbitrary numbers pulled out of the air by the Warden of that facility. These arbitrary numbers never fluctuated with the amount of inmates housed in that facility. For instance, if the Warden declared the minimal staffing level required 4 officers, it remained at that level no matter how many more inmates were added. This, coupled with the already increased levels of understaffing, made security extremely weak and vulnerable. While the Facility should run with a minimal staffing level of 4, often times only 3 officers were on duty. This could then drop down to two (2) if an emergency occurred.

    **4. The Job Action and Strike.** As the staffing grew worse and tension and stress levels escalated among correctional officers, on July 22, 2004 ten days after the rape of a correctional officer by an inmate (see Section D.1.a. below) 25 COAD members held a special meeting to discuss the problems at DOC. Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the increasingly dangerous conditions they were working under with staffing being at an all time low. As WBOC quoted David Knight, "It's getting dangerous. It's coming to a head."

    Two days after this meeting the media reported that correctional officers were planning a seven-day work action to protest low pay and other issues. This action, at the time unsanctioned by COAD, would have a severe impact on inmate transportation units because officers would refuse to work any voluntary overtime shifts. By law officers could not strike or refuse mandatory overtime, but no one could force them to work voluntary overtime shifts. Cpl. John

14

**A000074**

Smith was one of the organizers of the job action and stated publically that officers were just fed up and that there was "20 years worth of problems." The job action was intended to illustrate their frustration and let the Governor and legislature know there were problems that needed attention and solutions. Officers, desperate for change, felt this was the only way to make their voices heard by the Governor and the Legislature that in order to get and retain more people is a change in pay. By law, COAD could not sanction such a work action because they could risk being sued. However, they stated publically that they were happy to see the rank and file full together.

The work action, or job action, had the most impact on the court and transportation department. As a result of the situation created by more than 400 officer vacancies, officers were often asked to work voluntary overtime to help move inmates to and from state prison facilities to courts for scheduled hearings and other appearances. At the start of the job action, Cpl. Smith reported to the media that there was about a 99% effort where almost no one showed up for voluntary overtime. On the first day of the strike, only 59 inmates were transported while 66 were not. On the second day of the strike, 85 inmates were transported while 53 were not. One of the main problems the court system faced was the requirement that inmates must receive a preliminary hearing within 10 days. The impact prompted prison officials and courts to come up with alternative ways to make sure prisoners were present for the preliminary hearings and trial dates as well as forcing overtime and forcing officers to work 16 hour shifts. With the absence of officers to transport these prisoners to court, if inmates did not receive their preliminary hearing they could be released with all charges dropped. Despite this, officers threatened to continue the job action until they saw something from union officials in writing.

In a desperate attempt to get officers to accept voluntary overtime, a memo was issued by

15

management to members urging them to resume voluntary overtime which was posted in the prisons. However, on July 30, 2004, COAD issued a public press release stating that all three unions - COAD, American Federal of State, County and Municipal Employees ("AFSCME") Local 247, Fraternal Order of Police ("FOP") Lodge 10 - supported their membership's desire not to accept voluntary overtime to ensure the concerns of all DOC personnel are addressed. As a result, the job action only grew in strength.

In late July, prison officials agreed to meet with COAD on August 3rd to discuss the issues plaguing the DOC and Taylor also planned to present a plan to correctional officers. However, Taylor's proposal only included across the board pay raises and recruitment incentives. COAD rejected the proposal since it failed to address retention issues and provided no incentives for officers to stay on the job longer. It was a "patchwork and piecemeal approach." As a result, officers refused to end the job action and continued to decline voluntary overtime.

On August 6, 2004, Taylor activated five members of the Certified Emergency Response Team ("CERT") to step in and staff the DOC's Court and Transportation unit. Upon hearing this, the CERT members became concerned that if they reported to their assignment they would be going against the job action instituted by their fellow correctional officers. But after a long meeting, they decided that if their presence was needed to protect the public from the possible release of prisoners they would report to Court and Transportation.

Therefore, on August 6, 2004, the CERT members showed up for the assignment and crossed the picket line. However, when they reported to their assignment, they were ridiculed and cursed at by their fellow co-workers and given the cold shoulder. Shortly thereafter they learned that there was an extremely light court load that day with only a handful of prisoners on the court list. Only two prisoners would have been released if they did not get to court that day.

16

Further, in addition to the five assigned CERT members, there were also approximately five full time Court and Transportation officers assigned on that day as well.

Generally, when CERT is activated, DOC Commissioner Stan Taylor allowed CERT command to draw up the operation orders and then he would pick the best one. When they asked Major Dave Hall, the head of CERT, why they had been activated given the small amount of prisoners that needed to be transported he replied that he had given four operations orders to Stan Taylor. One CERT member, Cpl. John Balas, asked Major Hall why Taylor had picked this one. Taylor replied, "He didn't." Another CERT member, Lee Mears, asked Taylor who gave the order and Taylor replied, "It came from higher than Stan." This was extremely unusual given that initial CERT command decisions were never made by someone higher than the Commissioner. At this point the CERT members realized CERT's activation was politically motivated and had not occurred for critical reasons of public safety.

