IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SERGEANT WILBUR F. JUSTICE, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | C.A.No. 06-497-SLR |
| | : | |
| STANLEY W. TAYLOR, JR., in his official | : | |
| capacity as the Commissioner of Correction; | : | |
| ALAN MACHTINGER, individually and in his | : | |
| official capacity as the Director of Human | : | |
| Resources of the Department of Correction; and | : | |
| DEPARTMENT OF CORRECTION OF THE | : | |
| STATE OF DELAWARE, | : | |
| | : | |
| **Defendants.** | : | |

PLAINTIFF'S SHORT AND CONCISE STATEMENT IN
SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

This is a First Amendment retaliation case where a Union Vice-President was denied a

fair opportunity to compete for promotion in retaliation for aggressive Union activity.  In accord

with the Court's Order dated February 4, 2008, (D.I. 48), and in support of his pending motion

for partial summary judgment, this is plaintiff's short and concise statement in numbered

paragraphs of (a) the material facts proving there is no genuine issue to be tried, and (b) the legal

issues upon which judgment is sought.

<u>FACTS</u>

A.    **Plaintiff Sgt. Wilbur Justice.**

1.  Plaintiff was a Sergeant and 22 year veteran employee of the Department of

Correction ("DOC"), prior to his retirement on February 1, 2007, after the filing of this case.

(Justice Dep. 16-28).[1]

_____

[1] In accord with the Court's Order, plaintiff has not filed a supporting appendix. (<u>See</u> D.I.
48 ¶3).  Instead, plaintiff has simply cited to sworn deposition testimony (cited as "Dep."), sworn

2. Sgt. Justice has received numerous awards and commendations for his outstanding work at DOC over the last 22 years. (P442-52).[2]

3. He has been praised by his superiors for his "hard work, dedication and going above and beyond the call of duty ensuring security and safety measures are met." (P446).

4. Plaintiff also has more than 20 years of service in the Army and National Guard. (P453-63).

**B.     Plaintiff's Protected Union Association as an Active Member and Union Vice-President.**

5. In July 2004, plaintiff was a member and Vice-President of the Correctional Officers Association of Delaware ("COAD" or "Union") - the correctional officer union. (Justice Dep. 66,68; Machtinger Dep. 21).

6. His status as a Union official was well known. (Machtinger Dep. 21; Knight Decl. ¶3 (P495)).

7. Plaintiff's role as a Union Vice-President was so significant in 2004 that he was individually sued and named as a defendant in the Chancery Court lawsuit filed against the Union and its officers by the State of Delaware. (Machtinger Test. 170; Taylor Dep. Ex. 8). See State v. Correctional Officer Association of Delaware, et al., C.A.No. 626-CC (Del.Ch.).

8. As a Union Vice-President, plaintiff attended and was an active participant in contract negotiation sessions and meetings with DOC management, including defendant Machtinger. (Justice Dep. 77,84; Knight Decl. ¶3 (P495)).

---

testimony during plaintiff's Merit Employee Relations Board ("MERB") hearing (cited as "Test."), declarations, plaintiff's sworn amended interrogatory responses (cited as "Amend. Inter."), and documents produced during discovery.

[2] Plaintiff's document production will be cited as "P___" and defendants' document production will be cited as "D___."

9.  Plaintiff was also involved in labor management meetings, and also vigorously represented correctional officers in employment grievances against management. (Justice Dep. 68-69,74-75).

**C.      The Content of the Speech by the Union With Which Plaintiff Associated.**

10.  During the Summer of 2004, Union officials pushed hard for reform in several areas plaguing the DOC and correctional officers. (See Knight Decl. ¶16 (P498)).

11.  As the voice of the rank and file, Sergeants and below, COAD lobbied hard for these issues at every opportunity. (Id. ¶17 ).

12.  **Severe Understaffing.**  During this time, the DOC suffered from severe understaffing as a result of jobs cuts and problems with hiring and retaining qualified correctional officers. (Id. ¶11,18-28 (P497-99)).

13.  In order to fill these vacancies, officers were often asked to work voluntary or mandatory overtime, a process called "freezing." (Id. ¶24 (P499)).