Therefore, at the end of their shift that day, the five assigned CERT members and five additional CERT members met with the Warden and resigned their positions on CERT in an effort to show support for the job action. They explained that they were resigning because they did not feel CERT's activation was proper and that they were lied to and used for political reasons. They expressed to the Warden that they would not go against their fellow co-workers if the public's safety was not in jeopardy. When the Warden asked that they reconsider their resignations, they stated that they felt betrayed by the department despite their loyal service and that management could no longer be trusted. Accordingly, they refused to reconsider.

     **5. Suggested Solutions to These Problems.** During legislative meetings and negotiating sessions, union officials posed several solutions. To help alleviate the understaffing problem and the amount of officers leaving the job, COAD suggested implementing policies

17

such as a career ladder or longevity pay which would provide incentives for correctional officers to remain on the job and not flee to other state institutions or other industries. Additionally, COAD proposed pay increases commensurate with time on the job. This would help close the gap in pay between Delaware and surrounding states.

In an effort to eliminate some of the strain felt by the understaffing problem DOC recommended changing eight hour shifts to twelve hour shifts. COAD opposed this change. COAD's fear is that this change would disrupt the schedules of older workers who already have set schedules including weekends off. This in turn would lead to more officers leaving the job and would enhance the problem, not solve it. COAD advocated a mass hiring, while prison officials suggested holding job fairs. DOC also took steps to lower employment requirements such as the minimum age and accepting a larger amount of candidates who pass the pre-hire test. But these measures barely helped DOC retain the minimum staffing requirements.

Further, DOC implemented a task force created by Taylor to evaluate the problems at DOC and make recommendations. The task force made several recommendations to management such as allowing officers to retire after 25 years instead of 30, spending $900,000 to increase starting salaries, and changing state law to allow for a career ladder which would create easier movement through the pay scales. But DOC officials claimed the task force did not come to a lot of conclusions and was short on evaluating what would work best. Essentially, the governor and legislature would make the final decision. Early in the year, the administration granted a $600 increase in hazardous duty pay, as well as a bonus between $600 and $1,000 in June and an increase in salaries by 3% in July. However, this only scratched the surface. Officers were still without a contract, and to date have yet to reach agreement with DOC officials in contract negotiations.

18

**A000078**

**D. The Form and Context of the Union Activity.** During the Summer of 2004, union officials were speaking out on matters of public concern to the media, DOC management and the State Legislature in an effort to bring to light the many issues plaguing DOC correctional officers. There is a wealth of media articles covering these issues, specifically the severe understaffing, security concerns, low wages for officers and the need for high salaries, and retention problems. Many times during this time period, The News Journal and Delaware State News would run several stories in one day. Additionally, the union was responsible for several billboards posed throughout the State.

**1. The Many Contemporaneous Problems at DOC.**

**a. The Abduction and Rape of a Female Counselor.** On July 12, 2004, as COAD had previously warned, inmate Scott A. Miller took Cassandra Arnold, a female counselor, hostage for six and a half hours at Delaware Correctional Center in Smyrna. Miller was serving a 699 year sentence for 37 counts of rape, kidnapping and robbery. After a group counseling session, Miller armed with a handmade knife snuck into a secure area and hid in the women's restroom. Arnold spotted Miller hiding out in the bathroom. Miller grabbed Arnold and threw her against a wall in the bathroom. He then drug her down the hallway and into the counselor's work room. Once inside the room, Miller barricaded the door with metal file cabinets and covered up the windows. By phone, he requested a one-on-one meeting with DCC Warden Tom Carroll. However his request was granted on the condition that the hostage was released. Upon hearing this Miller became enraged, stabbing cabinets and walls with his knife. Miller told Arnold, "This is how I'm going to kill you." A few hours later he produced a shoelace, tied Arnold's hands behind her back, raped, and sexually assaulted her while holding his knife between his teeth.

19

**A000079**

In the meantime, DOC activated CERT who gained access to the room where Miller was holding Arnold by climbing through a tile in a false ceiling. From this position, a CERT officer was able to see Miller sexually assaulting Arnold. However, the movement in the ceiling alerted Miller that he was being watched. Miller then threatened the victim with his knife and made an effort to assault the officer. The CERT officer then fired his weapon killing Miller and ending the standoff.

As the investigation unfolded it became apparent that a convicted felon was able to pass through secure doors which had been propped open and into a bathroom undetected. Then while Arnold was being dragged back to her office, there was not one correctional officer in that hallway. Several weeks before the rape, Arnold had warned her supervisors of this door being propped open, but nothing was ever done about it. Arnold's lawyer and family made several media statements calling for an investigation independent of Governor Minner's influence.