14.  As Union officials disclosed to the media, understaffing was the number one problem facing officers. (Id. ¶26).

15.  **Understaffing Endangered the Public Safety.**  The issues of security and understaffing went hand-in-hand. (Id. ¶29 (P500)).

16.  The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers. (Id.)

17.  **Wage Increases to Attract and Retain Skilled Correctional Officers.**  Union officials advocated for wage changes such as a career ladder and longevity pay which would result in better working conditions for correctional officers which in turn would help to keep officers on the job. (Id. ¶53 (P504-05)).

18.  **Frequent Security Lapses.**   Approximately nine months prior to the violent rape of a DOC counselor, Union official David Knight prophetically addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape within DOC. (Id. ¶54 (P505)).

19.  Having one officer multi-task and perform a job designed for several officers inevitably led to security breakdowns. (Id. ¶56-57 (P505)).

20.  **The Job Action and Strike.**   In late July of 2004, correctional officers engaged in a job action where they refused to work voluntary overtime in an effort to protest low pay and other issues. (Id. ¶60 (P506); see P141).

21.  The job action was intended to demonstrate to the Governor and Legislature over "20 years worth of problems." (Id. ¶66 (P506); see P142).

22.  This job action had a severe impact on the court and transportation unit because that unit depended upon officers working voluntary overtime due to the critically low staffing levels. (Id. ¶¶69-72 (P506-07); Machtinger Dep. 37-38,45-46; Taylor Dep. 24-26).

23.  **Suggested Solutions to These Problems.**   During legislative meetings and negotiating sessions, solutions to these many problems were presented by Union officials. (Knight Decl. ¶80 (P508)).

**D.       The Form and Context of Plaintiff's Union Association**

24.  **Union Contract Negotiations with DOC.**   During the Summer of 2004, COAD was involved in protracted, divisive and confrontational contract negotiations with DOC.  (Knight Decl. ¶¶4-7 (P496); Justice Dep. 77-88; Machtinger Dep. 19-22).

25.  Plaintiff attended every one of these adversarial contract negotiation sessions, as did defendant Machtinger. (Justice Dep. 77,84; Machtinger Dep. 22: Knight Decl. ¶¶3,8 (P495-96);

see Machtinger Dep. 68).

26.  **Union Speech to the Media and the Public.**  In the Spring and Summer of 2004, in an effort to publicly pressure DOC management and elected State officials to enact workplace reform, Union officials began successfully speaking to the media about dire health and safety issues, severe understaffing, low wages, the lack of longevity pay or a career ladder, the inability of DOC to retain correctional officers after ten years of service, and lapses in security, among other issues. (Knight Decl. ¶¶9,11 (P496-97)).

27.  This resulted in a flood of newspaper articles and media attention. (P1-441).

28.  As defendant Machtinger stated, "if union officials had the opportunity, they would make comments that relate to pay and compensation and staffing." (Machtinger Dep. 30-31).

29.  **Union Speech and Petitions to Elected Officials.**  Union officials also spoke directly with elected officials during the summer of 2004 and even made pointed speeches before the Joint Finance Committee. (Id. ¶¶14-15 (P497-98)).

E.        **The Overall Context of Plaintiff's Union Association.**

30.  On August 5, 2004, DOC actually filed a lawsuit against plaintiff, COAD and other Union officials in Chancery Court because of their union activities, including their support for a devastating work stoppage by prison guards protesting dangerous working conditions in Delaware prisons. (Machtinger Test. 170; Taylor Dep. Ex. 8). See State v. Correctional Officer Association of Delaware, et al., C.A.No. 626-CC (Del.Ch.).

31. Additionally, during the Summer of 2004, all this union activity occurred in a setting of: (1) the rape of a female DOC employee; (2) escapes; (3) security breakdowns; (4) a highly critical public report by a security expert; and (5) a race for the reelection of the Governor.

32.  COAD publically opposed the re-election of the incumbent Governor and actively

worked to defeat her. (Knight Decl. ¶¶97-98 (P510)).

33.  Many times during this time period, The News Journal and Delaware State News ran several stories in one day. (See e.g. P203,208; P220,226,230; P235-239).