In the media frenzy following the violent rape, union officials were quoted in the media criticizing management because for months they had begged for improvements and had warned the governor and legislature that something like this could happen if no action was taken. Three days later, Minner was quoted in The News Journal saying this was the type of thing that you expect to happen in prisons. DOC officials constantly denied that staffing played a role in the incident claiming the facility was only short one officer, while union officials vigorously continued to attack the legislature and Governor in the media for not addressing pay and staffing issues. Further, union officials explained that while the building where the rape occurred might have only been short one officer, this failed to take into account that seven of the officers were working either voluntary or involuntary overtime.

**b. Prison Escapes.** In December of 2003, inmate Myron D. Price

20

escaped from two correctional officers while being transported to the Kent County Courthouse. Price used a paperclip or similar device to loosen his leg shackles and handcuffs. Then after exiting the transportation van in a wide open parking lot, he took off. His escape prompted a three week manhunt and ended in his capture in Arkansas. While on the run Price allegedly robbed two motels and led police on a high-speed chase in a stolen car.

  **c. Other Security Breakdowns.** On April 26, 2004, inmate Willis T. Matthews, Jr. was on trial in Sussex County Superior Court for allegedly raping a 91 year old woman. While on trial, he slit his neck with a tiny piece of disposable razor blade. This incident occurred on the heels of an inmate convicted of racketeering was injured by a tiny piece of disposable razor blade. Then two days later, convicted burglar Sean A. Dupree swallowed a handcuff key as part of an alleged escape plan while in transport to Kent County Superior Court. The very next day inmate Richard L. Clark had walked away from Sussex Community Corrections Center in Georgetown causing a Wilmington police officer to fire his service weapon at him.

  Then in June of 2004, Doug Ingram, a private security expert who volunteered his time to conduct a review of DOC's court transportation policies and procedures, released his February report to the media. Ingram stated that if changes were not made soon to the DOC's transportation procedures, someone would be seriously injured or killed. Ingram also harshly criticized the administration for severe security lapses and lack of training transportation officers receive. The Ingram report identified serious flaws in the transport security including the fact that vans were not equipped with two-way radios to communicate with superiors in cases of emergencies, prisoners are barely patted down and searched before being loaded onto the vans, and van operators are only supplied with a list of inmates being transported and have no face

21

**A000081**

recognition for the inmates. Ingram offered several recommendations for improvement including: photo ID verification of all transports, strip searches, body searches, utilization of full restraints, having inmates dress in court clothing and shower shoes, and the prohibition of personal items except court papers.

Ingram's report identified only five full-time court and transportation employees. All other officers serving in court and transportation were working overtime. As COAD President Allen Deal stated to the media, Ingram's recommendations would be hard to implement given the severe understaffing problem in the DOC. They simply did not have the staff to perform extra security measures such as strip searches.

**d. The Job Action by Union Members.** See section C.4 above.

**2. Widespread Media Attention About These Problems.** There was a regular flood of newspaper articles and media attention about these many problems which are in the record. The articles in the record are true and correct copies and internet printouts of articles which ran in the Delaware media.

**3. Legislative Concern About These Problems.** State legislators also regularly and publically expressed serious concerns about these many problems in the Delaware media.

**4. Prison Conditions Were an Issue in the Upcoming Gubernatorial Race.** COAD publically opposed the re-election of the incumbent Governor and actively worked to defeat her. COAD publically supported Gubernatorial candidate Bill Lee. On their own time, union officials and members would hand fliers out at local grocery stores or in housing developments to support his campaign. In turn, Mr. Lee ran radio ads which pushed the prison issues. The media often quoted candidates who were critical of how Minner was addressing, or failing to address, the prison issues. These candidates publically expressed their concern for the

22

**A000082**

problems and explained how they would work to fix the problems.

**E. The Promotion At Issue.** In the midst of this public firestorm, a vacancy came open in DOC. The promotion at issue was for the position of community work program coordinator at Morris Correctional Facility, which was posted around July 7, 2004.

**1. Sgt. Justice Applies for the Promotion.** Sgt. Justice, the union vice-president, applied for the position in a timely manner on July 15, 2004.

**2. Machtinger's Knowledge of Sgt. Justice's Application.** Not surprisingly, Machtinger admits that it is very possible he was told by his staff that Sgt. Justice had applied for the promotion. Machtinger clearly remembers being subsequently informed about the fiasco involving losing Sgt. Justice's application.

**3. Machtinger's Involvement in Promotions.** Machtinger is the director of Human Resources for DOC. He is involved in all aspects of his office. Even when he is out on vacation, he stays in touch to keep on top of things.

The HR department is not a large office and it is well known throughout this small office which positions are posted to be filled. Anyone in the office, including Machtinger, had access to applicant files. It is common knowledge throughout that Machtinger is aware of when positions are posted, and who is being hired. Indeed, everyone in HR learns about the applicant certification lists.