34.  Additionally, the Union was responsible for the posting of several billboards highly critical of the DOC, the State and the Governor, throughout the State. (Knight Decl. ¶¶12-13 (P497)).

**F.      The Scope of Plaintiff's Job Duties.**

35.  Plaintiff's job duties as a correctional officer did not require him to: (1) associate with COAD; (2) hold the position of Vice-President of COAD; or (3) engage in contract negotiations against DOC or other similar union activities.

36.  Rather, as indicated in his evaluation for the time period of 2004 through 2005, as a Vacation Holiday Relief ("VHR") Sergeant, plaintiff's job duties included being knowledgeable in all security procedures, program functions, and acting as shift commander. (D153; see also D152-161).  Additionally, plaintiff was often responsible for on the job training of new employees at Morris Correctional Facility. (D153).

37.  There is no evidence that plaintiff's job duties as a VHR Sergeant required him to serve as a Union Vice-President and engage in related union activities.

**G.      Plaintiff Applied for a Promotion In the Midst of This Union Association, Activity and Speech.**

38.  **The Promotion at Issue.**  In the midst of this public firestorm, around July 7, 2004, a job opening was posted for the position of community work program coordinator at Morris Correctional Facility. (Justice Dep. Ex.2 (D571)).

39.  Plaintiff applied for the position in a timely manner on July 15, 2004. (Justice Dep.

45).

40.  Plaintiff submitted his application to Human Resources and was given a receipted copy of his application. (Justice Dep. 45-47).

41.  **Defendant Machtinger Knew of Plaintiff's Application.**  Machtinger admits that it is possible his staff informed him that plaintiff had applied for the promotion. (Machtinger Test. 178).

42.  Machtinger clearly was subsequently informed about the fiasco involving losing plaintiff's application. (see Klebart Test. 119-120; Machtinger Dep. 55-56).

43.  **Defendant Machtinger Also Was Intimately Involved in All Promotions.**

44.  Machtinger is the director of Human Resources for the DOC and is involved in all aspects of his office including promotions and grievances, even when on vacation. (Machtinger Dep. 6-7; Machtinger Test. 171,173; Justice Dep. 94).

45.  It is common knowledge that Machtinger is aware of when positions are posted and who is being hired. (Klebart Test. 119-20).

46.  Anyone in the office, including Machtinger, had access to applicant files. (Klebart Test. 110).

H.     **Defendants' Retaliation Against Plaintiff.**

(1)     **Defendants Lose His Application.**

47.  On Friday, August 13th, 2004, plaintiff went to the HR office to check on the status of his application. (Klebart Test. 96-98; Amend. Inter. #1.G.1).

48.  There a Human Resources employee informed plaintiff that his application had been mysteriously lost.  (Klebart Test. 100-01,107,98).

(2)     **Defendants Then Falsely Assure Plaintiff That the Certification List**

7

**Required for Interviews to be Conducted Had Not Yet Even Been Prepared.**

49.  Despite the alleged loss of his application, the same HR employee assured plaintiff that there was no need to worry that his application had been lost because the required certification list had not yet even been completed.[3]  (Klebart Test. 98-99).

50.  Plaintiff was further assured that when the certification list was completed, he would be notified and then scheduled for an interview. (See Klebart Test. 98-99).

51.  Despite these false assertions, however, the certification list had been prepared more than three weeks earlier, on July 22, 2004, by the same DOC employee. (P472).

52.  Quite tellingly, plaintiff's name was not included on the list. (Klebart Test. 146-47,152).

**(3)    Defendants Next Falsely Claim That No Interviews Had Been Scheduled.**

53.  Additionally, when plaintiff inquired as to the status of his application on August 13th, the same HR employee checked the computer database and falsely assured plaintiff that despite having lost his application, their computer system and register still had him listed as one of the applicants for the position.  (Klebart Test. 100,105,125-26).

54.  Plaintiff also was incorrectly told that the interviews for the position had not yet been scheduled. (Klebart Test. 98-99).

55.  Nevertheless, despite the false reassurances from HR on August 13th, just three days earlier, on August 10th, the five other applicants had already been notified and scheduled for interviews for the following Monday, August 16th. (P472; Klebart Test. 139,110-11).