The two employees directly under Machtinger in the chain of command regularly sign off on hiring and promoting individuals.

**F. Adverse Action - Defendants Immediately Lose His Application.** In the midst of this public firestorm, Sgt. Justice's application was then mysteriously lost by Human Resources in the next four days.

23

**G. Adverse Action - DOC Actively Misleads and Deceives Sgt. Justice About the Status of His Application.**

      **1. Sgt. Justice Checks on the Status of His Application.** One month after applying, on Friday, August 13th, Sgt. Justice went to the HR office and asked about the status of his application.

      **2. Sgt. Justice is Told That No Interviews Have Yet Been Scheduled.** The HR employee then checked the computer database and assured Sgt. Justice that their computer system and register still had him listed as one of the applicants for the position. He was told that the interviews for the position had not yet been scheduled.

      **a. But DOC Had Scheduled Interviews for All Candidates Except Sgt. Justice.** Nevertheless, despite the reassurances from HR on August 13th, three days earlier, on August 10th, the five other applicants had already been notified and scheduled for interviews for the following Monday, August 16th, but Sgt. Justice's name was mysteriously absent from the list and he was never notified.

      **3. Sgt. Justice is Falsely Told That the Certification List Had Not Been Prepared.** Next, DOC told Sgt. Justice that there was no need to worry because the required certification list had not yet been completed. DOC claimed that when the certification list was completed, Sgt. Justice would of course be notified and then scheduled as one of the interviews.

      **a. But the Certification List Had Been Prepared Three Weeks Earlier.** However, this explanation was a blatant falsehood given that the certification list had been prepared and distributed more than three weeks earlier, on July 22, 2004, by this same DOC employee, without Sgt. Justice's name on it.

      **4. Sgt. Justice Goes On Vacation.** After being reassured by DOC that

interviews had not been scheduled for the vacant position, Sgt. Justice went on vacation with his family.

**H. Sgt. Justice Learns That the Interviews Were Occurring.** Then, on Monday, August 16th, while away on vacation, upon learning that the interviews had been surreptitiously scheduled for that same morning, Sgt. Justice abruptly returned from vacation, went to HR and confronted the same employee from the previous Friday.

**1. Sgt. Justice Confronts DOC.** Sgt. Justice confronted the same HR employee and asked why he had not been notified that the interviews had been scheduled. The HR employee then confirmed that Sgt. Justice's name was on the register and stated he did not know why Sgt. Justice had not been scheduled for an interview.

When pressed, this same DOC employee contradictorily admitted that he personally prepared the certification list on Friday, August 13th, mere hours after meeting with Sgt. Justice earlier that morning about his application, but somehow neglected to put his name on it and never notified him that the list had been prepared. This contradicts this same employee's testimony that the certification list had been prepared and distributed more than three weeks earlier, on July 22, 2004, again, without Sgt. Justice's name on it.

**2. DOC Claims to Have Lost It.** Human Resources then told Sgt. Justice that his application had somehow been lost and could not be found. It was claimed that it had been "misplaced" or "misfiled."

**3. Sgt. Justice Brings a Dated, Stamped Copy of His Application and Proves He Had Previously Applied.** That Monday morning, Sgt. Justice brought with him a dated, stamped copy of his original application that had been filed on July 15th to prove he had properly applied, to replace the original application that had mysteriously disappeared.

25

**a. DOC Doctored and Tampered With Sgt. Justice's Original Application.** Later, HR found his phantom original application which had somehow vanished but then miraculously reappeared. It appears that Sgt. Justice's original application was tampered with while in the possession of DOC. DOC has yet been unable to explain these troubling problems.

**I. At the Last Minute, With No Notice or Opportunity to Prepare, Sgt. Justice is Added to the Interview List.** After Sgt. Justice presented his stamped copy of his application, the HR employee reviewed Sgt Justice's application and found that he met the minimum qualifications. Sgt. Justice was then told that he was being immediately penciled in and was now scheduled for an interview before the three member panel. He hurriedly went home to change into more appropriate clothing. Sgt. Justice was afforded no time to prepare for the important interview or gather any documents to present to the board to illustrate his qualifications. In this frantic rush, Sgt. Justice obviously felt hurried and out-of-sorts. Additionally, Sgt. Justice was frustrated by the fact that he was not afforded any time to prepare and gather himself together. Other applicants, such as Hansel Fuller took the entire day off of work to prepare for his interview.

In the Interview Committee's words, Sgt. Justice was added to the list at the "last minute," after the interviews had already begun. Defendants never told the Committee why Sgt. Justice was being so belatedly added or that he had been deprived of the opportunity to prepare.

**1. DOC Did Not Order That the Interviews Be Postponed.** No one from the DOC suggested postponing the interviews.

**2. DOC Did Not Tell Sgt. Justice That He Could Have the Interview Postponed.** DOC also never told Sgt. Justice that he could have the interview postponed so he

26

would have time to prepare.