_____

[3] A certification list is a list of individuals who meet the minimum qualifications for the position. (Klebart Test. 98-99).

56. Plaintiff's name was not on the interview list and he was not notified of any pending interviews. (P472; Amend. Inter. #1.G.2.a.).

57. Having been reassured that no certification list had been prepared and no interviews were scheduled, plaintiff went on a family vacation. (Amend. Inter. #1.G.4).

58. However, on Monday, August 16th, plaintiff learned that interviews had been surreptitiously scheduled for that same morning so he abruptly returned from vacation. (Amend. Inter. #1.H.1.).

59. Upon his return, plaintiff went directly to HR and confronted the same employee from the previous Friday and asked why he had not been notified of the scheduled interviews. (Klebart Test. 96-97,101-03,141; Amend. Inter. #1.H.1.).

60. This employee could not give plaintiff a clear answer. (Klebart Test. 105-106).

61. That Monday morning, plaintiff brought with him a dated, stamped copy of his original application that had been filed on July 15th to prove he had properly applied, to replace his original application which allegedly had mysteriously disappeared. (Klebart Test. 107,117,142; Amend. Inter #1.H.3).

62. At the very same time, HR found his phantom original application which had somehow vanished but then miraculously reappeared. (Klebart Test. 114-18,123-24).

63. After presenting the HR employee with a copy of his application, this employee reviewed his application to ensure he met the minimum qualifications. (Klebart Test. 117,123,133).

64. Plaintiff's name then was added to the certification list and he was scheduled for a "last minute" interview that same day. (Klebart Test. 112; Raymond Test. 49; Amend. Inter. #1.I).

**(4)    Defendants Refused to Reschedule Plaintiff's Last Minute Interview.**

65.  Defendants did not suggest postponing the interviews for this position. (See Klebart Test. 113-14).

66.  Likewise, defendants did not seek to postpone only plaintiff's interview given that their mistake caused his last minute interview. (Klebart Test. 113).

67.  No one from the DOC even suggested to plaintiff that he could postpone the last minute interview so he could have a chance to prepare to put his best foot forward with the interviewers. (Amend. Inter. #1.I.1.; Klebart Test. 113).

68.  Based on plaintiff's experience in the DOC as an employee and as a Union representative, the DOC never postponed interviews for candidates so he did not think he could request a postponement. (Amend. Inter. #1.I.3.).

69.  It was unheard of that a candidate could request to have the interviews postponed. (Id.).

70.  Rather, DOC's past practice was that if you did not make the interview as scheduled, you simply were not considered as a candidate. (Id.).

**(5)    Plaintiff is Denied Promotion to Community Work Program Coordinator.**

71.  Despite having no opportunity to prepare for his last minute interview, plaintiff still managed to finish second in the process. (Raymond Test. 20-21; Records Test. 57).

72.  A Mr. Fuller was ranked first and he was awarded the promotion. (Fuller Dep. 10,17-18; Raymond Test. 20-21; Bianco Test. 229).

**a.    Plaintiff was More Qualified Than the Comparator.**

73.  Plaintiff was qualified for the Community Work Program Coordinator through his

experience, stellar job performance, commendations, awards and years of service for DOC.

74.  While the comparator, Hansel Fuller, had a mere seven years of experience at the

DOC, plaintiff had served an impressive 22 years.  (Fuller Dep. 10; Justice Dep. 16; Raymond

Test. 31-32; Records Test. 64).

75.  Additionally, unlike plaintiff, Fuller never received any awards or commendations

for any of his work there. (Fuller Test. 189-90,196-97).

76.  Conversely, plaintiff had received numerous awards and commendations. (P442-52;

Machtinger Test. 212-13; Bianco Test. 225).

77.  Further, during his interview and on his application, Fuller discussed and stressed his

military background including 20 years in the Air Force which the interview committee

considered to be a positive factor. (Raymond Test. 21-22,29-30,34).

78.  But plaintiff had over 20 years in the Army and National Guard where he was

repeatedly praised for his "outstanding" service. (Justice Dep. 5-10; P453-63).