**3. Past DOC Practice.** Past practice reveals that DOC never postponed interviews for candidates. If the interviews were held and you did not participate, you were not considered for that position. Likewise, it was unheard of that a candidate could request to have the interviews postponed. Candidates never requested extensions. Rather, DOC's past practice was that if you did not make the interview as scheduled, you simply were not considered as a candidate. Based on this past practice, Sgt. Justice did not request that his interview be postponed. Rather he was forced to rush around to get ready for his last minute interview.

**4. Sgt. Justice Had No Time to Prepare or Bring Necessary Documents.** The interviewees were responsible for bringing documentation with them to the interview to use and some took advantage of the opportunity. But because of the last minute addition, Sgt. Justice did not have time to bring his personnel file, awards and commendations, or any of his military records for the Committee to consider when making their decision. The Committee admitted that if Sgt. Justice had brought these types of documents to the interview with him, they would have been reviewed and considered.

**5. Sgt. Justice Manages to Finish Second Anyway.** Despite having no opportunity to prepare for his last minute interview, Sgt. Justice still managed to finish second in the process. A Mr. Fuller, who had taken the day off of work to prepare, was ranked first and was awarded the promotion.

**a. Performance During the Last Minute Interview Was the Primary Reason Why Sgt. Justice Was Not Chosen.** The "main distinguishing factor" between Mr. Fuller and Sgt. Justice was the "ability to communicate well" during the last minute interview, his "communication skills." Performance during the last minute interview and the ability to

27

clearly and concisely answer questions during the last minute interview was the "principal distinguishing feature that distinguished Mr. Fuller from Mr. Justice."

**J.  Evidence of Causation.**

**1.  Knowledge of the Protected Activity.**  Sgt. Justice's status as a union official was so well known that this fact was posted on a bulletin board in the HR office.

Defendant Machtinger was aware that Sgt. Justice was a union official, a member of contract negotiating team and that the union was publically speaking out about the many problems at DOC.  Machtinger was involved in the intricacies of DOC operation and attended every contract negotiation session.

**2.  Motive to Retaliate.**  As a result of the union membership refusing to accept voluntary overtime and union officials' speech about DOC management, prison officials such as defendant and HR Director Machtinger began implementing extremely vague policies giving management more control over personnel matters.   Additionally, there was no contract in place to protect the correctional officers or overrule these policies.

Further, while fighting with management in the media and contract negotiations, COAD union officials also were fighting management in grievance hearings on behalf of correctional officers.  The union had almost a 95% success rate against management.  Machtinger was very involved in the grievance process and did not like that union officials were so successful. Defendant Machtinger did not like when people spoke out against DOC or management.

Machtinger is admittedly friends with Commissioner Stan Taylor.  The two spend time together outside of work, as well as often working side by side on DOC matters.  Additionally, Governor Minner used Taylor and Machtinger as puppets to carry out her personal vendettas. Taylor worked at the Governor's discretion.  Accordingly, Minner was able to utilize Stan Taylor

28

**A000088**

and HR Director Machtinger to project her will. As a result of the union officials' speech to the media and management, Minner felt pressure from her constituents and was taking constant hits in the media during an election year. As discussed above, Minner was also having to publically debate other candidates on issues concerning DOC in public forums. As a result, Minner began taking her anger and frustration out on union officials, such as Sgt. Justice, by filing a lawsuit against them.

      **3. Temporal Proximity.** The temporal proximity is unduly suggestive.

July 12th -     Cassandra Arnold rape, prisoner executed.

July 15th -     Plaintiff files his application for Community Work Program Coordinator.

July 16th -     COAD publicly contradicts the Governor in the media and denies her false claims that there was no shortage of correctional officers or lax security in the prisons.

July 18th -     COAD publishes an opinion piece in the media sounding the alarm that the prison system is dangerously understaffed.

July 16-19th - HR mysteriously loses his application.

      **4. Intervening Pattern of Antagonism.** In the midst of the events that led to this case, on August 5, 2004, the State of Delaware and DOC filed a lawsuit against Sgt. Justice himself and COAD in Chancery Court because of their union activities, including their perceived support for a devastating work stoppage by prison guards protesting dangerous working conditions in Delaware prisons. See State v. Correctional Officer Association of Delaware, et al., C.A.No. 626-CC (Del.Ch.). This lawsuit was the result of a last ditch effort by the Governor to put a stop to the correctional officers' defiance of upper management and to end their very successful job action. When the Chancellor ruled in favor of union officials, Minner lost face in

29

the public eye. The highly successful job action and the Court's refusal to put an end to it left her entirely helpless and without any immediate remedy.

Furthermore, by definition the contract negotiation sessions were adversarial. As explained above, after a few contract negotiation sessions where arguments ensured between prison and union officials, the two parties would keep themselves separate. Prison officials would often keep union officials waiting hours for their comments. These sessions were stressful for all parties involved as discussions were taking place in a piecemeal fashion. Union officials would work painstakingly hard on their revisions and comments, only to be stonewalled by DOC officials who took their time and often came back with no indication they were willing to meet the union's demands.