79.  It turns out that Fuller spent twelve of his 20 years in the Air Force performing in the

military band. (Fuller Dep. 6-7).

          **b.**        **Defendants Placed Plaintiff at a Severe Disadvantage with the
Last Minute Interview.**

80.  The last minute nature of the interview put plaintiff at a severe disadvantage with the

other applicants who had approximately six days to prepare for their interviews.  (P472; Klebart

Test. 139,110-11).

81. For example, the interviewees were responsible for bringing documentation with

them to the interview to use and some took advantage of the opportunity.  (Raymond Test. 44-45;

Machtinger Test. 212-13).

82. But because of the last minute addition, plaintiff did not have time to bring his personnel file, awards and commendations, or any of his military records for the Committee to consider when making their decision. (Raymond Test. 21-28; Records Test. 57-58,68,77-78; Amend. Inter. #1.I.4.).

83. The Committee admitted that if Sgt. Justice had brought these types of documents to the interview with him, they would have been reviewed and considered. (Raymond Test. 26-29; Records Test. 57-58; Machtinger Test. 213-14).

84. Additionally, due to the last minute nature of the interview, plaintiff was unable to take the time to mentally prepare for the interview.

85. For example, Mr. Fuller, the winning applicant, took the entire day off of work so his "mind would be just on what [he] was going to do," meaning the interview. (Fuller Dep,. 15).

86. In fact, Mr. Fuller was even afforded the opportunity to chose his interview date. (Id. at 14).

87. Quite tellingly, the "principal distinguishing feature that distinguished Mr. Fuller from Mr. Justice" during the last minute interview was his on his feet performance and his ability to clearly and concisely answer questions. (Records Test. 83-84; see Raymond Test. 52-53).

88. Had plaintiff not been required to rush home from vacation and instead had he been given time to prepare, he would not have been so hurried, frantic and out-of-sorts. (Amend. Inter. #1.I).

89. Additionally, plaintiff's presentation  was frustrated by not being given any time to prepare and gather himself together. (Id.).

          c.       **The Comparator was Never a Union Member or Official.**

90. Notably, Fuller has never been sued by DOC for his union activities, been a member

of COAD,  held a leadership position in a union or helped negotiate a union contract.  (Fuller

Test. 193-94; A193-94).

### (6)    DOC Doctored and Tampered With Plaintiff's Original Application.

91.  As noted above, in August of 2004, HR found plaintiff's phantom original

application which had somehow vanished but then miraculously reappeared. (Klebart Test. 100-

01,107,98).

92.  However, in comparing plaintiff's copy of his originally submitted application

(P464-67) and the copy the DOC submitted to MERB (P468-471), it is clear that plaintiff's

original application was tampered with while in the possession of DOC.

93.  DOC has never been able to explain this document tampering.

94.  Further, during discovery defendants produced yet another copy of plaintiff's

application that does not match either of the two copies discussed above. (See D1772-75).

95.  The belated defense claim that this third variation on plaintiff's application proves

that he was not qualified for the contested position contradicts the sworn testimony of their

employee Klebart who testified that plaintiff met the minimum qualifications in August 2004.

(Klebart Test. 117,123,133; see also Machtinger Test. 212).

### LEGAL ISSUES

(1).  Plaintiff seeks a court ruling that as a matter of law he engaged in First Amendment

protected activity under the association and speech clauses by way of: (1) his association with

and membership in COAD; (2) his serving as Vice-President of COAD; (3) his serving on the

contract negotiations team against the DOC, and his other union activities.

(2).  Plaintiff also seeks a court ruling that as a matter of law the sum total of defendants'

actions which resulted in denying him a fair opportunity to compete for promotion would chill a

person of ordinary firmness from engaging in protected First Amendment activity.

The question of whether there is a causal connection between such protected activity and the adverse action of the loss of this promotion opportunity will be a fact question left for the jury to decide.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

 /s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: February 26, 2008          Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

February 26, 2008, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Stephani Ballard, Esq.
Marc Niedelski, Esq.
Department of Justice
820 N. French Street, 8th Floor
Wilmington, DE 19801


        /s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ.**

Justice \ Briefs \ SJOB \ SJOB - final