### 5. Disparate Treatment.

**1. Only Sgt. Justice's Application Was Lost.** Out of 6 applicants for the Community Work Program Coordinator position, Sgt. Justice's application was the only one lost. HR claimed to have made a "mistake" with Sgt. Justice's application, but not with anyone else's.

#### a. None of the Other Applicants Were Union Officials.

Ironically, of these 6 applicants, Sgt. Justice was the only union official. Further, Sgt. Justice was not simply a union member, but an official intimately involved in the contract negotiations and visibly supportive of the union, the correctional officers and their messages to upper management. Additionally, Sgt. Justice was the only applicant sued by DOC for his union membership. Notably, Fuller had never been a member of COAD, has never held a leadership position in a union, has never helped negotiate a union contract and has never been sued by DOC for his union activities.

**2. Only Sgt. Justice Was Left Off of the Certification List.** Similarly,

30

**A000090**

Sgt. Justice was the only applicant who was left off the Certification list. The 5 other applicants who submitted their applications in the same fashion as plaintiff were added onto this list with no problem.

**3. Only Sgt. Justice Was Actively and Repeatedly Deceived and Lied to By HR.** Likewise, Sgt. Justice was the only applicant who was deceived and lied to by HR and DOC. No other applicant was assured by HR that no interviews had been scheduled or that a certification list had not been prepared. All the other applicants received proper notice of their scheduled interviews.

**4. All Other Candidates Had Six Days To Prepare for Their Interview.** By virtue of not being left off the certification list, the other applicants had ample time and opportunity to gather their thoughts and documents prior to their scheduled interviews. Unlike Sgt. Justice, these applicants were afforded the opportunity to arrive at their interview calm, collected and with any documentation they wished to submit to support their qualifications. Conversely, immediately before his interview Sgt. Justice was rushing home to change his clothes. As a result he was flustered and frustrated at having to feel so rushed. Further, he had no time to gather his thoughts and supporting documents.

**6. Violations of Procedures.** HR's policy is not to lose its employee's applications for vacant promotions and not to lie to and deceive these employees. However, each of these policies were violated with regard to Sgt. Justice in 2004 when he applied for the vacant Community Work Program Coordinator position.

Additionally, it was DOC's policy to use a testing procedure for promotions to positions with pay grades of 11, such as Lieutenants and the Community Work Program Coordinator position. The testing process for Lieutenants consisted of taking a test, being placed on the

31

**A000091**

certification list, and then participating in an interview. During the interview process, an applicant was scored by each of the evaluators and eventually ranked based on their scores. The candidate with the highest score was supposed to be awarded the position. Conversely, however, the process DOC used for promotion to Community Work Program Coordinator position had no scoring procedure and was completely arbitrary. There was no objectivity built into the process through a test or score.

      **7. Falsehoods and Other Pretextual Reasons.** Defendants' cover up and lies only prove their discriminatory animus toward Sgt. Justice.

      (1) When Sgt. Justice inquired about interviews, he was told that the certification list had not been prepared, an admitted falsehood given that the list had been prepared three weeks earlier.

      (2) Sgt. Justice also was assured that when the second certification list was completed, he would be scheduled for an interview which did not occur.

      **K. The Board Would Not Have Made the Same Decision Anyway.**

      **1. Sgt. Justice Had Superior Qualifications.** Sgt. Justice was qualified for the Community Work Program Coordinator through his experience, stellar job performance, commendations and awards and years of service for DOC. Fuller had a mere seven years of experience at the DOC as opposed to Sgt. Justice's 22. Despite belated claims that he excelled in his job during his seven years with DOC, he never received any awards or commendations for any of his work there. Conversely, Sgt. Justice has received numerous awards and commendations.

      During his interview, Fuller also discussed and stressed his military background including 20 years in the Air Force. This was considered to be a positive factor in his favor. However, the

32

**A000092**

majority of his Air Force career were spent in the Air Force marching band. Of course, Sgt.

Justice had more than 20 years in the Army and National Guard and has been repeatedly praised

for his "outstanding" service there.

2.　　　Identify by name, address and telephone number, all health care providers (e.g.

doctors, dentists, physicians, surgeons, therapists, etc.) that have treated or examined you in the

last 15 years and provide the dates of service or treatment, the nature of any treatment or

examination and the result of each treatment or examination.

**Answer:** Objection. Overbroad and burdensome. Additionally, the request seeks

documents not relevant to this action or that do not appear reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff is claiming garden variety emotional distress and not

offering evidence he sought medical treatment for it.

3.　　　State and identify by names of parties, court or administrative body, date and case

number all lawsuits or legal proceedings, at law or equity, of any nature in which you have ever

been a party and the disposition of that matter.

**Answer:**　In addition to the present case:

- Wilbur F. Justice v. State of Delaware Department of Corrections,
  MERB Docket No. 05-01-317

- State of Delaware / Department of Correction, v. Wilbur F. Justice and MERB,
  06A-12-006-RBY (Del.Super.)

- State of Delaware and Department of Correction v. COAD, et al.,
  626-CC (Del.Ch. 2004)

- Sgt. Justice was also involved as a plaintiff in a civil lawsuit regarding a vehicular
  accident.

33

**A000093**

4.     Identify by name, address, phone number, location, date and persons present, all individuals that have been interviewed by you in connection with this matter and identify the subject matter of that interview and any documents discussed.  Please state whether any documents or memorandum were prepared relating to that interview.

**Answer:** Objection. Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product.

Subject to and without waiving the foregoing objection: David Knight, Steve Martelli and Lee Mears.  The affidavits of these three witnesses will be produced.

5.     State and identify each and all photographs, videotapes, audio tapes or any other form of recording media that relates to this matter, and provide the time, date, location and manner that such were made as well as the names of all individuals that have the originals or copies.

**Answer:**  None.

6.     To the extent you contend that defendants violated any law, state with particularity and specificity all the facts that support your contention.  Please include the date(s) of any conduct or omissions that underlie your contentions and identify any documents or persons with knowledge.

**Answer:** Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.

Subject to and without waiving the foregoing objection: See Complaint (D.I.1) and

34

answer to Interrogatory #1.

7.      State with particularity and specificity in narrative form the incident(s) that is (are) the basis of this suit.  Please include dates, times, exact location, persons present and identify any documents that relate to the incident.

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.

Subject to and without waiving the foregoing objection: See Complaint (D.I.1) and answer to Interrogatory #1.  Additionally, see P00001 - 00493.

8. State, identify and describe all funds available to you since January, 1999.  Please include: the location, account or other identifying number, the name or title under which the funds were held, the source of such funds and identify all documents that relate to such funds.

**Answer:**  Objection.  Overbroad and burdensome.  Additionally, the request seeks documents not relevant to this action or that do not appear reasonably calculated to lead to the discovery of admissible evidence.

9.      Identify all persons by name, address and telephone number that plaintiff communicated with regarding the facts or allegations in the present matter.  Please include a description of the mode and manner of such communication and the time and date.

**Answer:**  Objection.  Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product.

35

**A000095**

Subject to and without waiving the foregoing objection:

Beatrice Justice (wife)
203 North Caroline Place
Dover, DE 19904
    mode - in person, telephone
    specific times and dates - unknown

Harold Justice (brother)
P.O. Box 110
Millsboro. DE
    mode - in person, telephone
    specific times and dates - unknown

Stephen Martelli
655 South Bay Road
Suite 4kk
Dover, DE 19901
    mode - telephone
    time and date - September 2007

10.    Identify all individuals by name, address and phone number and all evidence by complete description that you intend to call or offer at trial. Please include a summary of the witnesses' expected testimony or the reason for offering the exhibit.

**Answer:** Objection. Any identification of trial witnesses or documents is premature prior to preparation of the pretrial order. Fact witnesses already have been identified in the Rule 26 disclosures. For facts of which these witnesses are aware see the answer to Interrogatory #1 above and the depositions that have already been taken in this case.

11.    State, identify and describe all documents or records that relate to this lawsuit in plaintiff's or her lawyer's possession. Please include the name of the document or record, the nature of the information or record, the form in which the information is kept, the date and how

36

you acquired such documents.

**Answer:** Objection. Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product.

Subject to and without waiving the foregoing objection: See Rule 26 Disclosures and P00001 - 00493.

12.    State and identify all damages you claim you are entitled to by the defendants' alleged wrongful conduct and include your calculations of those amounts, if any.

**Answer:** Objection. To the extent this question seeks information on wage and benefit loss, pension loss and front pay it violates the scheduling order and Civil Rule 26.

As to the other elements of damages plaintiff responds as follows.

**(1) Economic Damages.** For a description of pecuniary damages claimed, see the report entitled "The Losses Associated with the Failure to Promote" submitted by Dr. Thomas C. Borzilleri, Ph.D. (See P00474-485).

**(2) Emotional Distress.**

**(a) Emotional Impact.** Plaintiff has always strived to be professional in his job. He was well respected by his colleagues, as well as the prisoners he supervised. He always felt that if you worked hard, you would be rewarded. Plaintiff worked for DOC for over twenty years and always had superior job evaluations and commendations. Plaintiff grew frustrated over the fact that he was not being treated fairly. He knew that he was denied this position not because of his qualifications, but rather defendants actions in losing his application and almost denying him the very opportunity to be interviewed. Plaintiff was forced to rush back from vacation after

37

learning that interviews were being held knowing he was not as prepared for the interview as the other candidates. He knew going into the interviews that he was at a disadvantage and that defendants had put him in that position. At that point, plaintiff knew their loss of his application was no accident. All plaintiff wanted was to be treated fairly - to have his years of stellar service with the DOC, his commendations and awards, his years of service to this Country in the U.S. Army, and his overall mindset to protect the public by monitoring prisoners be considered in an unbiased fashion. The fact that defendants stood in his way despite his professional demeanor and hard work ethic, has weighed heavy on his mind.

(b) **Physical Impact.** When plaintiff learned he was begin retaliated against, he began experiencing problems sleeping. He would have trouble falling asleep because he would constantly think about what would have happened if he had been given a fair opportunity to interview for the position and received the position. His frustration at being denied this opportunity would takeover his mind and as a result he could not sleep. After being denied the position, plaintiff became very involved with the union and tried to bury his emotions by staying busy. But at night he would have to wrestle with his thoughts and feelings. Because of this lack of sleep, plaintiff was always fatigued and tired. It affected everything. When he was in bed, he could not get the thoughts of the retaliation out of his mind.

(c) **Impact on the Family and Social Relationships.** Plaintiff's stress and lack of sleep had an adverse impact on his family relationships. When he would come home from work he was irritable and would be withdrawn refusing to talk at all until he was able to wind down from the stresses of work. When he did speak the conversation would often turn to work.

(3) **Humiliation and Embarrassment.** The humiliation of the experience also has weighed heavily on plaintiff. To be passed over for someone with lesser qualifications is

38

**A000098**

humiliating and embarrassing. Further, while he was still employed as a Sergeant with DOC, plaintiff had to do the job of Community Work Program Coordinator on holidays when counselors were not at work and on Mondays when his shift commander was off. He would have to make the important work release decisions, just as the Community Work Program Coordinator would do on a normal basis. On these days, plaintiff was repeatedly reminded of the fact that he was more than qualified to do the job and how he was passed over for someone who was less qualified. To be forced to do the same job he was told he was not qualified to do was humiliating and embarrassing for plaintiff.

Additionally, plaintiff had to deal with the barrage of people who knew plaintiff was fighting for the position and would regularly come up to him asking, "When are you going to get that job?" This took its toll on plaintiff as he was constantly faced with the notion that he was having to fight an uphill battle for a position that he was more than qualified to fill, knowing that the sole reason he was denied that opportunity was because he stood up in opposition to management and in support of his fellow co-workers.

Plaintiff could not get away from it. From the embarrassment at work to the intrusive thoughts at home, it was always with him and was a heavy weight for him to carry every day. For over two decades plaintiff worked in extremely dangerous conditions in order to serve and protect the public. Yet because he was outspoken on issues relating to the conditions of employment for correctional officers, a matter of public concern, he was denied the opportunity to advance his career and know that his hard work had paid off.

**(4) Injury to Reputation.** When the fact that Sgt. Justice was fighting for this position became public in 2005, he was already serving as President for COAD. The fact that the union President was having to fight management for a promotion weakened his position as a leader for

39

**A000099**

the correctional officers.

13.    Identify by name, dosage and by whom prescribed, all medications that have been

prescribed for you, and the reason such medication was prescribed for you for the last 5 years.

**Answer:** Objection. Overbroad and burdensome. Additionally, the request seeks

documents not relevant to this action or that do not appear reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff is claiming garden variety emotional distress only and

is not offering evidence he sought medical treatment for it.

14.    State in reverse chronological order, all your employment, including part time

positions, the name of employer, address and phone number, dates of employments, name and

nature of the position and the reasons that you left each position.

**Answer:**

U.S. Army National Guard
Training NCO
8/83 - current

Department of Correction
Correctional Officer, Sergeant
5/16/82 - 2/1/07

Just Us Cleaning
Owner
2002 - 2003

Seaford School District
Custodian
4/76 - 5/77

Masten Lumber Co.
Driver
1977 - 1982

40

Various construction companies in Ocean City, MD
Laborer
1973 - 1977

General Motors
Assemblyman
1970 - 1973

DuPont Company
Machine Operator
1969

U.S. Army
1966 - 1968


As to Objections:

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: October 17, 2007          Attorneys for Plaintiff


41

**A000101**

**DECLARATION OF SERGEANT WILBUR F. JUSTICE UNDER 28 U.S.C. § 1746**

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Amended Answers to Defendant's Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_____
**WILBUR F. JUSTICE**

_16 OcT  07_____
Date

42

## CERTIFICATE OF SERVICE

The undersigned certifies that on the date indicated, he caused the attached document to be electronically served on the following:

Thomas S. Neuberger, Esquire
Stephen J. Neuberger, Esquire
Thomas S. Neuberger, P.A.
2 E. Seventh St., Suite 302
Wilmington, DE 19801
TSN@Neubergerlaw.com
SJN@Neubergerlaw.com

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


   /s/ Marc P. Niedzielski
Marc P. Niedzielski, I.D. #2616
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED:  February 26, 2008